## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**SARA AVIEL,** in her personal capacity and in her official capacity as President of the Inter-American Foundation, 1331 Pennsylvania Avenue, Washington, DC 20004,

        Plaintiff,

**v.**

**SERGIO GOR,** in his official capacity as Director of the White House Presidential Personnel Office, 1600 Pennsylvania Avenue NW, Washington, DC 20500,

**PETE MAROCCO,** in his official capacity as Acting Deputy Administrator for Policy and Planning and for Management and Resources for USAID and Director of Foreign Assistance at the Department of State and in his purported official capacity as Chairman of the Board of the Inter-American Foundation and President of the Inter-American Foundation, 1300 Pennsylvania Ave. NW, Washington, DC 20004,

**U.S. DOGE SERVICE,** 736 Jackson Place, N.W., Washington, DC 20503,

**U.S. DOGE SERVICE TEMPORARY ORGANIZATION,** 736 Jackson Place, N.W., Washington, DC 20503,

**AMY GLEASON,** in her official capacity as the Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization, 736 Jackson Place, N.W., Washington, D.C. 20503,

**STEPHEN EHIKIAN,** in his official capacity as Acting Administrator of the U.S. General Services Administration, 1800 F

Civil Case No. _____

**COMPLAINT**

Street, NW, Washington, DC 20405,

**SCOTT BESSENT,** in his official capacity as the Secretary of the Treasury, 1500 Pennsylvania Avenue NW, Washington DC 20220, and

**DONALD J. TRUMP,** in his official capacity as President of the United States of America, 1600 Pennsylvania Avenue NW Washington, DC 20500,

      Defendants.

## INTRODUCTION

1.     Defendants are laying waste to a half-century-old independent agency created by Congress to support the United States' strategic interests in Lain America and the Caribbean. In the past three weeks, the Government has unlawfully purported to remove the President and CEO of the Inter-American Foundation (IAF) ("Plaintiff" or "Ms. Aviel") and unlawfully appointed a new Board member, without advice and consent of the Senate, who claims to be the entire Board by himself. This ostensible one-man Board has in turn, and without authority, appointed himself President and CEO of the IAF. Then the so-called President terminated the IAF's staff, cut off its grants, and even ordered the return of already-disbursed and obligated funds from grantees. Many, if not all, IAF employees have been notified they will be terminated effective April 4, 2025. All of this was done in contravention of the clear law that dictates that Plaintiff, the true President and CEO of the IAF and an inferior officer under the Constitution, can *only* be removed by the Board itself, and that new Board members (excepting Recess Appointments) *must* be made with the advice and consent of the Senate. If this Court does not take action, what remains of the IAF—created by an Act of Congress and sustained for the past fifty-six years—will soon be destroyed. This wholesale gutting of the IAF by the Government flies in the face of the law, and it can only

be accomplished through the unlawful termination of Plaintiff, the IAF's President & CEO, and the *ultra vires* acts of a pretender-Board. This Court must take action to return Plaintiff, the lawful President and CEO of the IAF, to her rightful position so she can run the agency as set forth by law.

2.      The Inter-American Foundation owns an illustrious history. Over fifty years ago, at a time of fraught intentional relations, a bipartisan group of visionaries in the U.S. Congress founded the IAF to address their concern that the U.S. government needed to do better at directing its foreign development aid to the most vulnerable and underserved people.[1] Congress formed the IAF's precursor in 1969, creating the agency as an alternative to large foreign assistance programs, such as the U.S. Agency for International Development, by developing the agency with a unique mission in mind: it charged the IAF with providing smaller amounts to local, community-led organizations that worked directly on grassroots projects in Latin America.

3.      Since that time, the Inter-American Foundation has transformed into an effective independent U.S. government agency while maintaining its nimble nature. It has funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country, including important efforts to support faith leaders in combatting child abuse, trafficking, and violence; integrate migrants fleeing oppressive regimes in Nicaragua and Venezuela who are settling in neighboring Latin American countries; address hunger, poverty, and violence in Haiti; create livelihood opportunities for youth to stay in their communities throughout Central America; and monitor illegal mining, logging, and drug trafficking in remote areas of the Amazon. For over five decades, regardless of party or politics, the IAF has served America's interest in the region.

---

[1] Inter-American Foundation, *Frequently Asked Questions (FAQ)* (last accessed Jan. 9, 2025 via archive), https://web.archive.org/web/20250120231025/https://www.iaf.gov/faq/. (The IAF's website is no longer operative.)

4.    To ensure the agency's effectiveness, Congress vested in the IAF Board of directors (the "Board") the authority to exercise "all the powers of the Foundation." 22 U.S.C. § 290f(i). That Board, in turn, has sole authority to appoint the President of the IAF on such terms as the Board may determine. 22 U.S.C. § 290f(*l*)(1). With these statutory requirements, Congress created an agency structure that both serves and represents independence and insulation from partisan politics.

5.    Congress also mandated that the IAF "shall have perpetual succession unless sooner dissolved by an Act of Congress." 22 U.S.C. § 290f(e)(1). Yet despite the clear statutory directive, Defendants have been in pursuit of an unrelenting, unlawful plan to shutter the agency.

6.    In the last few weeks, Defendants have descended upon the IAF offices numerous times attempting to seize control of the IAF and its systems. On one of these occasions, Defendant Peter Marocco visited the IAF office with the intent to call an "emergency meeting." When he and Department of Government Efficiency ("DOGE") staff found no one there, Marocco purported to hold a closed-door meeting of the Board—consisting of just himself, DOGE representatives, and the empty IAF lobby—where he immediately installed himself as Chair of the Board of the IAF and acting President and CEO.

7.    Marocco did not, and does not, have statutory authority to hold any of those positions. He is not Chair of the Board—or a member of the Board for that matter—because President Trump did not follow the required process for appointing Marocco with advice and consent of the Senate. And he is not President or CEO because he was not named by the Board to the position. Rather, the position of President continues to belong to Plaintiff, an individual who has dedicated her career to international development, and is not a political appointee. Under the law, the removal of Plaintiff from her position without the approval of the Board is illegal.

8.     Rather than adhere to the proper process established by Congress, the present administration informed Plaintiff on February 26, 2025, that she no longer held her position.

9.     Prior to this unlawful notice of termination, Plaintiff sought to implement the policy priorities of DOGE and the new Trump Administration where permissible by law. Plaintiff only refused to comply with orders she had concerns were unlawful. Defendants' actions in proceeding with the purported termination thus make their intentions clear: ignore statutory structures and safeguards, and shutter the IAF.

10.     Indeed, the same night that Marocco appointed himself President of the IAF, Marocco went to work immediately, directing the Treasury to cancel all but a handful of the IAF's contracts. Subsequently, while purporting to act as both President and sole Board member, Marocco has directed DOGE to cancel all but one of the IAF's grants, shut employees out of the IT systems, laid off almost the entire IAF staff, and shut down the IAF's website.

11.     Without this Court's immediate intervention, Defendants will continue their tactics to fully dismantle the IAF, including by winding down all grants, formally terminating the federal service of IAF employees by April 4 of this year, and demanding the return of unspent (but already allocated) funds from partner organizations by March 19. To protect the vital interests served by the IAF, this court should enjoin the unlawful removal of Sara Aviel as President and CEO of the IAF.

## JURISDICTION AND VENUE

12.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff alleges violations of the United States Constitution, the Federal Vacancies Reform Act, 5 U.S.C. § 3345 et seq., the Inter-American Foundation Act, 22 U.S.C. § 290f, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

13.     Venue is proper under 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claim occurred in this district, and Defendants include an agency and official of the United States.

14.     This Court has the authority to grant the relief requested by Plaintiff under Rules 57 and 65 of the Federal Rules of Civil Procedure, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, under the Mandamus Act, 28 U.S.C. § 1361, and under the Court's inherent equitable authority.

## PARTIES

15.     Plaintiff Sara Aviel serves as the lawful President and CEO of the Inter-American Foundation (IAF). In March 2022, she was appointed to lead the IAF by the Board of the IAF. Prior to becoming the President of the IAF, Aviel was a Senior Advisor at the Center for Strategic and International Studies, a bipartisan, non-profit research institution, and was the Founder and Principal of Margalit Strategies. She previously served various roles in the Department of the Treasury, the National Security Council, the World Bank Group, and the Office of Management and Budget, and for international development organizations including Root Capital, Mercy Corps and CARE.

16.     Defendant Sergio Gor is the Director of the White House Presidential Personnel Office.

17.     Defendant Pete Marocco is the Acting Deputy Administrator for Policy and Planning and for Management and Resources for USAID and Director of Foreign Assistance at the Department of State. He also purports to be the Chair of the Board of the IAF and the President and CEO of the IAF, but his purported appointments to those positions were *ultra vires*. In truth, he holds no position at the IAF.

18.     Defendant U.S. DOGE Service is an entity that was created within the Executive Office of the President by Executive Order 14158.

19.     Defendant U.S. DOGE Service Temporary Organization is an entity that was created within the Executive Office of the President by Executive Order 14158.

20.     Defendant Amy Gleason is the Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

21.     Defendant Stephen Ehikian is the Acting Administrator of the U.S. General Services Administration.

22.     Defendant Scott Bessent is the Secretary of the Treasury.

23.     Defendant Donald J. Trump is the President of the United States.

## LEGAL BACKGROUND

### A.     The Appointments Clause

24.     The Appointments Clause of the United States Constitution provides that "[the President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., art. II, § 2, cl. 2.

25.     In other words, "[o]nly the President, with the advice and consent of the Senate, can appoint . . . 'principal' officers." *United States v. Arthrex, Inc.,* 594 U.S. 1, 12 (2021).

26.     But "the Appointments Clause permits Congress to dispense with joint appointment . . . for inferior officers. Congress may vest the appointment of such officers 'in the

President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* at 12–13 (citation omitted).

**B.    The Inter-American Foundation Act**

27.    In 1969, Congress established the Inter-American Foundation as a "body corporate." 22 U.S.C. § 290f(a).

28.    Congress declared that the IAF was created in furtherance of the "freedom, security, and economic development in the Western Hemisphere." 22 U.S.C. § 290f(b). To that end, the IAF's statutory purposes include "provid[ing] support for developmental activities designed to achieve conditions in the Western Hemisphere" and "strengthen[ing] the bonds of friendship and understanding among the peoples of this hemisphere," among other purposes. *Id.*

29.    Congress directed the IAF to carry out its mission "primarily through and with private organizations, individuals, and international organizations by undertaking or sponsoring appropriate research and by planning, initiating, assisting, financing, administering, and executing programs and projects designed to promote the achievement of such purposes." 22 U.S.C. § 290f(c).

30.    To fulfill these statutory purposes, Congress authorized the IAF to "make advances, grants, and loans to any individual, corporation, or other body of persons, whether within or without the United States of America, or to any government or governmental agency, domestic or foreign, when deemed advisable by the Foundation in furtherance of its purposes." 22 U.S.C. § 290f(e)(9).

31.    Congress specified that the IAF, "as a corporation," "shall have perpetual succession unless sooner dissolved by an Act of Congress." 22 U.S.C. § 290f(e)(1).

32.     The management of the IAF is vested in a bipartisan board of directors, composed of nine members appointed by the President, by and with the advice and consent of the Senate. 22 U.S.C. § 290f(g). No more than five board members may belong to any one political party. *Id.* All members of the Board "shall possess an understanding of and sensitivity to community level development processes." *Id.*

33.     New members of the Board are appointed to terms of six years by default. *Id.* "[U]pon the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified." *Id.*

34.     "The Board shall direct the exercise of all the powers of the Foundation." 22 U.S.C. § 290f(i). As such, the Board "may prescribe, amend, and repeal bylaws, rules, and regulations governing the manner in which the business of the Foundation may be conducted and in which the powers granted to it by law may be exercised and enjoyed." 22 U.S.C. § 290f(j). "A majority of the Board shall be required as a quorum." *Id.*

35.     The Board of the IAF manages the entity through the appointment of a President who serves as the IAF's Chief Executive Officer. 22 U.S.C. § 290f(*l*)(1).

36.     The Board determines the terms of the President's appointment. *Id.*

37.     In March 2022, Sara Aviel was lawfully appointed by the Board of the IAF to be the President and Chief Executive Officer of the agency, effective April 24, 2022.

## FACTUAL BACKGROUND

### A.     The IAF's Contributions to Western Hemisphere Relations

38.     The IAF is a "nimble and transformative U.S. government agency" that invests in community-led development across Latin America and the Caribbean.[2] The IAF directly engages

---

[2] Inter-American Foundation, *Who We Are* (last accessed Feb. 6, 2025 via archive), http://web.archive.org/web/20250206120850/https://iaf.gov/.

with community leaders, innovators, and entrepreneurs working to promote prosperity, peace, and democracy in the region. Since 1972, the IAF has funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country.

39.     In 1969, the United States Congress established the Inter-American Social Development Institute (ISDI) as "a body corporate." Pub. L. 91-175, 83 Stat. 805, 821-24 (Dec. 30, 1969). In 1971, the ISDI changed its name to the Inter-American Foundation.

40.     The lean, flexible model the IAF has honed since its creation in 1969 has enabled the agency to propel responsive development designed and led by target communities for lasting impact. This model has allowed the IAF to quickly shift resources toward emerging areas of U.S. interests, including providing viable alternatives to migration and responding to the proliferation of organized crime.

41.     Until a few weeks ago, the IAF had over 400 active grantees. These local organizations are working to stabilize communities affected by transnational crime, foster sustainable economic prosperity, provide alternatives to migration, and increase communities' goodwill towards the United States in the face of increasing pressures from actors like the People's Republic of China.

42.     The IAF serves the United States' strategic interests throughout Latin America and the Caribbean in a cost-effective manner. Over 70% of IAF grantees independently and anonymously surveyed reported that their opinion of the United States had improved as a result of their work with the IAF.[3]  For every dollar the IAF invested in fiscal year 2024, grantees committed $1.36 in co-investment. Philanthropic and corporate partners have recognized the effectiveness of the IAF's approach by channeling their own resources through the IAF—private investment that

---

[3] Inter-American Foundation, *supra* note 2.

is now in the process of being returned to their donors rather than being used to advance American strategic interests in the region.

43.     Congress has appropriated to the IAF, "[f]or necessary expenses to carry out the Inter-American Foundation," $47 million to remain available until September 30, 2025. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, Div. F. tit. III, 138 Stat. 460, 746 (Mar. 23, 2024). Congress directed that the IAF may not use appropriated funds "to implement a reorganization, redesign, or other plan" to "expand, eliminate, consolidate, or downsize" the agency without first consulting with Congressional appropriations committees, and providing the committees with a detailed justification for any such plan. *Id.*, Div. F., § 7063(a), 138 Stat. 460, 843–44.

44.     The IAF has long had bipartisan support and remains accounted for in recent Congressional appropriation bills. The House Bill Report for the most recent State, Foreign Operations, and Related Programs Appropriations Bill states, "[t]he Committee recognizes the strong track record of the Inter-America Foundation (IAF) in achieving cost-share from new grantees that is greater, on average by 20 percent, than IAF's initial support for new projects. The Committee encourages USAID to learn best practices from IAF in this regard . . . ."[4] Similarly, a Senate resolution in 2019 "commending the Inter-American Foundation on the occasion of its 50th Anniversary for its significant accomplishments and contributions to the economic and social development of the Americas" was co-sponsored by Senators Rubio, Cruz, Kaine, and Cardin.[5]

---

[4] Available at https://docs.house.gov/meetings/AP/AP00/20240612/117434/HMKP-118-AP00-20240612-SD002.pdf.

[5] Available at https://www.congress.gov/bill/116th-congress/senate-resolution/297/cosponsors.

**B.    President Trump's Executive Orders**

45.    On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy."

46.    The stated purpose of the executive order is to "dramatically reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary."

47.    The executive order lists federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."

48.    The executive order lists the IAF as one of the targeted entities.

49.    Under the executive order, "the head of each unnecessary governmental entity" identified in the order had 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent."

50.    In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order."

51.    The executive order "shall [not] be construed to impair or otherwise effect," among other things, "the authority granted by law to an executive department, agency, or the head thereof"

and "shall be implemented consistent with applicable law and subject to the availability of appropriations."

52.    On January 20, 2025, President Trump signed Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" which reorganized and renamed the United States Digital Service as the United States DOGE Service, to be "established in the Executive Office of the President."

53.    Executive Order 14158 established the role of U.S. DOGE Service Administrator within the Executive Office of the President, reporting to the White House Chief of Staff.

54.    The Executive Order further established a temporary organization within the U.S. DOGE Service, "the U.S. DOGE Service Temporary Organization." The U.S DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing the "President's 18-month DOGE agenda."

C.    **DOGE's Attempts to Shut Down the IAF**

55.    On February 19, 2025, representatives of the IAF were informed that representatives from DOGE had requested a meeting for the following day. Ms. Aviel and other IAF representatives prepared for the meeting on short notice by assembling discussion points showing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the Executive Orders. Ms. Aviel sought to align the agency with the President's stated policy instructions permissible by law.

56.    The next day, February 20, 2025, representatives of the U.S. DOGE Service, Nate Cavanaugh and Ethan Shaotran, met with representatives of the IAF, including Ms. Aviel. Cavanaugh and Shaotran represented to the IAF that they had been detailed to the General Services

Administration (GSA). The DOGE representatives further informed the IAF that their goal was to support IAF compliance with the President's Executive Order.

57.    During the meeting, IAF staff members sought to facilitate Cavanaugh and Shaotran's requests by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others. Additionally, Ms. Aviel attempted to share information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities.

58.    The DOGE representatives showed minimal interest in the initiatives and instead indicated that their purpose was to focus on obtaining access to the IAF's systems. Following the meeting, the DOGE representatives emailed representatives of the IAF, requesting that they sign a memorandum of understanding with the GSA that provided for Cavanaugh to be detailed from the GSA to the IAF.

59.    On February 21, 2025, representatives of the IAF, including Ms. Aviel, met again with Cavanaugh and Shaotran, as well as for the first time Jacob Altik, who stated he was a lawyer from the Executive Office of the President (EOP). Altik stated his view that the minimum statutory requirements for the IAF entailed the existence of a Board and a President, a presence in the District of Columbia, and a minimum level of grants and contracts. To that end, DOGE intended to effectuate the reduction-in-force (RIF) of most, if not all of the IAF's employees, and the termination of all but a handful of the IAF's grants and contracts.

60.    The DOGE representatives asked Ms. Aviel to contact the Board immediately to determine if the Board was in alignment on this plan, and suggested that if the Board was not so aligned, DOGE intended to terminate the Board and install individuals who were aligned with President Trump's vision.

61.     Ms. Aviel explained that matters of this consequence required a Board meeting to discuss, that it would be difficult to convene the Board immediately, and that the Board was subject to certain legal requirements before convening. The DOGE representatives indicated that they did not need to call a Board meeting, and that they just needed a quick "yes-or-no" answer from the Board on alignment. Ms. Aviel asked that the specific request be put in writing.

62.     After the meeting, Ms. Aviel heard from Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees. They also noted that the IAF's annual funding was provided to "cover only the minimum statutory requirements" and that if Ms. Aviel were to take actions to reduce staff, it "would be in contravention of the appropriations enacted into law." Ms. Aviel shared this information with the IAF Board.

63.     From February 21, through the weekend, and on Monday, February 24, Ms. Aviel spoke with each member of the IAF Board multiple times to analyze all options and identify the best and most lawful path forward. Ms. Aviel also heard from multiple congressional stakeholders and legal experts that they believed the DOGE plan was unlawful and contrary to congressional intent.

64.     On February 24, 2025, Altik contacted one of the members of the Board of the IAF, notifying him that the other Board members had purportedly been terminated.

65.     Also on February 24, 2025, Ms. Aviel spoke on the telephone with Cavanaugh and Altik. In this call, the DOGE representatives claimed that with one exception, all members of the Board had been terminated. Ms. Aviel expressed surprise at this news, given that she had been in

recent touch with each Board member. The DOGE representatives asked Ms. Aviel to confirm that she would implement DOGE's agenda in the absence of a Board, and they threatened that the President would terminate her if she declined to do so. Ms. Aviel responded that she could not further respond to DOGE's requests without more specificity as to those requests in writing and the opportunity to determine whether they were legal. She further stated that she was committed to always doing what was lawful, and to follow all of her legal obligations and responsibilities. The DOGE representatives again asked Ms. Aviel to sign a MOU agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems. Ms. Aviel declined, stating that she did not believe she had the authority to do so given her understanding that her Board still remained.

66.    After the call, Ms. Aviel confirmed that no Board member had yet received a termination letter from the President, or anyone else.

67.    The next day, February 25, 2025, DOGE representatives contacted the Senior Procurement Executive (SPE) at the Department of Treasury, directing the SPE to close all IAF contracts by the close of business on February 27, 2025. The SPE relayed this request to the U.S. Treasury's Administrative Resource Center (ARC)—which is housed at the Treasury Department's Bureau of the Fiscal Service and manages the IAF's procurement and finance functions—asking the ARC to cancel all IAF contracts. Such contracts also included those for contracted field staff, who serve as the agency's local liaisons and monitoring and evaluation specialists abroad.

68.    A representative from the IAF contacted the ARC to discuss the contracts. Employees of the ARC expressed concerns about the legality of the request and decided to hold off on taking any action.

**D.    DOGE's Attempts to Fire Ms. Aviel and Gut the IAF**

69.    On the evening of Wednesday, February 26, 2025, Ms. Aviel received an email from Trent Morse of the Presidential Personnel Office informing her that President Trump had exercised a purported authority to terminate her from her position as President and CEO of the IAF, effective immediately. This purported termination was *ultra vires*.

70.    On the afternoon of February 28, 2025, the IAF's Chief Operating Officer received a communication from Morse stating that President Trump had exercised a purported authority to appoint Pete Marocco as the acting Chair of the Board of the IAF. The communication represented that there were no other remaining members of the Board of the IAF. But that cannot be; even if the Board had been terminated, the IAF organic statute provides that "upon the expiration of his term of office a member *shall* continue to serve until his successor is appointed and shall have qualified." 22 U.S.C. § 290f(g) (emphasis added). The communication also acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members but asserted that President Trump had inherent authority under Article II to do so.

71.    Marocco subsequently visited the IAF office, seeking an "emergency board meeting." On information and belief, Marocco determined that because no one was there to let him, he was permitted to hold the meeting outside the IAF office. Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member in attendance. He voted to close the Board meeting to the public. He then voted to appoint himself as the acting President and CEO of the IAF.

72.    That same evening, the Administrative Resource Center received a directive authorized by Marocco, now representing himself to be the President of the IAF, to terminate IAF

contracts. The ARC subsequently informed an IAF representative that it would be taking action immediately to execute those terminations, as authorized by the IAF's newly-appointed "President Peter Marocco."

73.     In response to the notice from the ARC, an IAF representative proposed revisions to the termination list in an effort to preserve certain contracts. The ARC ultimately determined that most IAF contracts were to be terminated that same evening, with the exception of a handful that were flagged as critical operations, such as HR and IT.

74.     On March 2, 2025, members of the Board of the IAF wrote to Ms. Aviel, stating their intent to serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law. They communicated their view that, accordingly, the governance of the IAF remained unaltered and in place, no duly qualified members of the Board had fired Ms. Aviel, and that Ms. Aviel remained the agency's President and CEO. The Board directed Ms. Aviel to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the agency's grantees.

75.     Defendants disregarded this statement of the Board and the statutory law cited therein. On Monday, March 3, 2025, Marocco circulated a Board Resolution, naming himself as Board Chair, President, and CEO of the IAF.

76.     On the same day, the IAF Chief Operating Officer was instructed to send a communication on behalf of the U.S. DOGE Service to all IAF staff members. In the message, the COO wrote: "On Friday, 2/28/25 Sara Aviel was terminated by the White House Council's [sic] Office. Pete Marocco has been appointed as Acting Chairman, President and CEO of Inter-American Foundation to implement the President's Executive Order signed on February 19, 2025."

77.    Later the same day, Marocco and DOGE began implementing a RIF of the IAF's employees, notifying most IAF staff that they would be placed on administrative leave. Since then, IAF employees have been shut out of the IT systems. The IAF website has been taken down and is no longer operating. Although the IAF's offices remain open, there are only three employees remaining who have not been placed on administrative leave and who have access to the building.

78.    Within just 72 hours of seizing control of the IAF, Marocco and DOGE were nearly finished in their mission of terminating all IAF grants. As of the date of this filing, Marocco has terminated virtually all existing IAF grants. The exception is a single grant that only has limited funds remaining—approximately $66,000—that will soon expire. The IAF also continues to own a single equity investment in a microfinance institution.

79.    In grant termination notices that were sent beginning March 4, grantees were instructed to "send remaining unspent funds to the IAF" within fifteen days (that is, March 19) and to submit their "final programmatic and financial report no later than April 2, 2025." The IAF's grant recipients will face legal and financial challenges based on the pause and cancellation of agreements signed with the IAF.

80.    In direct response to DOGE's actions, IAF's philanthropic partners have asked that their donations be returned. The IAF's grant management system that houses the agency's key programmatic processes—including administration of grantee proposals, reports, and financing information—remains in place for now.

81.    Beginning last week, IAF staff members have received RIF notices sent on behalf of Marocco, informing the staff members of their severance as part of "workplace reshaping" at the IAF. Staff members have been informed that their official separation date will be Friday, April 4, 2025.

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF 22 U.S.C. § 290f
**(All Defendants)**

82.     Plaintiff incorporates by reference all allegations contained in paragraphs 1–81 as though fully set forth herein.

83.     Plaintiff has a clear entitlement to remain in her office as the President and CEO of the IAF. The Inter-American Foundation Act sets out in no uncertain terms that the Board appoints the President of the IAF on such terms as the Board may determine. 22 U.S.C. § 290f(*l*)(1). The Board alone retains the power to remove her from that office. The Board has not done so.

84.     Marocco's purported appointment as acting Chair of the Board of the IAF and/or as President of the IAF is *ultra vires*. The Inter-American Foundation Act requires that the Board be appointed "by and with the advice and consent of the Senate." 28 U.S.C. § 290f(g). Marocco has not been nominated by the President or confirmed by the Senate to a seat on the Board of the IAF. No provision of law authorizes the President to appoint an acting member of the Board of IAF. Moreover, the Board of the IAF has not appointed Marocco to serve as the President of the IAF.

85.     The purported termination of Plaintiff from her position as President of the IAF, by President Trump, Director Gor, or any of the remaining Defendants is unlawful. None of Defendants is lawfully a member of the Board of the IAF, and only the Board has the authority to remove Plaintiff from her position.

86.     As a result, the purported termination of Plaintiff and the purported appointment of Marocco are *ultra vires* and are clear violations of the IAF's organic statute.

## COUNT II

### VIOLATION OF THE SEPARATION OF POWERS
### (All Defendants)

87. Plaintiff incorporates by reference all allegations contained in paragraphs 1–86 as though fully set forth herein.

88. President Trump's purported removal of Plaintiff is further invalid because it violates Article II, section 2 of the U.S. Constitution. The Appointments Clause grants Congress the authority to vest the appointment of inferior officers, such as the President of the IAF, in the heads of Departments. Congress has exercised that authority to grant the Board of the IAF the exclusive authority to appoint the President of the IAF, and the Board of the IAF accordingly holds the exclusive authority to remove that officer. Moreover, the Appointments Clause requires the appointment of principal officers, such as the Board of the IAF, through the process of Presidential nomination and Senate confirmation. Although Congress has authorized limited departures from that process for certain acting officials, it has not authorized the appointment of acting members of the Board of the IAF. The purported termination of Plaintiff and the purported appointment of Marocco are in violation of the authorities vested in Congress by the Constitution and further violate the President's duty under article II to "take Care that the Laws be faithfully executed."

89. Indeed, the Inter-American Foundation Act requires that the Board be appointed "by the President, by and with the advice and consent of the Senate." 28 U.S.C. § 290f(g).

90. The Inter-American Foundation Act does not provide any process for filling vacancies with acting board members. *See id.* Instead, "upon the expiration of his upon the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified." *Id.*

91.    Under the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3341 *et seq.*, the President can appoint acting heads of agencies in specific, outlined instances. 5 U.S.C. § 3345.

92.    But the President's ability to fill vacancies does not apply to "any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that—(A) is composed of multiple members; and (B) governs an independent establishment or Government corporation." 5 U.S.C. § 3349(c).

93.    Defendants conceded that the Federal Vacancies Reform Act does not allow the President to appoint acting members to the IAF's board.

94.    Nevertheless, Defendants insisted that the President—having purported to fire the entire Board, thus purporting to create vacancies—must have inherent authority to fill the vacancies without the advice and consent of the Senate.

95.    "Insofar as Congress has made explicit statutory requirements, they must be observed." *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 296 (1945).

## COUNT III

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (All Defendants)

96.    Plaintiff incorporates by reference all allegations contained in paragraphs 1–95 as though fully set forth herein.

97.    Under the Administrative Procedure Act (APA), a reviewing court may "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

98.    The purported removal of Plaintiff without approval by the Board is arbitrary, capricious, and abuse of discretion, and not in accordance with law; is in excess of Defendants' statutory authority; and does not accord with procedure required by law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sara Aviel respectfully prays that the Court:

a.    Enter a preliminary and permanent injunction[6] ordering that Plaintiff Sara Aviel may not be removed from her office as President and CEO of the Inter-American Foundation, or in any way be treated as having been removed, denied, or obstructed in accessing any of the benefits or resources of her office, or otherwise be obstructed from her ability to carry out her duties, absent a decision by the Board of the Inter-American Foundation to remove her from that office;

b.    Enter a preliminary and permanent injunction ordering that Defendants may not appoint Peter Marocco or any other person as an acting member of the Board of the Inter-American Foundation, that Defendants may not place Pete Marocco or any other person as President of the Inter-American Foundation in Plaintiff Sara Aviel's position, or otherwise recognize any other person as President of the Inter-American Foundation, and that any actions taken or contemplated

---

[6] To the extent that the Government intends to seek a security under Rule 65(c), the Plaintiff requests that the security be waived in this case. District courts enjoy broad discretion to determine the security amount or to waive the security requirement altogether. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) ("Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all.") (*quoting DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995). There is a longstanding exception to the security requirement in public-interest cases like these. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]ublic-interest litigation [constitutes] an area in which the courts have recognized an exception to the Rule 65 security requirement."); *Natural Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) ("The purpose of the security given under Rule 65(c) is to cover the costs and damages suffered by the party wrongfully enjoined. It would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party.").

to be taken by Pete Marocco or any other improperly appointed person as an officer of the Inter-American Foundation are void *ab initio* and without effect;

c.      Declare that Plaintiff Sara Aviel lawfully remains the President of the Inter-American Foundation, and that Defendant Pete Marocco has not been lawfully appointed as an acting member of the Board of the Inter-American Foundation, as the President of the Inter-American Foundation, or as any other officer of the United States Inter-American Foundation;

d.      Award Plaintiff Sara Aviel costs of suit and attorneys' fees and expenses pursuant to any applicable law; and

e.      Grant Plaintiff Sara Aviel such other relief as is necessary and just.


Dated: March 17, 2025                    Respectfully submitted,


                              */s/ Aaron S.J. Zelinsky*
                              Aaron S.J. Zelinsky*
                              ZUCKERMAN SPAEDER LLP
                              100 East Pratt Street, Suite 2440
                              Baltimore, MD 21202
                              Tel: (410) 332-0444
                              Fax: (410) 659-0436
                              azelinsky@zuckerman.com

                              Aaron Chou (DC Bar No. 90020425)*
                              M Moore (DC Bar No. 90004368)
                              ZUCKERMAN SPAEDER LLP
                              2100 L Street NW, Suite 400
                              Washington, DC 20037
                              Tel: (202) 778-1800
                              Fax: (202) 822-8106
                              achou@zuckerman.com
                              mmoore@zuckerman.com

                              *Counsel for Plaintiff Sara Aviel*

                              *\*Pro hac vice forthcoming*