# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

        *Plaintiff,*

        –v.–                                    Case No. 25-cv-00778

SERGIO GOR, *et. al.*,

        *Defendants.*

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

   A.  THE INTER-AMERICAN FOUNDATION ................................................................ 4

   B.  FEBRUARY 19 EXECUTIVE ORDER ...................................................................... 7

   C.  DOGE'S ATTEMPTS TO SHUT DOWN THE IAF .................................................... 8

   D.  DOGE'S ATTEMPTS TO FIRE PLAINTIFF AND GUT THE IAF ............................. 12

ARGUMENT .................................................................................................................... 14

   A.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS BECAUSE HER REMOVAL WAS
   UNLAWFUL. ................................................................................................................. 15

     I.  Plaintiff Is At Most An Inferior Officer and Not Subject to Removal by the Presidential
     Personnel Office.................................................................................................... 15

     II.  Marocco Does Not Lawfully Hold a Position as a Board Member or Officer of the IAF
     ................................................................................................................................ 19

   B.  PLAINTIFF WILL SUFFER IRREPARABLE HARM WITHOUT IMMEDIATE INJUNCTIVE RELIEF.22

   C.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR IMMEDIATE INJUNCTIVE
   RELIEF. ...................................................................................................................... 27

CONCLUSION ................................................................................................................. 29

# TABLE OF AUTHORITIES

**CASES**

*Aamer v. Obama,*
　742 F.3d 1023, 1038 (D.C. Cir. 2014) ................................................................. 18

*Al Bahlul v. United States,*
　967 F.3d 858 (D.C. Cir. 2020) ........................................................................... 16

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
　968 F. Supp. 2d 38 (D.D.C. 2013) ....................................................................... 29

*Asylumworks v. Mayorkas,*
　590 F. Supp. 3d 11 (D.D.C. 2022) ....................................................................... 22

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
　928 F.3d 1102, 1112 (D.C. Cir. 2019) ................................................................. 15

*Audubon Levy Invs., LP v. E. W. Realty Ventures, LLC,*
　698 F. Supp. 2d 328 (E.D.N.Y. 2010) ................................................................. 26

*Berry v. Reagan,*
　1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) ....................................................... 24

*C.G.B. v. Wolf,*
　464 F. Supp. 3d 174 (D.D.C. 2020) ..................................................................... 28

*Chaplaincy of Full Gospel Churches v. England,*
　454 F.3d 290 (D.C. Cir. 2006) ........................................................................... 22

*Chapman v. Heath,*
　288 F. Supp. 3d 215 (D.D.C. 2018) ..................................................................... 15

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,*
　636 F.2d 1084 (5th Cir. 1981) ........................................................................... 15

*Davis v. Pension Ben. Guar. Corp.,*
　571 F.3d 1288 (D.C. Cir. 2009) ......................................................................... 15

*Davis v. Rondina,* 741 F. Supp.
　1115 (S.D.N.Y. 1990) ....................................................................................... 26

*Dellinger v. Bessent,*
　No. 25-5052 (D.C. Cir. Mar. 10, 2025) ............................................................... 24

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) .............................................................. 15

*Edmond v. United States*,
520 U.S. 651 (1997) ........................................................................... 16

*Fleming v. U.S. Dep't of Agric.*,
987 F.3d 1093 (D.C. Cir. 2021) ..................................................... 16, 17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ........................................................................... 17

*Freytag v. Commissioner*,
501 U.S. 868 (1991) ........................................................................... 19

*Harris v. Bessent*,
No. CV 25-412 (RC), --- F. Supp. 3d ---, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025)
............................................................................................ 24, 25, 28

*Holiday CVS, L.L.C. v. Holder*,
2012 WL 10973832, at *1 (D.D.C. Feb. 7, 2012) ................................ 14

*In re Hennen*,
38 U.S. 230 (1839) ............................................................................. 18

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
684 F.3d 1332 (D.C. Cir. 2012) ......................................................... 16

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ............................................................... 22

*Moltan Co. v. Eagle-Picher Indus.*,
55 F.3d 1171 (6th Cir. 1995) ............................................................. 15

*Nat'l Treasury Emps. Union v. Reagan*,
663 F.2d 239 (D.C. Cir. 1981 ............................................................. 18

*Natural Res. Def. Council, Inc. v. Morton*,
337 F. Supp. 167 (D.D.C. 1971) ........................................................ 15

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................... 27

*NLRB v. Noel Canning*,
573 U.S. 513, 523 (2014) ................................................................... 20

iv

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017) ................................................................................ 19

*Noel Canning v. NLRB*,
    705 F.3d 490 (D.C. Cir. 2013), aff'd,  573 U.S. 513 (2014) ..................... 22

*Open Cmty. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ......................................................... 28

*Ramirez v. U.S. Immigration & Customs Enf't*,
    310 F. Supp. 3d 7 (D.D.C. 2018) ............................................................. 27

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ........................................................... 15

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ............................................................................... 16, 17

*United States v. Maurice*,
    26 F. Cas. 1211 (C.C.D. Va. 1823) ......................................................... 20

*Vitoria Telecom, LLC v. MET One LLC*,
    No. 1:21-CV-20832-PCH, 2021 WL 10257113, at *4 (S.D. Fla. May 17, 2021).................. 26

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)) ................................................................................... 15

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003) .................................................................... 24

## STATUTES

22 U.S.C. § 290f ......................................................................... *passim*

5 U.S.C. § 3347(a) ............................................................................. 20, 22

5 U.S.C. § 3349c(1) ................................................................................. 20

5 U.S.C. §§ 3345 ..................................................................................... 20

Pub. L. No. 118-47, 138 Stat. 460 (Mar. 23, 2024) ....................................... 6

Pub. L. 91-175, 83 Stat. 805 (Dec. 30, 1969) ............................................... 5

**CONSTITUTIONAL PROVISIONS**

U.S. Const., art. II, § 2, cl. 2. ....................................................................................... 16

**OTHER AUTHORITIES**

The Constitutional Separation of Powers Between the President and Congress, 20 U.S. Op.
    O.L.C. 124 (1996).................................................................................................... 18

# INTRODUCTION

Defendants are laying waste to a half-century-old independent agency created by Congress to support the United States' strategic interests in Lain America and the Caribbean.  In the past three weeks, the Government has unlawfully purported to remove the President and CEO of the Inter-American Foundation (IAF) ("Plaintiff") and unlawfully appointed a new Board member, without advice and consent of the Senate, who claims to be the entire Board by himself.  This ostensible one-man Board has in turn, and without authority, appointed himself President and CEO of the IAF.  Then the so-called President terminated the IAF's staff, cut off its grants, and even ordered the return of already-disbursed and obligated funds from grantees.  Many, if not all, IAF employees have been notified they will be terminated effective April 4, 2025.  All of this was done in contravention of the clear law that dictates that Plaintiff, the true President and CEO of the IAF and an inferior officer under the Constitution, can *only* be removed by the Board itself, and that new Board members (excepting Recess Appointments) *must* be made with the advice and consent of the Senate.  If this Court does not take action, what remains of the IAF—created by an Act of Congress and sustained for the past fifty-six years—will soon be destroyed.  This wholesale gutting of the IAF by the Government flies in the face of the law, and it can only be accomplished through the unlawful termination of Plaintiff, the IAF's President & CEO, and the *ultra vires* acts of a pretender-Board. This Court must take action to return Plaintiff, the lawful President and CEO of the IAF, to her rightful position so she can run the agency as set forth by law.

The Inter-American Foundation owns an illustrious history.  Over fifty years ago, at a time of fraught intentional relations, a bipartisan group of visionaries in the U.S. Congress founded the IAF to address their concern that the U.S. government needed to do better at directing its foreign development aid to the most vulnerable and underserved people.  Congress formed the agency as

an alternative to large foreign assistance programs and charged the agency with disbursing smaller amounts to local, community-led organizations that worked directly on grassroots projects in Latin America. Since that time, the IAF has transformed into an effective independent U.S. government agency while maintaining its nimble nature. It has funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country, including important efforts to support faith leaders in combatting child abuse, trafficking, and violence; integrate migrants fleeing oppressive regimes in Nicaragua and Venezuela who are settling in neighboring Latin American countries; address hunger, poverty, and violence in Haiti; create livelihood opportunities for youth to stay in their communities throughout Central America; and monitor illegal mining, logging, and drug trafficking in remote areas of the Amazon. For over five decades, regardless of party or politics, the IAF has served America's interest in the region.

To ensure the agency's effectiveness, Congress vested in the IAF Board of directors (the "Board") the authority to exercise "all the powers of the Foundation." 22 U.S.C. § 290f(i). That Board, in turn, has sole authority to appoint the President of the IAF on such terms as the Board may determine. 22 U.S.C. § 290f(*l*)(1). With these statutory requirements, Congress created an agency structure that both serves and represents independence and insulation from partisan politics.

Congress also mandated that the IAF "shall have perpetual succession unless sooner dissolved by an Act of Congress." 22 U.S.C. § 290f(e)(1). Yet despite the clear statutory directive, Defendants have been in pursuit of an unrelenting, unlawful plan to shutter the agency. In the last few weeks, Defendants have descended upon the IAF offices numerous times attempting to seize control of the IAF and its systems. On one of these occasions, Defendant Peter Marocco visited the IAF office with the intent to call an "emergency meeting." When he and Department of

Government Efficiency ("DOGE") staff found no one there, Marocco purported to hold a closed-door meeting of the Board—consisting of just himself, DOGE representatives, and the empty IAF lobby—where he immediately installed himself as Chair of the Board of the IAF and acting President and CEO.

Marocco did not, and does not, have statutory authority to hold any of those positions. He is not Chair of the Board—or a member of the Board for that matter—because President Trump did not follow the required process for appointing Marocco with advice and consent of the Senate. And he is not President or CEO because he was not named by the Board to the position. Rather, the position of President continues to belong to Plaintiff, an individual who has dedicated her career to international development, and is not a political appointee. Under the law, the removal of Plaintiff from her position without the approval of the Board is illegal.

Rather than adhere to the proper process established by Congress, the present administration informed Plaintiff on February 26, 2025, that she no longer held her position. Prior to this unlawful notice of termination, Plaintiff sought to implement the policy priorities of DOGE and the new Trump Administration where permissible by law. Plaintiff only refused to comply with orders she had concerns were unlawful. Defendants' actions in proceeding with the purported termination thus make their intentions clear: ignore statutory structures and safeguards, and shutter the IAF. Indeed, the same night that Marocco appointed himself President of the IAF, Marocco went to work immediately, directing the Treasury to cancel all but a handful of the IAF's contracts. Subsequently, while purporting to act as both President and sole Board member, Marocco has directed DOGE to cancel all but one of the IAF's grants, shut employees out of the IT systems, laid off almost the entire IAF staff, and shut down the IAF's website.

This action challenges Plaintiff's removal from her position as President and CEO of the IAF as a violation of the clear directive of federal law.  The Board of the IAF, the entity that oversees the President, may remove Plaintiff from her position as President under the Board's terms only.  Defendants blatantly failed to follow that process in purporting to remove Plaintiff from her position.  Defendants will continue their tactics to fully dismantle the IAF, including by winding down all grants, formally terminating the federal service of IAF employees by April 4 of this year, and demanding the return of unspent (but already allocated) funds from partner organizations by March 19.  Because Plaintiff will suffer irreparable harm absent this Court's intervention, the Court should exercise its equitable powers and temporarily restrain and preliminarily enjoin Defendants' actions until this Court has decided the merits.

## **BACKGROUND**

### A.    **The Inter-American Foundation**

The IAF's functions are governed by the IAF's enabling legislation.  22 U.S.C. § 290f *et seq.*  Under the statute, the IAF is a "body corporate."  22 U.S.C. § 290f(a).  Congress specified that the IAF, "as a corporation," "shall have perpetual succession unless sooner dissolved by an Act of Congress."  22 U.S.C. § 290f(e)(1).  The management of the IAF is vested in a bipartisan board of directors, composed of nine members appointed by the President, by and with the advice and consent of the Senate.  22 U.S.C. § 290f(g).  No more than five board members may belong to any one political party.  *Id.*  All members of the Board "shall possess an understanding of and sensitivity to community level development processes."  *Id.*

New members of the Board are appointed to terms of six years by default.  *Id.*  "[U]pon the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified."  *Id.*  "The Board shall direct the exercise of all the powers of the Foundation."  22 U.S.C. § 290f(i).  As such, the Board "may prescribe, amend, and repeal bylaws,

4

rules, and regulations governing the manner in which the business of the Foundation may be conducted and in which the powers granted to it by law may be exercised and enjoyed." 22 U.S.C. § 290f(j). "A majority of the Board shall be required as a quorum." *Id.*

The Board of the IAF manages the entity through the appointment of a President who serves as the IAF's Chief Executive Officer. 22 U.S.C. § 290f(*l*)(1). The Board determines the terms of the President's appointment. *Id.* In March 2022, Sara Aviel was lawfully appointed by the Board of the IAF to be the President and Chief Executive Officer of the agency, effective April 24, 2022.

The IAF itself is a "nimble and transformative U.S. government agency" that invests in community-led development across Latin America and the Caribbean. Compl. ¶ 38 (quoting the IAF website). The IAF directly engages with community leaders, innovators, and entrepreneurs working to promote prosperity, peace, and democracy in the region. *Id.* Since 1972, the IAF has funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country. *Id.*

The United States Congress established the Inter-American Social Development Institute (ISDI) in 1969. Pub. L. 91-175, 83 Stat. 805, 821-24 (Dec. 30, 1969). In 1971, the ISDI changed its name to the Inter-American Foundation. Compl. ¶ 39. The lean, flexible model the IAF has honed since its creation in 1969 has enabled the agency to propel responsive development designed and led by target communities for lasting impact. *Id.* ¶ 40; Aviel Decl. ("Decl.") ¶ 1. This model has allowed the IAF to quickly shift resources toward emerging areas of U.S. interests, including providing viable alternatives to migration and responding to the proliferation of organized crime. Compl. ¶ 40; Decl. ¶ 1.

Until a few weeks ago, the IAF had over 400 active grantees.  Compl. ¶ 41; Decl. ¶ 2. These local organizations are working to stabilize communities affected by transnational crime, foster sustainable economic prosperity, provide alternatives to migration, and increase communities' goodwill towards the United States in the face of increasing pressures from actors like the People's Republic of China.  Compl. ¶ 41.

The IAF serves the United States' strategic interests throughout Latin America and the Caribbean in a cost-effective manner.  *Id.* ¶ 42.  Over 70% of IAF grantees independently and anonymously surveyed reported that their opinion of the United States had improved as a result of their work with the IAF.  *Id.*  For every dollar the IAF invested in fiscal year 2024, grantees committed $1.36 in co-investment.  *Id.*  Philanthropic and corporate partners have recognized the effectiveness of the IAF's approach by channeling their own resources through the IAF—private investment that is now in the process of being returned to their donors rather than being used to advance American strategic interests in the region.  *Id.*

Congress has appropriated to the IAF, "[f]or necessary expenses to carry out the Inter-American Foundation," $47 million to remain available until September 30, 2025.  Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, § 7063(a), Div. F. tit. III, 138 Stat. 460, 746 (Mar. 23, 2024).  Congress directed that the IAF may not use appropriated funds "to implement a reorganization, redesign, or other plan" to "expand, eliminate, consolidate, or downsize" the agency without first consulting with Congressional appropriations committees, and providing the committees with a detailed justification for any such plan.  *Id.*, Div. F., § 7063(a), 138 Stat. 460, 843–44.

The IAF has long had bipartisan support and remains accounted for in recent Congressional appropriation bills.  *Id.* ¶ 44.  The House Bill Report for the most recent State, Foreign Operations,

and Related Programs Appropriations Bill states, "[t]he Committee recognizes the strong track record of the Inter-America Foundation (IAF) in achieving cost-share from new grantees that is greater, on average by 20 percent, than IAF's initial support for new projects. *Id.* (quoting bill). The Committee encourages USAID to learn best practices from IAF in this regard . . . ." Similarly, a  Senate resolution in 2019 "commending the Inter-American Foundation on the occasion of its 50th Anniversary for its significant accomplishments and contributions to the economic and social development of the Americas" was co-sponsored by Senators Rubio, Cruz, Kaine, and Cardin. *Id.* (quoting resolution).

## B.    February 19 Executive Order

On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy."  The stated purpose of the executive order is to "dramatically reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary."

The executive order lists federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."  The executive order lists the IAF as one of the targeted entities.

Under the executive order, "the head of each unnecessary governmental entity" identified in the order had 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent."

In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an

expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order."

The executive order "shall [not] be construed to impair or otherwise effect," among other things, "the authority granted by law to an executive department, agency, or the head thereof" and "shall be implemented consistent with applicable law and subject to the availability of appropriations."

On January 20, 2025, President Trump signed Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" which reorganized and renamed the United States Digital Service as the United States DOGE Service, to be "established in the Executive Office of the President." Executive Order 14158 established the role of U.S. DOGE Service Administrator within the Executive Office of the President, reporting to the White House Chief of Staff.

The Executive Order further established a temporary organization within the U.S. DOGE Service, "the U.S. DOGE Service Temporary Organization." The U.S DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing the "President's 18-month DOGE agenda."

## C.    DOGE's Attempts to Shut Down the IAF

On February 19, 2025, representatives of the IAF were informed that representatives from DOGE had requested a meeting for the following day. Compl. ¶ 55. Plaintiff and other IAF representatives prepared for the meeting on short notice by assembling discussion points showing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the Executive Orders. Decl. ¶ 7. Plaintiff sought to align the agency with the President's stated policy instructions permissible by law. *Id.*

The next day, February 20, 2025, representatives of the U.S. DOGE Service, Nate Cavanaugh and Ethan Shaotran, met with representatives of the IAF, including Plaintiff. Compl. ¶ 56. Cavanaugh and Shaotran represented to the IAF that they had been detailed to the General Services Administration (GSA). *Id.* The DOGE representatives further informed the IAF that their goal was to support IAF compliance with the President's Executive Order. *Id.*

During the meeting, IAF staff members sought to facilitate Cavanaugh and Shaotran's requests by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others. Decl. ¶ 8. Additionally, Plaintiff attempted to share information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities. *Id.* The DOGE representatives showed minimal interest in the initiatives and instead indicated that their purpose was to focus on obtaining access to the IAF's systems. *Id.* Following the meeting, the DOGE representatives emailed representatives of the IAF, requesting that they sign a memorandum of understanding with the GSA that provided for Cavanaugh to be detailed from the GSA to the IAF. Compl. ¶ 58.

On February 21, 2025, representatives of the IAF, including Plaintiff, met again with Cavanaugh and Shaotran, as well as for the first time Jacob Altik, who stated he was a lawyer from the Executive Office of the President (EOP). Decl. ¶ 9. Altik stated his view that the minimum statutory requirements for the IAF entailed the existence of a Board and a President, a presence in the District of Columbia, and a "minimum level" of grants and contracts. *Id.* To that end, DOGE intended to effectuate the reduction-in-force (RIF) of most, if not all of the IAF's employees, and the termination of all but a handful of the IAF's grants and contracts. *Id.* The DOGE representatives asked Plaintiff to contact the Board immediately to determine if the Board was in

alignment on this plan, and suggested that if the Board was not so aligned, DOGE intended to terminate the Board and install individuals who were aligned with President Trump's vision. *Id.* ¶ 10. Plaintiff explained that matters of this consequence required a Board meeting to discuss, that it would be difficult to convene the Board immediately, and that the Board was subject to certain legal requirements before convening. *Id.* The DOGE representatives indicated that they did not need to call a Board meeting, and that they just needed a quick "yes-or-no" answer from the Board on alignment. Plaintiff asked that the specific request be put in writing. *Id.*

After the meeting, Plaintiff heard from Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees. *Id.* ¶ 11. They also noted that the IAF's annual funding was provided to "cover only the minimum statutory requirements" and that if Plaintiff were to take actions to reduce staff, it "would be in contravention of the appropriations enacted into law." Plaintiff shared this information with the IAF Board. *Id.*

From February 21, through the weekend, and on Monday, February 24, Plaintiff spoke with each member of the IAF Board multiple times to analyze all options and identify the best and most lawful path forward. *Id.* ¶ 12. Plaintiff also heard from multiple congressional stakeholders and legal experts that they believed the DOGE plan was unlawful and contrary to congressional intent. *Id.*

On February 24, 2025, Altik contacted one of the members of the Board of the IAF, notifying him that the other Board members had purportedly been terminated. Compl. ¶ 64. Also on February 24, 2025, Plaintiff spoke on the telephone with Cavanaugh and Altik. Decl. ¶ 13. In

this call, the DOGE representatives claimed that with one exception, all members of the Board had been terminated. *Id.* Plaintiff expressed surprise at this news, given that she had been in recent touch with each Board member. *Id.* The DOGE representatives asked Plaintiff to confirm that she would implement DOGE's agenda in the absence of a Board, and they threatened that the President would terminate her if she declined to do so. *Id.* Plaintiff responded that she could not further respond to DOGE's requests without more specificity as to those requests in writing and the opportunity to determine whether they were legal. *Id.* She further stated that she was committed to always doing what was lawful, and to follow all of her legal obligations and responsibilities. *Id.* The DOGE representatives again asked Plaintiff to sign a MOU agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems. *Id.* Plaintiff declined, stating that she did not believe she had the authority to do so given her understanding that her Board still remained. *Id.* After the call, Plaintiff confirmed that no Board member had yet received a termination letter from the President, or anyone else. *Id.*

The next day, February 25, 2025, DOGE representatives contacted the Senior Procurement Executive (SPE) at the Department of Treasury, directing the SPE to close all IAF contracts by the close of business on February 27, 2025. Compl. ¶ 67. The SPE relayed this request to the U.S. Treasury's Administrative Resource Center (ARC)—which is housed at the Treasury Department's Bureau of the Fiscal Service and manages the IAF's procurement and finance functions—asking the ARC to cancel all IAF contracts. *Id.* Such contracts also included those for contracted field staff, who serve as the agency's local liaisons and monitoring and evaluation specialists abroad. *Id.* A representative from the IAF contacted the ARC to discuss the contracts. Employees of the ARC expressed concerns about the legality of the request and decided to hold off on taking any action. *Id.* ¶ 68.

11

**D.      DOGE's Attempts to Fire Plaintiff And Gut the IAF**

On the evening of Wednesday, February 26, 2025, Plaintiff received an email from Trent Morse of the Presidential Personnel Office informing her that President Trump had exercised a purported authority to terminate her from her position as President and CEO of the IAF, effective immediately.  Decl. ¶ 14.

On the afternoon of February 28, 2025, the IAF's Chief Operating Officer received a communication from Morse stating that President Trump had exercised a purported authority to appoint Pete Marocco as the acting Chair of the Board of the IAF.  Ex. A (Email from T. Morse). The communication represented that there were no other remaining members of the Board of the IAF.  *Id.*  The communication also acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members but asserted that President Trump had inherent authority under Article II to do so. *Id.*

Marocco subsequently visited the IAF office, seeking an "emergency board meeting." Compl. ¶ 71.  Marocco determined that because no one was there to let him, he was permitted to hold the meeting outside the IAF office.  *Id.*  Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member in attendance.  *Id.*  He voted to close the Board meeting to the public. He then voted to appoint himself as the acting President and CEO of the IAF.  *Id.*

That same evening, the Administrative Resource Center received a directive authorized by Marocco, now representing himself to be the President of the IAF, to terminate IAF contracts.  *Id.* ¶ 72.  The ARC subsequently informed an IAF representative that it would be taking action immediately to execute those terminations, as authorized by the IAF's newly-appointed "President Peter Marocco."  *Id.*  In response to the notice from the ARC, an IAF representative proposed

revisions to the termination list in an effort to preserve certain contracts. *Id.* ¶ 73. The ARC ultimately determined that most IAF contracts were to be terminated that same evening, with the exception of a handful that were flagged as critical operations, such as HR and IT. *Id.*

On March 2, 2025, members of the Board of the IAF wrote to Plaintiff, stating their intent to serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law. Ex. B (Letter from IAF Board). They communicated their view that, accordingly, the governance of the IAF remained unaltered and in place, no duly qualified members of the Board had fired Plaintiff, and that Plaintiff remained the agency's President and CEO. *Id.* The Board directed Plaintiff to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the agency's grantees. *Id.*

On Monday, March 3, 2025, Marocco circulated a Board Resolution, naming himself as Board Chair, President, and CEO of the IAF. Compl. ¶ 75. On the same day, the IAF Chief Operating Officer was instructed to send a communication on behalf of the U.S. DOGE Service to all IAF staff members. *Id.* ¶ 76. In the message, the COO wrote: "On Friday, 2/28/25 Sara Aviel was terminated by the White House Council's [sic] Office. Pete Marocco has been appointed as Acting Chairman, President and CEO of Inter-American Foundation to implement the President's Executive Order signed on February 19, 2025." *Id.*

Later the same day, Marocco and DOGE began implementing a RIF of the IAF's employees, notifying most IAF staff that they would be placed on administrative leave. *Id.* ¶ 77; Decl. ¶ 19. Since then, IAF employees have been shut out of the IT systems. Decl. ¶ 19. The IAF website has been taken down and is no longer operating. *Id.* Although the IAF's offices remain open, there are only three employees remaining who have not been placed on administrative leave and who have access to the building. *Id.*

As of the date of this filing, Marocco has terminated virtually all existing IAF grants. *Id.* ¶ 20. The exception is a single grant that only has limited funds remaining—approximately $66,000—that will soon expire. *Id.* The IAF also continues to own a single equity investment in a microfinance institution. *Id.* In grant termination notices that were sent beginning March 4, grantees were instructed to "send remaining unspent funds to the IAF" within fifteen days (that is, March 19) and to submit their "final programmatic and financial report no later than April 2, 2025." *Id.* The IAF's grant recipients will face legal and financial challenges based on the pause and cancellation of agreements signed with the IAF. *Id.*

In direct response to DOGE's actions, the IAF's philanthropic partners have asked that their donations be returned. *Id.* ¶ 21. The IAF's grant management system that houses the agency's key programmatic processes—including administration of grantee proposals, reports, and financing information—remains in place for now. *Id.*

Beginning last week, IAF staff members have received RIF notices sent on behalf of Marocco, informing the staff members of their severance as part of "workplace reshaping" at the IAF. *Id.* ¶ 22. Staff members have been informed that their official separation date will be Friday, April 4, 2025. *Id.*

## ARGUMENT

"The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction." *Holiday CVS, L.L.C. v. Holder*, 2012 WL 10973832, at *1 (D.D.C. Feb. 7, 2012) A plaintiff seeking a temporary restraining order or preliminary injunction must show "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent such relief; (3) that the equities favor the plaintiff's position; and (4) that the injunction is in the public's interest." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102,

1112 (D.C. Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). All factors are satisfied here.[1]

Courts in this Circuit typically evaluate the four factors on a "sliding scale," meaning if the movant makes an unusually strong showing on one of the factors, then she "does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). Although there is some question as to whether *Winter* displaced the sliding-scale analysis, "[t]he D.C. Circuit has yet to [] definitively" reach that holding. *Chapman v. Heath*, 288 F. Supp. 3d 215, 217 n.1 (D.D.C. 2018) (citing *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)).

## A.    Plaintiff Is Likely to Succeed on the Merits Because Her Removal Was Unlawful.

### I.    Plaintiff Is At Most An Inferior Officer and Not Subject to Removal by the Presidential Personnel Office.

The Appointments Clause of the United States Constitution provides:

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.

---

[1] To the extent that the Government intends to seek a security under Rule 65(c), the Plaintiff requests that the security be waived in this case. District courts enjoy broad discretion to determine the security amount or to waive the security requirement altogether. *See Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) ("Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all.") (*quoting DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); *Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995). There is a longstanding exception to the security requirement in public-interest cases like these. *See City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) ("[P]ublic-interest litigation [constitutes] an area in which the courts have recognized an exception to the Rule 65 security requirement."); *Natural Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) ("The purpose of the security given under Rule 65(c) is to cover the costs and damages suffered by the party wrongfully enjoined. It would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party.").

"Only the President, with the advice and consent of the Senate, can appoint . . . 'principal' officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021).  In contrast, "the Appointments Clause permits Congress to dispense with joint appointment . . . for inferior officers.  Congress may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'"  *Id.* at 12–13 (citation omitted).

"Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond v. United States,* 520 U.S. 651, 662 (1997).  In other words, an officer of the United States is "inferior" if her "work is directed and supervised at some level by" principal officers.  *Id.* at 663.  The D.C. Circuit applies *Edmond* by looking to three factors: "(i) whether the officer is subject to supervision and oversight by a principal officer; (ii) whether the officer is subject to removal by a principal officer; and (iii) whether the officer has final decisionmaking authority." *Fleming v. U.S. Dep't of Agric.,* 987 F.3d 1093, 1103 (D.C. Cir. 2021); *see also Al Bahlul v. United States,* 967 F.3d 858, 871 (D.C. Cir. 2020); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,* 684 F.3d 1332, 1339 (D.C. Cir. 2012).  Removability at will is central to this analysis; if a principal officer may remove another officer at will, this provides "a powerful tool for control," suggesting that "an officer who may be removed at will by another officer is the latter's 'alter ego' for constitutional purposes."  *Fleming,* 987 F.3d at 1103.

The IAF's enabling legislation follows these constitutional principles to establish the IAF's Board as its principal officer and the IAF's President as (at most) an inferior officer.  By statute, Congress has vested the "management of the Foundation" in a board of directors, "composed of nine members appointed by the President, by and with the advice and consent of the Senate."  22

16

U.S.C. § 290f(g).  "The Board shall direct the exercise of all the powers of the Foundation."  22 U.S.C. § 290f(i).  The Board is accordingly the principal officer of IAF for constitutional purposes.

In contrast, "[t]he chief executive officer of the Foundation shall be a President who shall be appointed by the Board of Directors on such terms as the Board may determine."  22 U.S.C. § 290f(*l*)(1). Pursuant to this authority, the Board has adopted bylaws, under which the Board reserves to itself "all powers of the Foundation," Ex. C (IAF Bylaws), Art. I, § 1, but delegates to the President of the Foundation the power of "general supervision" of the organization, "*responsible to and under the general direction of the Board*."  *Id.*, Art. III, § 2 (emphasis added).

Each of the three *Edmond* factors here leave no doubt that the President of IAF is at most an inferior officer.  At all times, she is "subject to supervision and oversight" by the principal officer of the organization, the Board.  *Fleming,* 987 F.3d at 1103.  She is appointed by the Board to her position as the President of the Foundation, and no provision of IAF's organic statute or any other provision of law limits the Board's authority to remove her from that position.  The Board thus retains the authority to replace the President of the Foundation at will, as "removal is incident to the power of appointment."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 508–09 (2010).  And she enjoys decision-making authority on behalf of the Foundation only to the extent that she is "permitted to do so by other Executive officers," *i.e.,* the Board.  *Arthrex, Inc.,* 594 U.S. at 14.

Because the President of the Foundation is at most an inferior officer, Plaintiff may be removed from her position only by her "principal officer"—the Board—and not by the President of the United States or any other person.  Where, as here, Congress vests the appointment of an inferior officer in the head of a department, "it is ordinarily the department head, rather than the President, who enjoys the power of removal."  *Free Enter. Fund,* 561 U.S. at 493; *see also id.* at

508–09 (remedying Appointments Clause violation by leaving an inferior officer removable by a principal officer at will and not by the President).  Generally, the power to hire is the power to fire.  Congress may depart from this ordinary rule, but, "[a]bsent relevant legislation," "the power to remove is held by the appointing authority, and *only by* the appointing authority."  *Nat'l Treasury Emps. Union v. Reagan,* 663 F.2d 239, 247 (D.C. Cir. 1981) (emphasis added).  "Thus, for example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President."  *Id.*; *see also In re Hennen,* 38 U.S. 230, 260 (1839) (where Congress has vested appointment power in the head of a department, that officer holds the power of removal, and "the President has certainly no power to remove"); *The Constitutional Separation of Powers Between the President and Congress,* 20 U.S. Op. O.L.C. 124, 166 (1996) (citing *Hennen* for the proposition that "inferior officers appointed by a department head were not removable by the President (absent statutory authorization to do so) but by the secretary who appointed them [and] . . . . [t]he Court's conclusions in *Hennen* . . . remain good law")).

Accordingly, the purported termination of Plaintiff from her position as the President of the Inter-American Foundation by the Presidential Personnel Office was *ultra vires*, and Plaintiff lawfully retains that position.  There is no question that the Board of IAF has *not* removed Plaintiff from her position as President of IAF.  Decl. ¶ 18; Ex. B.  The statutory violation could not be plainer, and thus this court need not look further than the fact that Defendants' actions run afoul of the statutory text to find that Plaintiff is likely to succeed on the merits of her claim.  This factor weighs heavily in favor of injunctive relief.  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (for purposes of preliminary injunctive relief, "the first and most important factor" is

"whether petitioners have established a likelihood of success on the merits"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 91 (D.D.C. 2021) (same).

Indeed, the Government has already tacitly acknowledged as much in analogous ongoing litigation in a different matter within this Circuit. In *Brehm v. Marocco*, 1:25-cv-00660-RJL, an ongoing challenge to the firing of the head of the United States African Development Foundation, a sister organization of the IAF, the plaintiff noted in oral argument without subsequent objection by the Government that it was "not even disputed in the Defendants' papers, that the law is that an inferior officer is removable by the authority that appointed him, but nobody else -- unless Congress alters that default rule." *Brehm*, Hr'g Tr. at 9:6-9 (Mar. 11, 2025).

## II.    Marocco Does Not Lawfully Hold a Position as a Board Member or Officer of the IAF.

As discussed above, the Appointments Clause forecloses a Presidential power to unilaterally appoint principal officers of the United States. The Framers believed that such an unchecked power was "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Commissioner*, 501 U.S. 868, 883 (1991). The Appointments Clause accordingly limits Constitution that power by "dividing" it "between the Executive and Legislative Branches." *Id.* at 884.

"The Senate's advice and consent power is a critical 'structural safeguard [] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.,* 580 U.S. 288, 293–94 (2017) (quoting *Edmond,* 520 U.S. at 659) (alterations in the original). To be sure, Congress recognized that the process of nomination and Senate confirmation "can take time," and that in some instances neither the President nor the Senate "may desire to see the duties of the vacant office go unperformed in the interim." *Id.* at 293-94. Accordingly, "Congress has given the President *limited authority* to appoint acting officials to temporarily perform the functions of a vacant [principal] office without

first obtaining Senate approval." *Id.* at 294 (emphasis added). Yet even this grant of limited authority is a departure from the constitutional "norm." *NLRB v. Noel Canning,* 573 U.S. 513, 523 (2014); *see United States v. Maurice,* 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (Marshall, C.J., sitting by designation) ("[T]he president shall nominate, and by and with the consent of the senate, appoint to *all* offices of the United States, with *such exceptions only* as are made in the Constitution[.]") (emphasis added).

The Federal Vacancies Reform Act (FVRA) describes certain circumstances under which Congress has delegated to the President this limited authority to appoint acting officials. *See* 5 U.S.C. §§ 3345-3346; *SW Gen.,* 580 U.S. at 296. These provisions "are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless another "statutory provision expressly" authorizes the President or another official to appoint an acting official or such a provision itself expressly designates an acting official, or the President validly makes a recess appointment. 5 U.S.C. § 3347(a).

The FVRA does not extend to the President this limited grant of appointment authority to vacancies arising in boards "composed of multiple members" and boards that control a "Government corporation." 5 U.S.C. § 3349c(1). The Inter-American Foundation is governed by a bipartisan nine-member board, and it operates as a government corporation. 22 U.S.C. § 290f(g); 22 U.S.C. § 290f(e) (setting forth the powers and functions of "[t]he Foundation, as a corporation"). Accordingly, the FVRA does not grant the President the authority to appoint acting members to the Board of the IAF. And, although the FVRA acknowledges that other statutes might provide such an appointment authority, no provision in the IAF's organic statute (or any

other source of law) grants the President the power to appoint acting board members.  Instead, the statute specifies that Board members may only be appointed pursuant to the process of nomination and confirmation by the Senate.  22 U.S.C. § 290f(g).

Because neither the FVRA nor any other provision of law contemplates the possibility of acting Board members, any vacancy in the Board of IAF "shall remain vacant," 5 U.S.C. § 3348(b)(1), until such time as the position is filled through the process of Senate confirmation. And any action taken by a person who purports to be an acting member of the Foundation's Board "in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect."  5 U.S.C. § 3348(d)(1).  Moreover, any such action "may not be ratified." 5 U.S.C. § 3348(d)(2).

The purported appointment of Marocco as chairman of the Board of IAF is therefore void and must be treated as having no force or effect.  In other proceedings, Defendants have resisted this conclusion on the ground that, where (as here) no statute grants the President the authority to appoint acting officials, he must have an inherent extra-statutory authority to do so.  There is no basis in the Constitution for the President to arrogate such a power to himself.  The President has a means available to him to appoint officials to the Board: he may nominate persons for that role and obtain Senate confirmation for those nominations.  *See* 22 U.S.C. § 290f(g).  Indeed, he has recently done so and nominated two members of the Board who are currently awaiting Senate confirmation. *See* PN29-1 & PN29-5, 119th Congress (2025-26) (nominations of Kenneth Jackson and Russell Vought to Board of IAF).  Further, Congress has "addressed the problem of vacancies on various multimember agencies [including IAF], providing that members may continue to serve for some period past the expiration of their commissions until successors are nominated and confirmed."  *Noel Canning v. NLRB,* 705 F.3d 490, 511 (D.C. Cir. 2013), *aff'd,* 573 U.S. 513

(2014). Even though "Congress has chosen not to provide for acting [Board] members[,] that choice cannot support" Defendants' theory. *Id.* Accordingly, courts have determined that they "cannot accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and equally remediable by—the executive and legislative branches." *Id.*

Finally, Congress has supported the findings in these cases by specifying that the FVRA provides the "exclusive means" for the appointment of acting officials in the absence of Senate confirmation. 5 U.S.C. § 3347(a). In the absence of a grant of authority from Congress to appoint an acting member of the Board of the IAF, the President lacked the authority to appoint Marocco to that Board. And because Marocco has not been validly appointed as an acting member of the Board, any actions he has taken or intends to take in that capacity, or as Plaintiff's replacement as President of the IAF, must be treated as void and as without effect. "The plain terms of the FVRA remove remedial discretion by directing that unlawful actions under that statute are void ab initio, thereby rendering the rules without 'force or effect' and requiring vacatur." *Asylumworks v. Mayorkas,* 590 F. Supp. 3d 11, 26 (D.D.C. 2022). Plaintiff is therefore entitled to relief precluding Marocco from exercising authority on behalf of the Inter-American Foundation.

**B.    Plaintiff Will Suffer Irreparable Harm Without Immediate Injunctive Relief.**

A demonstration of irreparable harm requires two showings. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted)). "Second, the harm 'must be beyond remediation.'" *Id.* (quoting *Chaplaincy*, 454 F.3d at 297).

Plaintiff will undoubtedly suffer irreparable harm unless she is allowed to retain her position as President and CEO of the IAF until she is lawfully removed.  Not only is serving as the head of the IAF—a unique agency dedicated to investing in community-led development—a special privilege, but Plaintiff is uniquely positioned to leverage the blend of experience she has related to international development, government service, and mobilizing private sector investment.  Decl. ¶ 24.  Unlawfully losing the statutorily-guaranteed right to remain, even if for a limited duration, as the President of a one-of-a-kind government entity with no counterpart in the private sector is a great, actual, and imminent harm.  *Id.*  Indeed, Plaintiff's entire career, including her decades spent in government roles at the Department of the Treasury, the National Security Council, the World Bank Group, and the Office of Management and Budget, as well as for international development organizations including Root Capital, Mercy Corps and CARE, put her in the position to be considered for the Presidency at IAF.  *Id.* ¶¶ 3–4, 24.  Losing the right to continue leading the IAF is a multifaceted harm.  It entails the professional loss of a once-in-a-lifetime job, the economic losses attendant to any termination, the reputational harm associated with the loss of a prominent government position, and the stripping of the ability to direct the function and direction of the IAF.  Each day in which Plaintiff is entitled to remain as President of the IAF is invaluable.

Even if it were possible for Plaintiff to be reinstated to her position as President of the IAF following a favorable resolution of this case, each day that Plaintiff is wrongfully prevented from serving while the IAF Board has not removed her is one of a number certain of days remaining for Plaintiff to serve as President of the IAF.  The loss of the statutorily-prescribed right to continue serving as President of the IAF is an irreparable harm in its own right.  Plaintiff accepted her appointment to be President of IAF with the knowledge and understanding that she could be

removed only through the approval by the IAF Board, and thus with the understanding that Congress granted her removal protection. *Id.* ¶ 25. Plaintiff's improper removal by definition deprives Plaintiff of her statutory right to continue leading IAF, a material and significant term of Plaintiff's employment. *See, e.g.*, *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114–15 (2d Cir. 2003) ("Conduct that unnecessarily frustrates efforts to obtain or *preserve the right to participate* in the management of a company may also constitute irreparable harm.") (emphasis added). Nothing can remedy the fundamental breach of this right associated with Plaintiff's employment.

Immediate injunctive relief is the only way to avoid "a deprivation of [Plaintiff's] statutory right to function as" the President of the IAF prior to the Board properly removing her from her duties. *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (holding that U.S. Commission on Civil Rights commissioners showed irreparable harm from being fired by President Reagan because, among other factors, commissioners had a statutory right to complete their work as commissioners). Recent district-court decisions addressing the Trump Administration's firings of statutorily-protected employees reiterate the same. *See, e.g.*, *Harris v. Bessent*, No. CV 25-412 (RC), --- F. Supp. 3d ---, 2025 WL 521027, at *8 (D.D.C. Feb. 18, 2025), *appeal filed* ("[S]ubtracting time from [plaintiff's] congressionally mandated seven-year term prevents her from carrying out the duties Congress has assigned to her."). The per curiam opinion issued in *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025), is not to the contrary. There, the court noted that the propriety of a stay "is dependent upon the circumstances of the particular case." *Id.*, slip. op. at 7 (citation omitted). Here, the injury is not just, "[a]t worst," Plaintiff remaining out of office; losing her statutorily guaranteed position means losing authority over the fundamental direction, culture, and work of an entire agency.

24

In other words, this is no ordinary employee-discharge case. Plaintiff's illegal removal will do immeasurable damage to the IAF and its credibility, particularly at a critical time. Congress created the IAF over fifty years ago and has carefully funded it every year since. It took Marocco and DOGE staff less than seventy-two hours to begin the process of reducing the IAF to rubble. That damage to the IAF irreparably harms Plaintiff because it undermines the very reason she chose to lead the agency in the first place. Decl. ¶ 27. It also prevents Plaintiff from advancing the commitment she made to the agency and its critical mission. *Id.* ¶ 24. And right now, especially, the agency needs Plaintiff, its President, to navigate political tides as Congress contemplates appropriations for organizations like the IAF. *See* Compl. ¶ 44; Decl. ¶ 26. Because the harm to Plaintiff and the harm to IAF are inextricably intertwined, this circumstance presents precisely the "extraordinary situation" that the Supreme Court left open in *Sampson*. *See Harris*, 2025 WL 521027, at *8 ("Even if this Court were to direct [plaintiff's] reinstatement after resolving the merits of her claims—a process that can take some time—the MSPB's congressionally mandated independence would be permanently marred by the threat of renewed removal and delayed reinstatement while litigation proceeds."). Plaintiff satisfies the first prong of the irreparable-harm showing.

Second, the harm is also irreparable because it is beyond remediation. Defendants have made clear that they intend to effectively shutter the IAF. DOGE employees threatened the IAF's Board with firing if the Board did not agree to layoff almost every employee, cancel all grants, and ignore their legal duties to spend properly-appropriated funds. When that did not work, DOGE attempted to go through the Treasury to carry out its mission. When that didn't work, Defendants purportedly fired Plaintiff, purported to fire the Board, and illegally appointed Marocco. Within hours, the Treasury had cancelled all but a handful of the IAF's contracts—many of which were

long-running employment contracts with overseas workers. Decl. ¶ 17. Many of these staff will be terminated based on the orders of an *ultra vires* IAF "President" on April 4, 2025. *Id.* ¶ 23. If those terminations go into effect, those staff will never return. The IAF will be gutted. The same is true of the relationships with grantees and donors, and the reputation the IAF has spent decades cultivating in Latin America. By demanding the termination of all existing IAF grants (barring one grant that has only $66,000 remaining and is expiring soon), Defendants will destroy the reputation of the IAF, undoing *precisely* what Congress sought to establish when they created the Plaintiff's position. Returning her to an empty office building, shorn of its employees, grants, relationships, and reputation, is not a remedy.

Compensation cannot make up for the loss of control and management of the IAF that Plaintiff necessarily surrenders from being improperly forced out of the IAF and watching Marocco's actions unfold. In other words, even if Plaintiff were to be reinstated down the line, she would return to an organization that has been run totally differently than Plaintiff would have run it; shifted its direction or agenda; and may have even ceased operating altogether. And she would return to an entity that has been irreparably damaged due to Defendants' illegal conduct. Under these circumstances, the only manner to vindicate the key statutory right to lead IAF associated with Plaintiff's job "is to enforce it." *Id.* at 114; *see also, e.g.*, *Audubon Levy Invs., LP v. E. W. Realty Ventures, LLC*, 698 F. Supp. 2d 328, 332–33 (E.D.N.Y. 2010) (finding irreparable harm because the plaintiff "is being denied the right to preclude [the defendant] from also managing the company"); *Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990) ("Money damages will not compensate [plaintiff] for loss of the opportunity to continue to manage the company which she has helped to build."); *Vitoria Telecom, LLC v. MET One LLC*, No. 1:21-CV-20832-PCH, 2021 WL 10257113, at *4 (S.D. Fla. May 17, 2021) (finding irreparable harm

26

because "Defendants are refusing to acknowledge [plaintiff's] right to exercise voting control . . . and lawful status as manager.").  Put simply, if the injunctive relief is denied and Plaintiff ultimately wins on the merits, there will be nothing for her to return to.  What's more, compensation alone does not enforce the law as set forth by Congress, which specifically created the IAF and a President who could be fired only by the Board.  Congress was not concerned primarily with backpay for a wrongly-terminated president.  It was concerned with the agency being able to function.

For the above reasons—loss of a fundamental control right and loss of a statutory right to continue as President of the IAF—Plaintiff has shown irreparable harm.  Plaintiff is entitled to the statutory removal protection that Congress has provided, and Plaintiff's harm derives from the violation of this statutory right.  That harm cannot be remedied at a later point.  All that Plaintiff seeks through this motion is a preservation of the lawful status quo.  For the reasons stated above, Plaintiff has shown that she will suffer irreparable harm absent immediate injunctive relief.

## C.    The Balance of Hardships and Public Interest Favor Immediate Injunctive Relief.

Finally, the balance of the equities and the public interest also favor an injunction.  These inquiries typically "merge into one factor when the government is the non-movant," as here. *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As discussed above, Plaintiff suffers irreparable harm from her unlawful removal as President of the IAF.  The loss of this statutory right to continue to serve and fundamental loss of control over the direction and day-to-day work of the IAF for any period of time constitutes irreparable harm for which there is no other adequate remedy.

What is more, the public interest has already been and will continue to be harmed by Defendants' actions.  Maintaining the credibility and independence of IAF—an entity that strives to foster a stronger image of the U.S. among Latin American and Caribbean countries—is integral

to its success and to meeting U.S. interests.  Compl. ¶¶ 41–42; Decl. ¶ 24.  Congress has recognized this time and time again, by continuing to carefully fund IAF.  Compl. ¶¶ 43–44.  When IAF can no longer serve local organizations in the region, its *raison d'être*—accomplishing U.S. interests by promoting equitable, democratic, and sustainable self-help development—no longer holds.

On the other side of this balance, the requested relief will not cause Defendants any hardship.  "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice."  *C.G.B. v. Wolf,* 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted).  Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *Open Cmty. All. v. Carson,* 286 F. Supp. 3d 148, 179 (D.D.C. 2017).  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations."  *Id.* (internal quotation marks and citations omitted).  That substantial public interest is particularly acute here. If Defendants could disregard the restrictions on inferior officer removal, and the prohibition on the appointment of acting board officials that Congress put into place, the Appointments Clause would be rendered to be a practical nullity.  *See Harris,* 2025 WL 521027, at *8.

Plaintiff will continue running the IAF and working with its career public servants as she has for nearly three years.  *See* Decl. ¶¶ 3, 24.  Nothing indicates that Plaintiff is unable to continue fulfilling her responsibilities as President of the IAF; in fact, the IAF is better served by Plaintiff remaining the IAF's President and CEO.  Furthermore, Defendants can complain of no hardship when injunctive relief would simply cause a 56-year-old agency, with a $47-million-dollar appropriation, to continue to exist and function while the Court decides the merits of this case.

When the balance of the equities and the public interest are "essentially derivative of the parties' arguments on the merits of the case," the public interest balancing "should weigh in favor

28

of whoever has the stronger arguments on the merits." *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013), *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014).  Here, that is undoubtedly Plaintiff.  Defendants' attempted removal of Plaintiff as President and CEO of the IAF runs afoul of the plain language of the statute. This court must immediately enjoin Defendants.

A temporary restraining order and preliminary injunction are therefore warranted.

## CONCLUSION

For the foregoing reasons, this Court should grant the requested temporary restraining order and preliminary injunction, ordering Defendants to refrain from improperly removing Plaintiff as President and CEO of the IAF pending resolution of this action, including any appeal.


Dated: March 17, 2025                         Respectfully submitted,


                                              */s/ Aaron S.J. Zelinsky*
                                              Aaron S.J. Zelinsky*
                                              ZUCKERMAN SPAEDER LLP
                                              100 East Pratt Street, Suite 2440
                                              Baltimore, MD 21202
                                              Tel: (410) 332-0444
                                              Fax: (410) 659-0436
                                              azelinsky@zuckerman.com

                                              Aaron Chou (DC Bar No. 90020425)*
                                              M Moore (DC Bar No. 90004368)
                                              ZUCKERMAN SPAEDER LLP
                                              2100 L Street NW, Suite 400
                                              Washington, DC 20037
                                              Tel: (202) 778-1800
                                              Fax: (202) 822-8106
                                              achou@zuckerman.com
                                              mmoore@zuckerman.com

                                              *Counsel for Plaintiff Sara Aviel*

                                              *\*Pro hac vice pending*

29

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 17th day of March, 2025, I caused the foregoing to be served

on counsel of record via the Court's electronic case filing system.

*/s/ Aaron S.J. Zelinsky*
Aaron S.J. Zelinsky

*Attorney for Plaintiff Sara Aviel*

## CERTIFICATE OF COUNSEL

Pursuant to Local Civil Rule 65.1(a), I hereby certify that on this 17th day of March, at 1:10 p.m., I furnished to the Directors of the Federal Programs Branch of the Department of Justice via email, the application and copies of all pleadings and papers filed in the action to date or to be presented to the Court at the hearing.

/s/ Aaron S.J. Zelinsky
Aaron S.J. Zelinsky

*Attorney for Plaintiff Sara Aviel*