UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

    *Plaintiff,*

    –v.–

SERGIO GOR, *et. al.*,

    *Defendants.*

Case No. 25-cv-00778

**DECLARATION OF SARA AVIEL**

    1.    I am the President and CEO of the Inter-American Foundation (IAF). The IAF is a government corporation that was established by Congress to invest in locally-led development across Latin America and the Caribbean. The lean, flexible model the IAF has honed since its creation in 1969 has enabled the agency to propel responsive development designed and led by target communities for lasting impact. This model has allowed the IAF to quickly shift resources toward emerging areas of U.S. interests, including providing viable alternatives to migration and responding to the proliferation of organized crime.

    2.    Until a few weeks ago, the IAF had over 400 active grantees. The IAF's programs advanced objectives ranging from supporting faith leaders in combatting child abuse, trafficking, and violence, to integrating migrants fleeing oppressive regimes in Nicaragua and Venezuela who are settling in neighboring countries; from creating livelihood opportunities for youth to stay in their communities throughout Central America to monitoring illegal mining, logging and drug trafficking in remote areas of the Amazon.

3. On February 16, 2022, I had my final interview with the full Board of Directors for the role of President and CEO of the IAF. On March 7, 2022, I received confirmation that the Board of the IAF had appointed me to be the position. The appointment followed a competitive government hiring process, and my prior experience uniquely placed me in the position to be considered for the role. I began my service as President and CEO of the IAF on April 24, 2022.

4. Prior to becoming the President of the IAF, I was a Senior Advisor at the Center for Strategic and International Studies, a bipartisan, non-profit research institution, and was the Founder and Principal of Margalit Strategies. I previously served various roles in the Department of the Treasury, the National Security Council, the World Bank Group, and the Office of Management and Budget, and for international development organizations including Root Capital, Mercy Corps and CARE. Leading the IAF was of particular interest to me because it uniquely took advantage of my experience serving at the highest levels of government, implementing community development programs, and mobilizing private sector investment.

5. I accepted my appointment to be the President of the IAF with the knowledge and understanding that federal law requires, through the IAF's organic statute, that the terms of my appointment are determined solely by the Board of the IAF. 22 U.S.C. § 290f(*l*)(1). Further, I was aware of the Senate's role in approving the appointment of new members to the IAF Board, 22 U.S.C. § 290f(g), and that this structure was put in place to promote the bipartisan nature of the IAF.

6. I understand that, under federal law, 22 U.S.C. § 290f is the statute that prescribes that I shall remain the President and CEO of the IAF until such time as the duly-appointed Board of the IAF removes me from my position.

7. On the morning of February 20, 2025, I learned that representatives from the Department of Government Efficiency ("DOGE") had requested a meeting for that afternoon. I worked with other IAF representatives to prepare for the meeting on short notice by assembling discussion points showing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the recently-issued Executive Orders. I sought to align the agency with the President's stated policy instructions as permissible by law.

8. During the meeting, other IAF staff members and I sought to facilitate the requests of DOGE representatives Nate Cavanaugh and Ethan Shaotran by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others. Additionally, I attempted to share information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities. The DOGE representatives showed minimal interest in the initiatives and instead indicated that their purpose was to focus on obtaining access to the IAF's systems.

9. On February 21, 2025, other IAF staff and I met again with Cavanaugh and Shaotran, as well as for the first time, Jacob Altik, a lawyer for the Executive Office of the President. Altik stated his view that the minimum statutory requirements for the IAF entailed the existence of a Board and a President, a presence in the District of Columbia, and a minimum level of grants and contracts. Therefore, they intended to conduct a reduction in force of almost all employees and a termination of almost all grants and contracts.

10. The DOGE representatives asked me to contact the Board immediately to determine if the Board was in alignment on this plan, and suggested that if the Board was not so aligned, DOGE intended to terminate the Board and install individuals who were aligned with President

3

Trump's vision. I explained that it would be difficult to convene the Board immediately, that matters of this consequence required a Board meeting to discuss, and that the Board was subject to certain legal requirements before convening. The DOGE representatives indicated that they did not need to call a Board meeting, and that they just needed a quick "yes-or-no" answer from the Board on alignment. I asked that the specific request be put in writing.

11. After the meeting, I heard from Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees. They also noted that the IAF's annual funding already was provided to "cover only the minimum statutory requirements" and that if I were to take actions to reduce staff, it "would be in contravention of the appropriations enacted into law." I shared this information with the IAF Board.

12. From February 21, through the weekend, and on Monday, February 24, I spoke with each member of the IAF Board multiple times to analyze all options and identify the best lawful path forward. I also heard from multiple congressional stakeholders and legal experts that they believed the DOGE plan was unlawful and contrary to congressional intent.

13. On February 24, 2025, I spoke on the telephone with Cavanaugh and Altik. During this call, the DOGE representatives claimed that with one exception, all members of the Board had been terminated. I expressed surprise at this news, given that I had been in recent touch with each Board member. They asked me to confirm that I would implement DOGE's agenda in the absence of a Board, and they threatened that the President would terminate me if I declined to do so. I responded that I could not further respond to DOGE's requests without more specificity as to those

requests in writing and the opportunity to determine whether they were legal. I further stated that I was committed to always doing what was lawful, and to follow all of my legal obligations and responsibilities. The DOGE representatives asked me to sign a memorandum of understanding agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems. I declined, stating that I did not believe I had the authority to do so, given my understanding that my Board still remained. After the call, I confirmed that no Board member had yet received a termination letter from the President, or anyone else.

14. On the evening of February 26, 2025, I received an email from Trent Morse stating that, at the direction of President Trump, my position at the IAF had been terminated, effectively immediately.

15. I was provided with a subsequent email from Trent Morse, dated February 28, 2025, stating to the IAF's Chief Operating Officer that President Trump had appointed Pete Marocco as the acting Chair of the Board of the IAF. Attached as Exhibit A is the email from Trent Morse to the IAF's Chief Operating Officer.

16. I have come to learn that following his purported appointment as acting Chair of the Board of the IAF, Marocco held a closed-door meeting where he voted to appoint himself as the acting President and CEO of the IAF.

17. I have also come to learn that the Administrative Resource Center, housed at the Treasury Department's Bureau of the Fiscal Service, received a directive to terminate the IAF contracts that was authorized by Peter Marocco, now representing himself to be the President of the IAF. The Administrative Resource Center, which manages the IAF's procurement and finance functions, ultimately determined that most IAF contracts were to be terminated that evening, with the exception of a handful that were flagged as critical operations, such as HR and IT.

18. On March 2, 2025, members of the Board of the IAF wrote to me, stating their intent to serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law. They communicated their view that, accordingly, the governance of the IAF remained unaltered and in place, no duly qualified members of the Board had fired me, and that I remained the agency's President and CEO. The Board directed me to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the agency's grantees. Attached as Exhibit B is the letter from the IAF Board that was sent to me.

19. I have come to understand that on March 3, 2025, Marocco and DOGE began implementing a RIF of the IAF's employees, notifying most IAF staff that they would be placed on administrative leave. Since then, the IAF employees have been shut out of the IT systems. The IAF website has been taken down and is no longer operating. Although the IAF's offices remain open, my understanding is that there are only three employees remaining who have not been placed on administrative leave and who have access to the building.

20. My understanding is that as of today, Marocco has terminated virtually all existing IAF grants. The exception is a single grant that only has limited funds remaining—approximately $66,000—that will soon expire. I believe that the IAF also continues to own a single equity investment in a microfinance institution.

21. In grant termination notices that were sent beginning March 4, grantees were instructed to "send remaining unspent funds to the IAF" within fifteen days and to submit their "final programmatic and financial report no later than April 2, 2025." Based on my experience, the IAF's grant recipients will face legal and financial challenges based on the pause and cancellation of agreements signed with the IAF.

22. In direct response to DOGE's actions, IAF's philanthropic partners have asked that their donations be returned. I understand that the IAF's grant management system that houses the agency's key programmatic processes—including administration of grantee proposals, reports, and financing information—remains in place for now.

23. Beginning last week, IAF staff members have received RIF notices sent on behalf of Marocco, informing the staff members of their severance as part of "workplace reshaping" at the IAF. Staff members have been informed that their official separation date will be Friday, April 4, 2025.

24. If I am illegally removed from my position of the IAF, I will suffer irreparable harm in my ability to advance the commitment I made to this agency and its critical mission. Serving as the President of the IAF uniquely leverages the blend of experience I have related to international development, government service, and mobilizing private sector investment, and the agency has no counterpart in the private sector. The IAF is a unique agency dedicated to investing in community-led development while also advancing American strategic interests in the region. As the President of IAF, I have the pleasure and responsibility of overseeing this mission and the work of professional public servants every day. Nothing will compensate for my loss of this role.

25. Further, I accepted my appointment to be President and CEO of the IAF with the knowledge that I can only be removed from my position by the bipartisan Board of the IAF. The statute prescribes that I shall continue serving as President of the IAF. My termination contrary to the statute is an irreparable injury. No subsequent remedy—including money or post-judgment reinstatement—will make up for each day in the interim that I was unlawfully prevented from serving as President of the IAF.

26.     Reinstatement (i.e., succeeding on the merits of my lawsuit) would not alone adequately compensate me for the irreparable harm I will suffer if I am unlawfully removed, because the agency will be effectively dismantled during the period in which I am not President. Loss of the right to continue my position at the IAF cannot be adequately remedied down the line.

27.     Finally, unless enjoined by this Court, Defendants will cause immeasurable damage to the mission of the IAF if they illegally remove me from my position at the IAF. Though this damage to the IAF, and by implication to U.S. interests abroad, is irreparable in its own right, I am similarly irreparably harmed by the damage done to the IAF because it defeats the reason why I chose to join the IAF: to further the agency's unique approach in reaching millions of people in the Western Hemisphere. In other words, the harm to me and the harm to the IAF are intertwined.

28.     Unless I am granted immediate injunctive relief from this Court, I will forever lose time as President of the IAF that Congress specifically instructed in statute should continue on terms set by a Senate confirmed Board. Immediate injunctive relief from this Court is necessary to vindicate my rights and to protect the functioning of the IAF.

29.     Attached as Exhibit C is a copy of the IAF Bylaws.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing declaration is true and correct.

Dated this 17th of March, 2025, and executed in Washington, D.C.

Signed:      /s/ Sara Aviel

Print Name:  Sara Aviel