APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–00778–LLA</u>
### *Internal Use Only*

AVIEL v. GOR et al
Assigned to: Judge Loren L. AliKhan
Related Case:  1:25–cv–00857–LLA
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 03/17/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of
Agency Decision
Jurisdiction: U.S. Government Defendant

**<u>Plaintiff</u>**

**SARA AVIEL**
*in her personal capacity and in her*
*official capacity as President of the*
*Inter–American Foundation*

represented by **Aaron Simcha Jon Zelinsky**
ZUCKERMAN SPAEDER LLP
100 E Pratt Street
Suite 2440
Baltimore, MD 21202
410–949–1167
Fax: 410–659–0436
Email: <u>azelinsky@zuckerman.com</u>
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aaron Chou**
ZUCKERMAN SPAEDER LLP
1800 M St. NW
Suite 1000
Washington, DC 20036
202–778–1864
Email: <u>achou@zuckerman.com</u>
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**M. Moore**
ZUCKERMAN SPAEDER LLP
1800 M St. NW
Suite 1000
Washington, DC 20036
202–778–1800
Email: <u>mmoore@zuckerman.com</u>
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

represented by

1

**SERGIO GOR**
*in his official capacity as Director of the White House Presidential Personnel Office*

**John Bardo**
DOJ–USAO
601 D Street NW
Washington, DC 20530
(202) 870–6770
Email: john.bardo@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETE MAROCCO**
*in his official capacity as Acting Deputy Administrator for Policy and Planning and for Management and Resources for USAID and Director of Foreign Assistance at the Department of State and in his purported official capacity as Chairman of the Board of IAF*

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE**

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE TEMPORARY ORGANIZATION**

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY GLEASON**
*in her official capacity as the Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization*

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN EHIKIAN**
*in his official capacity as Acting Administrator of the U.S. General Services Administration*

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**
*in his official capacity as the Secretary of the Treasury*

represented by  **John Bardo**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**                        represented by    **John Bardo**
*in his official capacity as President of the*                (See above for address)
*United States of America*                                  *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2025 | 1 | COMPLAINT against ALL DEFENDANTS ( Filing fee $ 405 receipt number ADCDC–11547346) filed by SARA AVIEL. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons, # 3 Summons Summons, # 4 Summons Summons, # 5 Summons Summons, # 6 Summons Summons, # 7 Summons Summons, # 8 Summons Summons, # 9 Summons Summons)(Moore, M.) (Attachment 1 replaced to remove fillable form on 3/17/2025) (zjd). Modified docket text per counsel on 3/18/2025 (mg). (Entered: 03/17/2025) |
| 03/17/2025 | 2 | NOTICE of Appearance by M. Moore on behalf of SARA AVIEL (Moore, M.) (Entered: 03/17/2025) |
| 03/17/2025 | 3 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Aaron Zelinsky, Fee Status: No Fee Paid. by SARA AVIEL. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Moore, M.) (Entered: 03/17/2025) |
| 03/17/2025 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Aaron Chou, Filing fee $ 100, receipt number ADCDC–11548135. Fee Status: Fee Paid. by SARA AVIEL. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Moore, M.) (Entered: 03/17/2025) |
| 03/17/2025 | 5 | MOTION for Temporary Restraining Order *and Preliminary Injunction* by SARA AVIEL. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Text of Proposed Order)(Moore, M.) (Entered: 03/17/2025) |
| 03/17/2025 | 6 | NOTICE of Appearance by John Bardo on behalf of SERGIO GOR, PETE MAROCCO, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, STEPHEN EHIKIAN, SCOTT BESSENT, DONALD J. TRUMP (Bardo, John) (Entered: 03/17/2025) |
| 03/17/2025 | | Case Assigned to Judge Amit P. Mehta. (zjd) (Entered: 03/17/2025) |
| 03/17/2025 | 7 | SUMMONS (8) Issued Electronically as to All Defendants. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/17/2025) |
| 03/17/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error needs correction: Missing summonses– U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zjd) (Entered: 03/17/2025) |
| 03/17/2025 | 8 | REQUEST FOR SUMMONS TO ISSUE by SARA AVIEL. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons)(Moore, M.) Modified event on 3/18/2025 (mg). (Entered: 03/17/2025) |

| 03/18/2025 | | Payment for 3 MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Aaron Zelinsky, Fee Status: No Fee Paid.. ($100; Receipt number ADCDC–11548627). (Moore, M.) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 9 | SUMMONS (10) Issued Electronically as to SCOTT BESSENT, STEPHEN EHIKIAN, AMY GLEASON, SERGIO GOR, PETE MAROCCO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, U.S. Attorney and U.S. Attorney General (mg) (Entered: 03/18/2025) |
| 03/18/2025 | 10 | Case randomly reassigned to Judge Loren L. AliKhan. Judge Amit P. Mehta is no longer assigned to the case. (ztnr) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Leave to Appear Pro Hac Vice 3 , it is hereby ORDERED that the motion is GRANTED and AARON ZELINSKY is granted leave to appear pro hac vice in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).  Click for Instructions**. Signed by Judge Loren L. AliKhan on 3/18/2025. (lclla3) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Leave to Appear Pro Hac Vice 4 , it is hereby ORDERED that the motion is GRANTED and AARON CHOU is granted leave to appear pro hac vice in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).  Click for Instructions**. Signed by Judge Loren L. AliKhan on 3/18/2025. (lclla3) (Entered: 03/18/2025) |
| 03/18/2025 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear for a Status Conference regarding Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction 5 on March 19, 2025 at 11:00 a.m. in Courtroom 21.<br><br>The court will provide access for the public to telephonically attend the hearing. The hearing can be accessed by dialing the Toll Free Number: 833–990–9400 (Meeting ID: 715234770). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Loren L. AliKhan on 3/18/2025. (lclla3) (Entered: 03/18/2025) |
| 03/18/2025 | 11 | NOTICE of Appearance by Aaron Simcha Jon Zelinsky on behalf of SARA AVIEL (Zelinsky, Aaron) (Entered: 03/18/2025) |
| 03/18/2025 | 12 | NOTICE of Appearance by Aaron Chou on behalf of SARA AVIEL (Chou, Aaron) (Entered: 03/18/2025) |
| 03/19/2025 | | Set/Reset Hearings: Status Conference re: Motion 5 for TRO/PI set for 3/19/2025 at 11:00 AM in Courtroom 21 (in person with audio line available) before Judge Loren L. AliKhan. (mhp) (Entered: 03/19/2025) |
| 03/19/2025 | 13 | ORDER directing Defendants to file a status report and declaration by 4:00 p.m. on March 19, 2025, and directing Plaintiff to file a response by 5:30 p.m. on March 19, 2025. See Order for details. Signed by Judge Loren L. AliKhan on 3/19/2025. (lclla3) |

| | | |
|---|---|---|
| | | (Entered: 03/19/2025) |
| 03/19/2025 | | Minute Entry for STATUS CONFERENCE held on 3/19/2025 before Judge Loren L. AliKhan: The matter comes before the court for a scheduling conference on Plaintiff's Motion 5 for Temporary Restraining Order and Preliminary Injunction. Aaron Zelinsky, Aaron Chou, and M. Moore present on behalf of Plaintiff. John Bardo and John C. Truong present on behalf of Defendants. Defendants agreed to extend the deadline for grantees to return funding and notify all grantees of the extension. For the reasons stated from the bench and further explained in the court's March 19, 2025 Order 13 , Defendants shall file their status report and declaration by 4PM on March 19, 2025 and Plaintiff shall file her response by 5:30PM on March 19, 2025. The court will set a briefing schedule after considering the parties' supplemental filings. Plaintiff's oral request to relieve counsel M. Moore from future hearings, granted. (Court Reporter Jeffrey Hook)(mhp) (Entered: 03/19/2025) |
| 03/19/2025 | 14 | NOTICE re 13 Order by SERGIO GOR, PETE MAROCCO, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, STEPHEN EHIKIAN, SCOTT BESSENT, DONALD J. TRUMP (Attachments: # 1 Affidavit)(Bardo, John) Modified to add link on 3/20/2025 (znmw). (Entered: 03/19/2025) |
| 03/19/2025 | 15 | NOTICE *Supplemental Notice of Compliance* by SERGIO GOR, PETE MAROCCO, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, STEPHEN EHIKIAN, SCOTT BESSENT, DONALD J. TRUMP re 14 Notice (Other) (Attachments: # 1 Exhibit)(Bardo, John) (Entered: 03/19/2025) |
| 03/19/2025 | 16 | NOTICE *in Response to Defendants' Notice* by SARA AVIEL re 14 Notice (Other) (Chou, Aaron) (Entered: 03/19/2025) |
| 03/19/2025 | 17 | TRANSCRIPT OF STATUS CONFERENCE before Judge Loren L. AliKhan held on March 19, 2025. Page Numbers: 1 – 46. Date of Issuance: March 19, 2025. Court Reporter: Jeff Hook. Telephone number: 202–354–3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/9/2025. Redacted Transcript Deadline set for 4/19/2025. Release of Transcript Restriction set for 6/17/2025.(Hook, Jeff) (Entered: 03/19/2025) |
| 03/19/2025 | | MINUTE ORDER: Upon consideration of the parties' notices and exhibits 14 15 16 and Defendants' representations at the Scheduling Conference held on March 19, 2025, it is hereby ORDERED that the following schedule shall govern briefing on Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction 5 : Defendants shall file their opposition to the motion on or before March 26, 2025; and Plaintiff shall |

| | | |
|---|---|---|
| | | file her reply on or before March 31, 2025.<br><br>It is further ORDERED that Defendants shall file a status report on or before 12:00 p.m. on March 20, 2025, providing a description or copy of the notice that they sent to all IAF grantees by 5:00 p.m. on March 19, 2025, informing them that the deadline for returning funds has been extended until the court rules on Plaintiff's motion.<br><br>It is further ORDERED that the parties shall convene for a hearing on Plaintiff's motion at 2:00 p.m. on April 2, 2025 in Courtroom 21.<br><br>The court will provide access for the public to telephonically attend the April 2, 2025 hearing. The hearing can be accessed by dialing the Toll Free Number: 833–990–9400 (Meeting ID: 715234770). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Loren L. AliKhan on 3/19/2025. (lclla3) (Entered: 03/19/2025) |
| 03/20/2025 | 18 | STATUS REPORT by SERGIO GOR, PETE MAROCCO, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, STEPHEN EHIKIAN, SCOTT BESSENT, DONALD J. TRUMP. (Bardo, John) (Entered: 03/20/2025) |
| 03/26/2025 | 19 | Memorandum in opposition to re 5 Motion for TRO filed by SERGIO GOR, PETE MAROCCO, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, STEPHEN EHIKIAN, SCOTT BESSENT, DONALD J. TRUMP. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Bardo, John) (Entered: 03/26/2025) |
| 03/27/2025 | | MINUTE ORDER: It is hereby ORDERED that the motions hearing currently set for 2:00 p.m. on April 2, 2025 in Courtroom 21 is consolidated with the motions hearing in *Cristosal Human Rights v. Marocco*, No. 25–CV–857. The cases are not consolidated for any other purpose at this time. Signed by Judge Loren L. AliKhan on 3/27/202. (lclla3) (Entered: 03/27/2025) |
| 03/31/2025 | 20 | REPLY to opposition to motion re 5 Motion for TRO *and Preliminary Injunction* filed by SARA AVIEL. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Zelinsky, Aaron) (Entered: 03/31/2025) |
| 04/02/2025 | 21 | NOTICE by SERGIO GOR, PETE MAROCCO, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, STEPHEN EHIKIAN, SCOTT BESSENT, DONALD J. TRUMP (Attachments: # 1 Exhibit)(Bardo, John) (Entered: 04/02/2025) |
| 04/02/2025 | | Minute Entry for MOTION HEARING held on 4/2/2025 before Judge Loren L. AliKhan: The matter comes before the court for Plaintiff's Motion 5 for a Temporary Restraining Order and Preliminary Injunction. Aaron Zelinsky and Aaron Chou present on behalf of Plaintiff. John Bardo and John C. Truong present on behalf of Defendants. Plaintiff's motion was heard in consolidation with the Motion for a Preliminary Injunction in Case No. 25–CV–857. Both matters were fully briefed, argued, and taken under advisement. (Court Reporter Jeffrey Hook)(mhp) Modified on 4/3/2025 (mhp) |

| | | |
|---|---|---|
| | | (Entered: 04/03/2025) |
| 04/04/2025 | 22 | MEMORANDUM OPINION regarding Plaintiff's Motion for a Preliminary Injunction 5 . See Opinion for details. Signed by Judge Loren L. AliKhan on 4/4/2025. (lclla3) (Entered: 04/04/2025) |
| 04/04/2025 | 23 | ORDER: For the reasons explained in the court's Memorandum Opinion 22 , it is hereby ORDERED that Plaintiff's Motion for a Preliminary Injunction 5 is GRANTED. It is further ORDERED that Defendants shall provide written notice of the court's order to the IAF's employees and grantees by **4:30 p.m. on April 4, 2025**. It is further ORDERED that Defendants shall file a status report on or before April 7, 2025 apprising the court of the status of their compliance with this Order. It is further ORDERED that the parties shall meet and confer and file a joint status report proposing next steps in this proceeding on or before April 9, 2025. Signed by Judge Loren L. AliKhan on 4/4/2025. (lclla3) (Entered: 04/04/2025) |
| 04/04/2025 | | Set/Reset Deadlines: Defendants Status of Compliance due by 4/7/2025. Joint Status Report due by 4/9/2025. (mhp) (Entered: 04/04/2025) |
| 04/05/2025 | 24 | NOTICE *Regarding Lack of Access to IAF Computer Systems* by SARA AVIEL re 23 Order on Motion for TRO,, (Zelinsky, Aaron) (Entered: 04/05/2025) |
| 04/05/2025 | | MINUTE ORDER: It is hereby ORDERED that Defendants shall file a response to Plaintiff's Notice 24 by **3:30 p.m. on April 5, 2025**, apprising the court of their compliance with the court's April 4, 2025 Order 23 . Signed by Judge Loren L. AliKhan on 4/5/2025. (lclla3) (Entered: 04/05/2025) |
| 04/05/2025 | 25 | NOTICE *In Response to Apr. 5, 2025 Minute Order* by SCOTT BESSENT, STEPHEN EHIKIAN, AMY GLEASON, SERGIO GOR, PETE MAROCCO, DONALD J. TRUMP, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION (Bardo, John) (Entered: 04/05/2025) |
| 04/06/2025 | 26 | NOTICE OF APPEAL TO DC CIRCUIT COURT by AMY GLEASON, PETE MAROCCO, STEPHEN EHIKIAN, DONALD J. TRUMP, SERGIO GOR, SCOTT BESSENT, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION. Fee Status: No Fee Paid. Parties have been notified. (Bardo, John) (Entered: 04/06/2025) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

        Plaintiff,

    v.

SERGIO GOR, et al.,

        Defendants.

Civil Action No. 25-0778 (LLA)

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit the Court's April 4, 2025 Order (ECF No. 23), and Memorandum Opinion (ECF No. 22). Defendants intend to request a stay of this Court's Order pending appeal, including an immediate administrative stay, from the United States Court of Appeals for the District of Columbia Circuit.

Dated: April 6, 2025
      Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: _____ */s/ John J. Bardo* _____
    JOHN J. BARDO, D.C. Bar #1655534
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 870-6770

*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

        *Plaintiff,*

     v.

SERGIO GOR, *et al.*,

        *Defendants.*

Civil Action No. 25 - 778 (LLA)

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, ECF No. 22, it is hereby **ORDERED** that Plaintiff's Motion for a Preliminary Injunction, ECF No. 5, is **GRANTED**. It is further

**ORDERED** that Defendants are enjoined from removing Sara Aviel from her position as president and CEO of the Inter-American Foundation ("IAF"), from denying her the benefits of that position, and from otherwise obstructing her ability to carry out the duties of that position, absent a decision by a lawfully constituted Board of the IAF. It is further

**ORDERED** that Peter Marocco is enjoined from serving as an "acting" Board member of the IAF and from carrying out the duties of that position in any way, shape, or form, absent a lawful appointment under Article II of the United States Constitution and the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.* It is further

**ORDERED** that Defendants may not appoint Peter Marocco or any other individual as an "acting" member of the IAF Board, and may not appoint Peter Marocco or any other individual as a permanent member of the IAF Board absent Senate confirmation. It is further

**ORDERED** that any actions taken by Peter Marocco in his role as "acting" Board member of the IAF—including, but not limited to, the removal of Ms. Aviel as president and CEO of the IAF, the termination of any grants or other forms of agreements entered into by the IAF, and the attempted reduction-in-force of the IAF's employees—are *void ab initio* and without any legal effect.  It is further

**ORDERED** that Defendants must provide written notice of the court's preliminary injunction to the IAF's employees and grantees by 4:30 p.m. on April 4, 2025.  It is further

**ORDERED** that Defendants shall file a status report on or before April 7, 2025, apprising the court of the status of their compliance with this Order, including by providing a copy of the written notice(s) described above; it is further

**ORDERED** that the parties shall meet and confer and file a joint status report proposing next steps in this proceeding, including an expedited schedule for summary judgment briefing, on or before April 9, 2025.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date:   April 4, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SARA AVIEL,

    *Plaintiff,*

  v.             Civil Action No. 25 - 778 (LLA)

SERGIO GOR, *et al.*,

    *Defendants.*

## <u>MEMORANDUM OPINION</u>

Plaintiff Sara Aviel was purportedly fired from her position as the president and Chief Executive Officer ("CEO") of the Inter-American Foundation ("IAF") by either President of the United States Donald J. Trump or supposed IAF Board member Pete Marocco. ECF No. 1 ¶¶ 1, 6, 69.[1] She brings this suit seeking declaratory and injunctive relief against President Trump, Mr. Marocco, and other government officials and entities (collectively, "Defendants"), *see generally id.*, and she seeks a temporary restraining order or a preliminary injunction directing that she be reinstated to her position and that any actions by Mr. Marocco on the IAF's behalf be deemed void *ab initio*, ECF No. 5, at 1-2. For the reasons explained below, the court will grant Ms. Aviel's motion for a preliminary injunction, reinstate Ms. Aviel as the lawful president and CEO of the IAF, and void all decisions Mr. Marocco has made on the IAF's behalf because he lacked the authority to make them.

---

[1] Throughout this opinion, the court will use lowercase to refer to Ms. Aviel's contested position at the IAF and uppercase to refer to the President of the United States.

# I.    FACTUAL BACKGROUND

## A.    The Inter-American Foundation

The Inter-American Foundation is "a half-century-old independent agency created by Congress to support the United States' strategic interests in La[t]in America and the Caribbean." ECF No. 1 ¶ 1.  In particular, the IAF helps the U.S. government "direct[] its foreign development aid to the most vulnerable and underserved people," and it has "funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country," to address issues including child abuse, sex trafficking, hunger, and poverty.  *Id.* ¶¶ 2-3.

Through the Inter-American Foundation Act, 22 U.S.C. § 290f, passed in 1969, Congress created the IAF and directed that it "shall have perpetual succession unless sooner dissolved by an Act of Congress," *id.* § 290f(e)(1).  The Act requires that the IAF have a bipartisan Board of Directors comprised of "nine members appointed by the President, by and with the advice and consent of the Senate," of which no more than five members may belong to a single political party. *Id.* § 290f(g).  Members of the Board serve six-year terms and, "upon the expiration of [a member's] term of office[, the] member shall continue to serve until his successor is appointed and shall have qualified."  *Id.*  This structure "both serves and represents independence and insulation from partisan politics."  ECF No. 1 ¶ 4.

Congress has further "vested in the IAF Board of directors . . . the authority to exercise 'all the powers of the Foundation.'"  *Id.* ¶ 4 (quoting 22 U.S.C. § 290f(i)).  Accordingly, the Board—and only the Board—is empowered to appoint the president of the IAF, who also serves as the IAF's CEO.  22 U.S.C. § 290f(l)(1).  In March 2022, the IAF Board appointed Ms. Aviel to be its president and CEO.  ECF No. 1 ¶ 15.

2

**B.    Executive Order Nos. 14,158 and 14,217**

On January 20, 2025, President Trump signed Executive Order 14,158 ("Establishing and Implementing the President's 'Department of Government Efficiency'"). Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025). That order reorganized the United States Digital Service, renamed it the "United States DOGE Service (USDS)," and "established [it] in the Executive Office of the President." *Id.* § 3. It also created the role of the United States DOGE Service Administrator and put the Administrator in charge of "the U.S. DOGE Service Temporary Organization," which the executive order also established. *Id.* The U.S. DOGE Service Temporary Organization works to "advanc[e] the President's 18-month DOGE agenda" of "modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* §§ 1, 3.

On February 19, 2025, President Trump issued Executive Order 14,217 ("Commencing the Reduction of the Federal Bureaucracy"), which has a stated purpose of "reduc[ing] the size of the Federal Government . . . [by] reduc[ing] . . . the elements of the Federal bureaucracy that the President has determined are unnecessary." Exec. Order No. 14,217 § 1, 90 Fed. Reg. 10577 (Feb. 19, 2025). The order identifies several federal entities, including the IAF, that "shall be eliminated to the maximum extent consistent with applicable law" and "shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." *Id.* § 2. The executive order also requires "the head of each unnecessary governmental entity listed in [the executive order to] . . . submit a report to the Director of the Office of Management and Budget (OMB Director) confirming compliance with th[e] order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id.* Executive Order 14,217 further directs that when reviewing grant requests made by the entities listed in the executive order, "the OMB Director or the head of

3

any executive department or agency charged with reviewing grant requests . . . shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order." *Id.*

### C.  Purported Termination of Ms. Aviel and other IAF employees

On February 19—the same day that President Trump issued Executive Order 14,217— DOGE representatives requested to meet with Ms. Aviel and other IAF officials.  ECF No. 1 ¶ 55. To prepare for the meeting, Ms. Aviel and others "assembl[ed] discussion points showing how the IAF had functioned in service of efficiency[] and how the agency was in alignment with the administration's aims stated in the Executive Orders." *Id.*  "Ms. Aviel sought to align the agency with the President's stated policy instructions permissible by law." *Id.*

On February 20, two DOGE representatives—Nate Cavanaugh and Ethan Shaotran—met with Ms. Aviel and the other IAF officials. *Id.* ¶ 56.  The DOGE representatives "represented to the IAF that they had been detailed to the General Services Administration (GSA) . . . [and] informed the IAF that their goal was to support [the] IAF['s] compliance with the President's Executive Order." *Id.*  IAF employees, including Ms. Aviel, "share[d] information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities." *Id.* ¶ 57.  During the meeting, the DOGE representatives "indicated that their purpose was to focus on obtaining access to the IAF's systems"; to this end, after the meeting, the DOGE representatives emailed the IAF representatives "a memorandum of understanding with the GSA that provided for [Mr.] Cavanaugh to be detailed from the GSA to the IAF." *Id.* ¶ 58.

4

On February 21, Ms. Aviel and other IAF representatives again met with Mr. Cavanaugh and Mr. Shaotran, as well as Jacob Altik, a lawyer from the Executive Office of the President. *Id.* ¶ 59. Mr. Altik explained that, in his view, "the minimum statutory requirements for the IAF entailed the existence of a Board and a President, a presence in the District of Columbia, and a minimum level of grants and contracts." *Id.* Accordingly, "DOGE intended to effectuate the reduction-in-force [("RIF")] of most, if not all[,] of the IAF's employees, and the termination of all but a handful of the IAF's grants and contracts." *Id.* Ms. Aviel was instructed to immediately contact the IAF Board to see if they would agree to DOGE's plan. *Id.* ¶ 60. It was "suggested that if the Board was not so aligned, DOGE intended to terminate the Board and install individuals who were aligned with President Trump's vision." *Id.* When Ms. Aviel explained that such a significant matter would require a formal Board meeting, and that arranging such a meeting on short notice would be difficult because "the Board was subject to certain legal requirements before convening," the DOGE representatives explained that a Board meeting was not necessary because "they just needed a quick 'yes-or-no' answer from the Board on alignment." *Id.* ¶ 61.

After this meeting with the DOGE representatives, Ms. Aviel was informed by "Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47[, 138 Stat. 460, 843] (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations

committees." *Id.* ¶ 62.[2]  Ms. Aviel was also notified that if she took "actions to reduce staff, it would be in contravention of the appropriations enacted into law." *Id.* (internal quotation marks omitted).  From February 21 through February 24, Ms. Aviel "spoke with each member of the IAF Board multiple times to analyze all options and identify the best and most lawful path forward," and she "heard from multiple congressional stakeholders and legal experts that they believed the DOGE plan was unlawful and contrary to congressional intent." *Id.* ¶ 63.

On February 24, Mr. Altik contacted one IAF Board member and notified him that his fellow Board members had been terminated.  *Id.* ¶ 64.  That same day, during a phone call with Ms. Aviel, Mr. Cavanaugh and Mr. Altik stated that "with one exception, all members of the Board had been terminated." *Id.* ¶ 65.  The DOGE representatives then "asked Ms. Aviel to confirm that she would implement DOGE's agenda in the absence of a Board," and they "threatened that the President would terminate her if she declined to do so." *Id.*  Ms. Aviel declined to respond to DOGE's requests without "more specificity as to those requests in writing and the opportunity to determine whether they were legal." *Id.*  The DOGE representatives then asked Ms. Aviel to sign a memorandum of understanding "agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems." *Id.*  Because she believed that the full Board remained intact, and that she therefore did not have the authority to unilaterally sign the memorandum, Ms. Aviel declined to sign.  *Id.*  After the call, Ms. Aviel confirmed that the IAF Board members had not received termination letters.  *Id.* ¶ 66.

---

[2] This legislation appropriated $47 million to the IAF through September 30, 2025, "[f]or necessary expenses to carry out the functions of the Inter-American Foundation."  Further Consolidated Appropriations Act of 2024, Div. F, 138 Stat. at 746.  Congress also specified that the IAF may not use appropriated funds to "expand, eliminate, consolidate, or downsize" the agency without "prior consultation . . . with the appropriate congressional committees" and "a detailed justification for any proposed action." *Id.* at 843-44.

On February 25, DOGE representatives directed the Senior Procurement Executive ("SPE") at the Department of the Treasury "to close all IAF contracts by the close of business on February 27, 2025." *Id.* ¶ 67. SPE "relayed this request to the U.S. Treasury's Administrative Resource Center [('ARC')]—which . . . manages the IAF's procurement and finance functions— asking the ARC to cancel all IAF contracts," including ones for "contracted field staff, who serve as the agency's local liaisons and monitoring and evaluation specialists abroad." *Id.*

On February 26, Ms. Aviel received an email from Trent Morse, an employee at the Presidential Personnel Office, "informing her that President Trump had . . . terminate[d] her from her position as [p]resident and CEO of the IAF, effective immediately." *Id.* ¶ 69. On February 28, Mr. Morse informed the IAF's Chief Operating Officer that President Trump had "appoint[ed] Pete Marocco as the acting Chair of the Board of the IAF." *Id.* ¶ 70. Mr. Morse "represented that there were no other remaining members of the Board of the IAF," even though "the IAF organic statute provides that 'upon the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified.'" *Id.* (quoting 22 U.S.C. § 290f(g)). Mr. Morse also explained that, while President Trump did not have "statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members . . . [he] had inherent authority under Article II [of the United States Constitution] to do so." *Id.*

Also on February 28, Mr. Marocco "visited the IAF office, seeking an 'emergency board meeting' . . . [and] determined that because no one was there to let him, he was permitted to hold the meeting outside the IAF office." *Id.* ¶ 71. While Mr. Cavanaugh and Mr. Shaotran were present at this meeting, Mr. Marocco "was the only purported Board member in attendance." *Id.* Mr. Marocco closed the meeting to the public and then voted to appoint himself as the IAF's acting

7

president and CEO.  *Id.*  Later that day, Mr. Marocco sent a directive to the ARC, commanding that it terminate the IAF's contracts.  *Id.* ¶ 72.  The ARC thereafter informed an IAF representative that it would be taking immediate steps to comply with the order, "as authorized by the IAF's newly-appointed President Peter Marocco."  *Id.* (internal quotation marks omitted).  Although the IAF representative "proposed revisions to the termination list in an effort to preserve certain contracts," the ARC terminated nearly all of the IAF's contracts that evening, "with the exception of a handful that were flagged as critical operations, such as HR and IT."  *Id.* ¶ 73.

On March 2, IAF Board members informed Ms. Aviel that they planned to "serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law"; explained that they believed that Ms. Aviel remained the IAF's president and CEO; and "directed Ms. Aviel to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the agency's grantees."  *Id.* ¶ 74.

The next day, Mr. Marocco "circulated a Board Resolution, naming himself as Board Chair, President, and CEO of the IAF."  *Id.* ¶ 75.  That same day, the IAF's Chief Operating Officer emailed all IAF staff members explaining that Ms. Aviel had been terminated on February 28, and that "Pete Marocco has been appointed as Acting Chairman, President and CEO of Inter-American Foundation to implement the President's Executive Order signed on February 19, 2025."  *Id.* ¶ 76. Shortly thereafter, Mr. Marocco and DOGE notified "most IAF staff that they would be placed on administrative leave."  *Id.* ¶ 77.  IAF employees were then "shut out of the IT systems" and the IAF's website was "taken down."  *Id.*  Although the IAF office still remains open, "there are only three employees remaining who have not been placed on administrative leave and who have access to the building."  *Id.*  Staff members have since received RIF notices informing them that their official separation date will be today, April 4, 2025.  *Id.* ¶ 81.

8

Within the span of seventy-two hours, Mr. Marocco and DOGE had terminated "virtually all existing IAF grants."[3]  *Id.* ¶ 78.  Beginning on March 4, grantees were ordered to "'send remaining unspent funds to the IAF' within fifteen days (that is, [by] March 19) and to submit their 'final programmatic and financial report no later than April 2, 2025.'"  *Id.* ¶ 79.  As a result of the termination of their grants, the IAF's grant recipients "will face legal and financial challenges based on the pause and cancellation of agreements signed with the IAF."  *Id.*  And "[i]n direct response to DOGE's actions," the IAF's philanthropic partners have also requested "that their donations be returned."  *Id.* ¶ 80.

## II.     PROCEDURAL HISTORY

Ms. Aviel filed this action on March 17, 2025.  ECF No. 1.  The same day, she moved for a temporary restraining order and a preliminary injunction.  ECF No. 5.  On March 19, the parties appeared before the court for a status conference.  *See* Mar. 19, 2025 Minute Entry.  To give the parties time to fully brief Ms. Aviel's motion, Defendants agreed to (1) suspend the deadline by which the IAF's grantees would be required to return grant funds until the resolution of Ms. Aviel's motion, and (2) hold any already returned funds at the IAF.  *See* Tr. of Status Conf., at 29:22-31:7 (D.D.C. Mar. 19, 2025).  The court then set a briefing schedule and scheduled a motions hearing for April 2.  *See* Mar. 19, 2025 Minute Order.  On March 27, the court consolidated the motions hearing in this case with the one in *Cristosal Human Rights v. Marocco*, No. 25-CV-857—a suit brought by several of the IAF's grantees.  *See* Mar. 27, 2025 Minute Order.  On April 2, the court

---

[3] A single grant with $66,000 remaining—which will soon expire—is the only grant that has not yet been terminated.  ECF No. 1 ¶ 78.  The IAF "also continues to own a single equity investment in a microfinance institution."  *Id.*

heard oral argument on the pending motions in both cases. *See* Apr. 2, 2025 Minute Entry. Ms. Aviel's motion is now fully briefed, ECF Nos. 5, 19, 20, and is ripe for resolution.

### III.    LEGAL STANDARDS

To obtain a preliminary injunction, "the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). These four considerations are factors, not elements. "A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Id.* (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). When a government entity is a party to the case, the third and fourth factors merge. *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

Before the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), courts in this Circuit tended to employ a "sliding scale" method in which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). While the D.C. Circuit has considered abandoning the sliding-scale method for one that treats the substantial likelihood prong as "an independent, free-standing requirement," *id.* at 393, it has yet to decide the issue one way or the other, *see Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022). At the very least, however, the plaintiff must present a "serious legal question on the merits." *Raimondo*, 40 F.4th at 726 (quoting *Sherley*, 644 F.3d at 398). Given the ambiguity with respect to the sliding-scale approach, the court will consider all factors and delve into their relative weight only if it would affect the outcome. *See Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020).

10

# IV.    DISCUSSION

While the parties primarily dispute the first two factors of the preliminary-injunction test, the court determines that each factor weighs in favor of granting a preliminary injunction. In addition to demonstrating an overwhelming likelihood of success on the merits, Ms. Aviel shows that she will suffer irreparable harm absent an injunction and that the merged factors of the balance of the equities and the public interest favor preliminary relief.

## A.    Likelihood of Success on the Merits

Under the Appointments Clause of the United States Constitution:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2. Put simply, this means that the President of the United States can appoint—with the advice and consent of the U.S. Senate—what are known as "principal officers," whereas Congress dictates the mechanisms for appointing "inferior [o]fficers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12-13 (2021). Whether a particular officer is a "principal officer" or an "inferior officer" "depends on whether [s]he has a superior." *Edmond v. United States*, 520 U.S. 651, 662 (1997). Generally speaking, an officer whose work is "directed and supervised" by a principal officer is an inferior officer. *Id.* at 663.

With these principles in mind, three key issues are not disputed in this case. First, the parties agree that each Senate-confirmed IAF Board member is a principal officer of the IAF because it "direct[s] the exercise of all the powers of the [IAF]." ECF No. 5-1, at 17 (quoting 22 U.S.C. § 290f(i)); *see* ECF No. 19, at 6-7. Second, the parties concur that the President of the

United States has the authority to fire any IAF Board member—or, indeed, all of them.  *See* Tr. of Prelim. Inj. Hr'g, at 18:3-6 (D.D.C. Apr. 2, 2025) (Counsel for Ms. Aviel: "We are not arguing that the [P]resident lacks authority to remove members of the board.  We grant that the case law allows that and that the board members can be removed."); ECF No. 19, at 6.  Third, the parties do not dispute that Ms. Aviel is an inferior officer under the Appointments Clause.  *See* ECF No. 5-1, at 17 (arguing that Ms. Aviel is "[a]t all times" "'subject to supervision and oversight' by the principal officer of the organization, the Board" (quoting *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021))); *see generally* ECF No. 19 (failing to contest whether Ms. Aviel is an inferior officer).

What *is* disputed in this case is (1) whether the President had the power to terminate Ms. Aviel, an inferior officer; and (2) whether the President had the power to appoint Mr. Marocco as an acting "principal officer," in which case, he could have terminated Ms. Aviel and taken the above-discussed actions on behalf of the IAF.  At this stage of the case, Ms. Aviel has convincingly shown that the answer to both questions is "no."

### 1.    Whether the President had the authority to terminate Ms. Aviel

In enacting the IAF's organic statute, Congress directed that the organization's president "shall be appointed by the Board of Directors on such terms as the Board may determine."  22 U.S.C. § 290f(*l*)(1).  Consistent with the statute, the IAF's Board has enacted bylaws conferring "general supervision" and "day-to-day business" responsibilities to its president.  ECF No. 5-5, at 4.  At all times, however, the president remains "responsible to and under the general direction of the Board."  *Id.*  Because "removal [power] is incident[al] to the power of appointment," the Board retains the authority to hire and fire the IAF's president.  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 509 (2010).

Congress deliberately chose to give the Board appointment power over the IAF's president. 22 U.S.C. § 290f(*l*)(1). When Congress enacts such a scheme, "it is ordinarily the department head"—here, the IAF's Board—"rather than the President, who enjoys the power of removal." *Free Enter. Fund*, 561 U.S. at 493. And "[a]bsent relevant legislation" stating otherwise, "the power to remove is held . . . only by the appointing authority." *Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239, 247 (D.C. Cir. 1981); *see id.* ("[F]or example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President.").

Defendants offer no response to this argument, nor could they.[4] Congress's enactment of the IAF's organic statute and other relevant legal authorities make clear that the Board holds hiring and firing power over the IAF's president and CEO. Therefore, to the extent President Trump purported to terminate Ms. Aviel from her role on February 26, that termination violated the Appointments Clause.

**2.     Whether the President could appoint Mr. Marocco as an acting IAF board member**

According to Defendants, even if the President did not have the authority to fire Ms. Aviel, Mr. Marocco had the power to remove her as president and CEO of the IAF after President Trump appointed him as an acting IAF Board member. On this point, the court vehemently disagrees.

The President's ability to appoint principal officers simultaneously flows from and is limited by the text of the Appointments Clause. While the clause plays a key role in enabling the

---

[4] In *Brehm v. Marocco*, No. 25-CV-660—a similar case involving the removal of the president of the U.S. African Development Foundation—the government also did not contest this point. *See* Tr. of TRO Hr'g, at 9:5-9, *Brehm*, No. 25-CV-660 (D.D.C. Mar. 11, 2025) ("[It]'s clear in our papers, and I think not even disputed in the Defendants' papers, that the law is that an inferior officer is removable by the authority that appointed him, but nobody else—unless Congress alters that default rule.").

President to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, the Framers also recognized its potential perils. As the Supreme Court has acknowledged, "the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (internal quotation marks and quoted source omitted). For that reason, principal officers nominated by the President must be confirmed by the Senate. This limitation is a "critical 'structural safeguard[] of the constitutional scheme." *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (alteration in original) (quoting *Edmond*, 520 U.S. at 659). It protects against unchecked power in a single individual by "dividing" it "between the Executive and Legislative Branches." *Freytag*, 501 U.S. at 884; *see SW Gen., Inc.*, 580 U.S. at 317 (Thomas, J., concurring) ("[T]he Framers . . . recognized the serious risk for abuse and corruption posed by permitting one person to fill every office in the Government . . . [and] knew that liberty could be preserved only by ensuring that the powers of Government would never be consolidated in one body." (citing The Federalist No. 76, at 513 (J. Cooke ed. 1961); 3 J. Story, *Commentaries on the Constitution of the United States* § 1524, at 376 (1833); The Federalist No. 51, at 348)).

In special circumstances, however, "Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval." *SW Gen., Inc.*, 580 U.S. at 294 (emphasis added). This authority—primarily vested by Congress in the Federal Vacancies Reform Act of 1998 ("FVRA"), 5 U.S.C. § 3345 *et seq.*—enables government agencies to continue functioning while a permanent officer awaits confirmation. *SW Gen., Inc.*, 580 U.S. at 293-94. The FVRA is ordinarily "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency" for which Senate confirmation is required. 5 U.S.C § 3347(a). The

14

only exceptions are if another "statutory provision expressly" authorizes the President or another official to make such an appointment, *id.* § 3347(a)(1) & (2), or if the President validly makes a recess appointment under Article II, U.S. Const., art. II, § 2—neither of which is applicable here.

Under the FVRA, if a vacancy for a principal officer arises, the President may direct a person "to perform the functions and duties of the vacant office temporarily [and] in an acting capacity, subject to the time limitations" set forth in the statute.  5 U.S.C. § 3345.  If no acting officer has been appointed pursuant to the FVRA or another express statutory provision, "the office shall remain vacant."  *Id.* § 3348(b)(1).  Furthermore, any action taken by a person who was not properly appointed pursuant to the FVRA "shall have no force or effect."  *Id.* § 3348(d)(1).

The FVRA does not, however, apply to "any [principal officer] who is appointed by the President . . . to any board, commission, or similar entity that" "is composed of multiple members" and "governs an independent establishment or Government corporation."  *Id.* § 3349c(1).  Both parties agree that the IAF Board is such an entity.  ECF No. 5-1, at 20; ECF No. 19, at 7.  Therefore, the FVRA does not give the President power to appoint acting members of the IAF Board, and any actions by so-called "acting" members of that Board are necessarily void.  *See id.* § 3348(d)(1).

Defendants attempt to circumvent the FVRA's limitations in two ways, but neither is persuasive.  First, they claim that the FVRA's non-applicability to the IAF (through Section 3349c) means that the IAF falls *entirely* out of the statute's scope.  ECF No. 19, at 7-8.  In their view, the FVRA's limitations thus cannot constrain the President from appointing acting members of the IAF's Board.  But reaching this conclusion requires a serious distortion—or a complete disregard—of the FVRA's text.  To be sure, Section 3349c excludes Board-like entities from the FVRA's temporary-appointment power.  *See* 5 U.S.C. § 3349c ("Sections 3345 through 3349b shall not apply to [Board-like entities].").  But Section 3348(d)(1), which invalidates actions by improperly

15

appointed officers, *expressly encompasses* "vacant office[s] to which . . . [Section] 3349c appl[ies]." 5 U.S.C. § 3348(d)(1).  Accordingly, even if the President purports to appoint an officer to a Board-like entity in an acting capacity—something he cannot do under the FVRA in the first place—any actions by that officer are null and void.

Defendants next try to claim that the FVRA's exclusion of Board-like entities means that there *no* limitations on the President's authority to fill their vacancies.  If the President cannot appoint acting members under the FVRA, they say, then surely he has "inherent" power to do so under Article II.  ECF No. 19, at 9 ("Because Congress has not provided for procedures that the President must undertake to fill vacancies on the Foundation Board, and because the President must 'take care that the laws be faithfully executed' . . . and cannot wait for the Senate to confirm all nominees, the President must be able to [appoint acting principal officers].").  Not only does this ignore the FVRA's clear statement that the FRVA is the "exclusive means for temporarily [appointing] an acting [principal] official," 5 U.S.C. § 3347(a), it asserts a broad, heretofore unrecognized expansion of Executive power that would eviscerate key parts of the Constitution. The court has no choice but to reject it.

This argument, reduced to no more than a paragraph in Defendants' opposition brief, cites no binding legal authority.  The best Defendants can conjure is a suspiciously timed opinion from the Department of Justice's Office of Legal Counsel ("OLC") issued three weeks after Ms. Aviel was purportedly fired.  *See* ECF No. 19, at 9 (citing *Temp. Presidential Designation of Acting Bd. Members of the Inter-Am. Found. & the U.S. Afr. Dev. Found.*, 49 Op. O.L.C. ___, 4 (Mar. 14, 2025), https://perma.cc/DC2T-4LS7).  Because the opinion directly addressed legal questions that arose in an analogous suit, it contravened OLC's general "prudential" principle that it "avoids opining on questions likely to arise in pending or imminent litigation involving the United States

16

as a party." *Mem. for Att'ys of the Off.* (July 16, 2010), https://perma.cc/72U6-49JC.  But curious

motives aside, the memorandum is neither legally binding nor logically persuasive.  It asserts that

"the President's authority to [designate acting officials] is consistent with the Framers' demand for

'unity in the Federal Executive' to guarantee 'both vigor and accountability.'"  *Temp. Presidential*

*Designation of Acting Bd. Members*, at 4 (quoting *Printz v. United States*, 521 U.S. 898, 922

(1997)).  This pronouncement directly contradicts the Supreme Court's repeated recognition of the

Framers' fears over unfettered appointment powers.  *See, e.g.*, *SW Gen., Inc.*, 580 U.S. at 293-94;

*Edmond*, 520 U.S. at 659; *Freytag*, 501 U.S. at 883-84.  And while this court acknowledges the

importance of permitting the President to hire who he wishes, that does not give him a license to

barrel over "[constitutional] safeguard[s]" in the process.  *SW Gen., Inc.*, 580 U.S. at 293 (quoting

*Edmond*, 520 U.S. at 659).

        Defendants also retreat to the text of the Take Care Clause, but that does not save them

either.  They argue that, in order to faithfully execute the laws, the President must be able to ensure

the continued functioning of government agencies like the IAF.  ECF No. 19, at 7 ("[N]othing

required the President to leave the [IAF] leaderless and unable to 'direct the exercise of all the

powers of the Foundation' as the Senate considers his nominees . . . to fill vacancies on the Board."

(quoting 22 U.S.C. § 290f(i)).  But the President did not have to terminate the bipartisan members

whom the Senate had previously confirmed to the IAF's Board.  Having exercised his authority to

do so—authority that no one challenges—the fact that there is no Board member to relieve

Ms. Aviel of her duties is a problem of the President's own making.  Accordingly, Ms. Aviel may

carry on as the IAF's president and CEO until a Presidentially nominated and Senate-confirmed

IAF Board decides otherwise.  *See SW Gen., Inc.*, 580 U.S. at 317 (Thomas, J., concurring) ("We

cannot cast aside the separation of powers and the Appointments Clause's important check on

17

executive power for the sake of administrative convenience or efficiency.").[5]  This court simply "[will not] accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and equally remediable by—the executive . . . branch[]."  *Noel Canning v. Nat'l Lab. Rels. Bd.*, 705 F.3d 490, 511 (D.C. Cir. 2013).

The logical extension of Defendants' inherent-power argument is frightening.  If the President holds unbridled authority to fill any principal vacancy with an acting official (even when Congress has not authorized him to do so), and if the FVRA's time limitations do not apply to boards like the IAF's (which Defendants claim, *see* ECF No. 19, at 7-8), then the President could appoint an "acting" board member *indefinitely* without *ever* needing to seek the advice and consent of the Senate.  That reading eviscerates the Appointments Clause.  When the court pressed Defendants' counsel for a limiting principle at oral argument, Defendants had no response— convincing or otherwise.  The best they could offer was that the government had no intention of installing an acting principal indefinitely.  But Defendants could not deny that such an outcome would be permissible under their reading of the Constitution.

Defendants' reading also makes no sense in the context of the rest of the Constitution.  If the President has the power to appoint acting principal officers at all times, there would be no need for the Recess Appointments Clause.  That clause permits the President "to fill up all Vacancies that may happen during the Recess of the Senate" until the end of the next Senate session.  *Noel Canning*, 705 F.3d at 499.  But if the President has "inherent" authority to appoint acting officers under the Take Care Clause, then the Recess Appointments Clause is unnecessary.  It would violate every bedrock principle of judicial review to assume that any part of the Constitution is surplusage.

---

[5] Indeed, the precise problem Defendants now complain about is precisely why Congress requires Senate-confirmed Board members, "upon the expiration of [their] term of office[, to] continue to serve until [their] successors [are] appointed."  22 U.S.C. § 290f(g).

*See Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect[.]").

The consequences of the above analysis for this case are clear. The President did not have the authority to appoint Mr. Marocco as an acting member of the IAF's Board, meaning that Mr. Marocco's actions in that role were without legal effect. Because accepting Defendants' arguments would leave parts of the Constitution in tatters, Ms. Aviel has shown a substantial likelihood of success on the merits.

### B.     Irreparable Harm

Irreparable harm is "a high standard." *England*, 454 F.3d at 297. To satisfy it, a plaintiff must show that the alleged injury is "both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). It must also "be beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674). Ms. Aviel has met her burden here.

This litigation has the luxury of unfolding simultaneously alongside numerous cases challenging similar officer removals. *See, e.g.*, *Dellinger v. Bessent*, No. 25-CV-385, 2025 WL 471022 (D.D.C. Feb. 12, 2025); *Harris v. Bessent*, No. 25-CV-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025), *appeal filed*, No. 25-5055 (D.C. Cir.); Order, *Brehm v. Marocco*, No. 25-CV-660 (D.D.C. Mar. 11, 2025). Unsurprisingly, the parties disagree on what each of these cases means for Ms. Aviel.

Ms. Aviel asserts that being removed as president of the IAF inflicts an irreparable injury because it "entails the professional loss of a once-in-a-lifetime job, the economic losses attendant

to any termination, the reputational harm associated with the loss of a prominent government position, and the stripping of the ability to direct the function and direction of the IAF." ECF No. 5-1, at 23. She also asserts that the "loss of the statutorily-prescribed right to continue serving as President of the IAF is an irreparable harm in its own right." *Id.*

The mere loss of employment is normally not enough to show irreparable harm because the plaintiff can be made whole through the issuance of backpay and reinstatement. *See Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) (rejecting a claim of irreparable injury predicated on an employee's "loss of income"). The harm that comes from the loss of a "statutory right to function," on the other hand, is less clear. This precise question is currently pending before the D.C. Circuit. *See* Notice of Appeal, *Harris v. Bessent*, No. 25-5055 (D.C. Cir. Mar. 4, 2025); Notice of Appeal, *Wilcox v. Trump*, No. 25-5057 (D.C. Cir. Mar 7, 2025). While some judges of this court have found such harm to be sufficient for irreparable injury, *see Harris*, 2025 WL 521027, at *8-9, the D.C. Circuit has cast doubt on those holdings in a non-precedential order, *see Dellinger v. Bessent*, No. 25-5052, at 7 (D.C. Cir. Mar. 10, 2025) (opining that "being 'deprived of the statutory right to function in office'" is not necessarily an irreparable injury).

But regardless of how the dust eventually settles on that question, Ms. Aviel identifies an additional layer of harm on top of her basic "right to function" as the IAF's president. She argues that, unlike in any of the above cases, the very survival of her organization is at stake. In her view, this puts her case squarely in the "genuinely extraordinary situation" contemplated by *Sampson*, 415 U.S. at 92 n.68, and the court agrees.

Reinstatement matters little if the officer of a government organization returns to a pile of rubble. Ms. Aviel persuasively argues that, absent immediate injunctive relief, there will be no IAF left for her to lead. The current, ostensible leadership of the IAF intends to fire every

20

employee except one by the end of the day today.  ECF No. 20-1 ¶ 6.  And all the organization's grants—save a single agreement for $66,000—have been canceled.  ECF No. 1 ¶ 78.  While Defendants insist that this dramatic reduction to the IAF's "minimum presence and function" still preserves its existence, that is nothing more than artful lawyering.  To argue that the IAF remains functioning when it has one employee, one grant, and little else is comically difficult to believe.

This unique, irremediable harm distinguishes this case from those where the plaintiff only pleads the loss of her own right to function in a role.  Defendants try to argue that this improperly converts the IAF's harm into Ms. Aviel's harm.  ECF No. 19, at 13.  But because Ms. Aviel can likely establish that she is the lawful president of the organization, her right to serve in that role is inextricably intertwined with the organization's survival.  If, during the pendency of this litigation, the IAF is "reduced to ash," ECF No. 20, at 8, no amount of relief will resurrect *her* right to function.  Such an outcome would also make the harm plainly "beyond remediation."  *England*, 454 F.3d at 297.

None of Defendants' cases are to the contrary.  ECF No. 19, at 10-13.  *Sampson*, which only addressed the firing of a probationary government employee and discerned no irreparable harm, carved out an exception for a "genuinely extraordinary situation" that "so far depart[s] from the normal situation."  415 U.S. at 92 n.68.  Defendants cannot convincingly claim that eliminating almost the entirety of Ms. Aviel's employer is in any way "normal."  In *English v. Trump*, 279 F. Supp. 3d 307 (D.D.C. 2018), the court also concluded that there was no irreparable harm to a plaintiff claiming to be the rightful director of the Consumer Financial Protection Bureau.  *Id.* at 336.  But in reaching that conclusion, the court relied on the knowledge that "[t]he CFPB is not and will not be shuttered; it continues to operate with [the purported director] functioning as acting Director."  *Id.* at 335.  The court then directly contrasted its case with one in which the relevant

agency *would* be closed.  It observed that "in *Berry* [*v. Reagan*, No. 83-CV-3182], any harm suffered by the commissioners was *plainly irreparable* because the commission would have expired and they could not have been reinstated to it." *English*, 279 F. Supp. 3d at 335 (emphasis added).  *Davis v. Billington*, 76 F. Supp. 3d 59 (D.D.C. 2014), teaches the same lesson.  There, the court did not find irreparable harm arising from the plaintiff's termination because "he ha[d] no concrete proof that the vacancy . . . or some other comparable position w[ould] not be available when th[e] [case] is ultimately resolved." *Id.* at 65.

The most analogous case to the one before the court is *Brehm v. Marocco*, No. 25-CV-660 (D.D.C. Mar. 11, 2025).  There, the court (Leon, J.) considered a request for injunctive relief by the president of the U.S. African Development Foundation ("USADF")—an organization remarkably similar in structure and purpose to the IAF (so much so that the Office of Legal Counsel's conveniently timed memorandum jointly discusses both organizations).  In holding that the USADF director could not show irreparable injury, the court emphasized that, if the director were to eventually prevail, "the Court could remedy any harm by reinstating him to his position and ordering backpay." *Id.* at 5.  Going even further, the court directly contrasted the speculative demise of the USADF to that of the IAF, writing: "the mere possibility that defendants will follow the *same path as they did with the IAF* falls short of the 'imminent threat of injury required to grant a TRO.'"  *Id.* at 7 (emphasis added) (quoting *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009)).  At the very least, the court implied that subjecting the USADF to the same fate as the IAF could significantly alter the irreparable harm analysis.  *See* ECF No. 20, at 13 ("This case is the *exact* case Judge Leon used as a foil for *Brehm*.  Brehm could not prove his case would be like the IAF, so he lost.  Ms. Aviel's case *is* the IAF.").

The court concludes that these cases compel a ruling in Ms. Aviel's favor on irreparable harm. The reasons why there was no irremediable injury in *Sampson*, *English*, *Davis*, and *Brehm*, are the precise reasons why there *is* irreparable harm here. If Ms. Aviel is denied injunctive relief now but ultimately prevails on the merits of her suit, she will very likely find herself leading a defunct organization.

### C.    Balance of the Equities and the Public Interest

Lastly, the balance of the equities and the public interest also weigh in favor of a preliminary injunction. As mentioned previously, these two factors "merge into one . . . when the government is the non-movant," as here. *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); ECF No. 5-1, at 27; ECF No. 19, at 14-15.

Here, the equities and the public interest weigh heavily in favor of "having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). As the court has explained, neither President Trump nor Mr. Marocco had the legal authority to remove Ms. Aviel as president of the IAF. *See supra* Part IV.A. There can be no public interest in her unlawful removal. *See League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

Nor can Defendants claim that the public's interest in "reducing the size of the [f]ederal [g]overnment" tips the equities in their favor. *See* ECF No. 19, at 15 (quoting Exec. Order No. 14,217). Congress directed that the IAF may not use appropriated funds to "expand, eliminate, consolidate, or downsize" the agency without "prior consultation . . . with the appropriate congressional committees" and "a detailed justification for any proposed action." Further

23

Consolidated Appropriations Act, Div. F, 138 Stat. at 843-44.  Based on the facts before the court, it appears that Defendants have exhibited a callous disregard for those instructions.  They cannot flout Congress's mandate while simultaneously pretending to act in the public interest.  While pursuing government efficiency is a valid goal, it must be carried out lawfully.  Defendants have not done so here.[6]

*     *     *

In sum, the court concludes that all factors weigh in favor of granting Ms. Aviel a preliminary injunction.  Because neither President Trump nor Mr. Marocco had the authority to fire her from her position as the president of the IAF, Ms. Aviel is likely to succeed on the merits of her case.  She has also shown that she will face irreparable harm without judicial intervention, given Defendants' swift attempts to completely dismantle the organization she lawfully runs.  Finally, the equities and the public interest in ensuring that Defendants abide by constitutional

---

[6] Defendants' final argument is a non-sequitur.  Defendants argue that Ms. Aviel seeks "a change in the status quo" by requesting reinstatement to the IAF, and that such injunctions are disfavored as "an even more extraordinary remedy" than the "typical preliminary injunction."  ECF No. 19, at 16 (quoting *Strait Shipbrokers Pte. Ltd. cv. Blinken*, 560 F. Supp. 3d 81, 93 (D.D.C. 2021)).  But Defendants have it backward.  *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022)).  "The status quo is the last *uncontested* status which preceded the pending controversy."  *Id.* (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)).  Here, the last uncontested status for Ms. Aviel was her lawful appointment as the president and CEO of the IAF.  Rather than alter the status quo, she seeks to maintain it.

24

guardrails when appointing and removing federal officials is significant, and Defendants cannot persuasively argue otherwise.[7]

## V.    CONCLUSION

For the foregoing reasons, the court will grant Ms. Aviel's Motion for a Preliminary Injunction, ECF No. 5.  A contemporaneous order will issue.

_____
LOREN L. ALIKHAN
United States District Judge

Date:    April 4, 2025

---

[7] Federal Rule of Civil Procedure 65(c) provides that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Defendants ask the court to "order [Ms.] Aviel to post security" in the event it grants her motion for a preliminary injunction.  The court exercises its "broad discretion" to decline this request.  *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)).  Ms. Aviel has sufficiently shown that Defendants unlawfully attempted to terminate her and eradicate the IAF.  Setting a bond would conflict with every holding in this opinion and contravene the interests of justice.  *See Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (explaining that a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action").