## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

        *Plaintiff,*

       –v.–                  Case No. 25-cv-00778-LLA

SERGIO GOR, *et. al.*,

        *Defendants.*

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 1

    A.   The Inter-American Foundation............................................................................ 2

    B.   President Trump's Executive Orders ................................................................... 5

    C.   DOGE's Attempts to Shut Down the IAF ........................................................... 6

    D.   DOGE's Attempts to Fire Plaintiff And Gut the IAF ....................................... 10

ARGUMENT ...................................................................................................................... 13

    A.   There Is No Genuine Dispute That the President Unlawfully Fired Ms. Aviel on February 26, 2025......................................................................................................................... 13

    B.   The President's Appointment Of Mr. Marocco As An Acting Member of The IAF Was Unlawful, and Marocco's Subsequent Actions, Including The February 28, 2025 Purported Termination of Ms. Aviel, Are Therefore Invalid. ................................................... 18

    C.   Ms. Aviel Is Entitled Relief.............................................................................. 24

        I.   Ms. Aviel is entitled to declaratory relief. ................................................. 24

        II.   Ms. Aviel is entitled to permanent injunctive relief. .................................. 27

        III.  Ms. Aviel is entitled to a writ of mandamus. .............................................. 32

CONCLUSION ................................................................................................................... 33

# TABLE OF AUTHORITIES

## CASES

*Al Bahlul v. United States,*
  967 F.3d 858 (D.C. Cir. 2020) ............................................................................. 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986) ...................................................................................... 14

*Asylumworks v. Mayorkas,*
  590 F. Supp. 3d 11 (D.D.C. 2022) ........................................................................ 30

*Aviel v. Gor,*
  No. CV 25-778 (LLA), --- F. Supp. 3d ----, 2025 WL 1009035 (D.D.C. Apr. 4, 2025).... *passim*

*Berry v. Reagan*,
  No. CV 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ...................................... 33

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
  68 F.3d 828 (3d Cir. 1995) .................................................................................... 36

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ............................................................................................... 38

*Dellinger v. Bessent*,
  No. 25-5052,  2025 WL 887518 (D.C. Cir. Mar. 10, 2025 .................................... 34

*Dellinger v. Bessent*,
  No. 25-5025, 2025 WL 559669 (D.C. Cir. Feb. 15, 2015 ..................................... 32

*DL v. District of Columbia,*
  860 F.3d 713 (D.C. Cir. 2017) .............................................................................. 31

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .............................................................................................. 31

*Edmond v. United States,*
  520 U.S. 651 (1997) ......................................................................................... 15, 20

*Fleming v. U.S. Dep't of Agric.,*
  987 F.3d 1093 (D.C. Cir. 2021) ....................................................................... 15, 17

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S.  477, 509 (2010) ........................................................................... 14, 17, 34

*Freytag v. Commissioner,*
  501 U.S. 868 (1991) ......................................................................................... 19, 23

*FTC v. Flotill Prods., Inc.*,
    389 U.S. 179 (1967) ................................................................................................ 25

*George v. Ishimaru*,
    1994 WL 517746 (D.C. Cir. Aug. 25, 1994) ........................................................ 23

*Glenn v. Thomas Fortune Fay*,
    222 F. Supp. 3d 31 (D.D.C. 2016). ....................................................................... 28

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988) ................................................................................................ 30

*Harris v. Bessent*,
    No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) .................................... 29

*Harris v. Bessent*,
    No. 25-5055, 2025 WL 980278 (D.C. Cir. Mar. 6, 2025)................................. 36, 37

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ............................................................................... 14

*In re Al Baluchi*,
    952 F.3d 363 (D.C. Cir. 2020) ............................................................................... 38

*In re Hennen*,
    38 U.S. 230 (1839).................................................................................................. 18

*INS v. Chadha*,
    462 U.S. 919 (1983).......................................................................................... 22, 23

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    684 F.3d 1332 (D.C. Cir. 2012) ............................................................................. 16

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)) .................................................................................. 34

*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
    468 F.3d 826 (D.C. Cir. 2006) ............................................................................... 36

*Nat'l Treasury Emps. Union v. Reagan*,
    663 F.2d 239 (D.C. Cir. 1981) ............................................................................... 18

*New York v. Biden*,
    636 F. Supp. 3d 1 (D.D.C. 2022) ........................................................................... 28

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)........................................................................................ 20, 36

*NLRB v. SW Gen., Inc.,*
   580 U.S. 288 (2017)........................................................................................ 20, 21, 22, 30

*Noel Canning v. NLRB,*
   705 F.3d 490 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014)..................................... 35

*POM Wonderful LLC v. F.T.C.,*
   894 F. Supp. 2d 40 (D.D.C. 2012) ............................................................................ 29

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639  (2012)................................................................................................... 27

*Ramirez v. U.S. Immigr. & Customs Enf't,*
   568 F. Supp. 3d 10 (D.D.C. 2021) ............................................................................ 31

*Safari Club Int'l v. Salazar,*
   852 F. Supp. 2d 102 (D.D.C. 2012) .......................................................................... 35

*Sampson v. Murray,*
   415 U.S. 61 (1974)..................................................................................................... 32

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.,*
   599 U.S. 419 (2023)................................................................................................... 26

*United States v. Am. Tobacco Co.,*
   221 U.S. 106 (1911)................................................................................................... 27

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021)................................................................................................. 15, 17

*United States v. Maurice,*
   26 F. Cas. 1211 (C.C.D. Va. 1823)........................................................................... 20

*United States v. Oakland Cannabis Buyers' Co-op.,*
   532 U.S. 483 (2001)................................................................................................... 30

**STATUTES**

22 U.S.C. § 290f ............................................................................................... *passim*

5 U.S.C. § 3345 *et seq.*....................................................................................... *passim*

**OTHER AUTHORITIES**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*
   § 2948.1 (3d ed. 2025) ............................................................................................... 31

Office of Legal Counsel, *Mem. for Att'ys of the Off.* (July 16, 2010) .......................................... 22

Office of Legal Counsel, *Power of the President to Designate Acting Member of the Federal Home Loan Bank Board,* 1 Op. O.L.C. 150 (1977) ........................................................... 22, 23

Office of Legal Counsel, *Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation,* 49 Op. O.L.C. __ (Mar. 14, 2025) ……………………………………………………………………22, 24

## RULES

Fed. R. Civ. P. 56(a) .................................................................................................................. 13

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. II, § 2, cl. 2 .................................................................................................... 14

## LEGISLATIVE MATERIALS

Pub. L. 91-175, 83 Stat. 805 (Dec. 30, 1969) ............................................................................. 3

Pub. L. No. 118-47, § 7063(a), Div. F. tit. III, 138 Stat. 460 (Mar. 23, 2024) ........................... 4, 8

S. Rep. No. 105-250, *Federal Vacancies Reform Act of 1998* (1998) ......................................... 23

## INTRODUCTION

This Court properly analyzed the relevant legal issues when it issued a preliminary injunction in this case, and Plaintiff's claims have only become stronger as more supporting evidence has been introduced into the record. This Court's legal reasoning was correct two weeks ago, and it is even more compelling now. As this Court properly concluded, the President unlawfully fired Plaintiff Sara Aviel ("Ms. Aviel"), an inferior officer of the United States, contrary to well-established precedent that the government has not meaningfully challenged. The President then unlawfully appointed Peter Marocco to the IAF Board, and Marocco commenced a series of *ultra vires* actions, purportedly firing Ms. Aviel a second time in secret, appointing himself president of the IAF, and then initiating the IAF's total destruction. As this Court properly found, these actions were all contrary to laws passed by Congress and signed by the President. The remedy in this case is equally self-evident: the Federal Vacancies Reform Act requires that any actions taken by Mr. Marocco be vacated. Precedent dictates that Ms. Aviel be returned to her rightful position; and the Constitution is clear that new Board members may be appointed only with the advice and consent of the Senate. The laws must be followed.

Throughout her tenure at the IAF, Ms. Aviel has consistently sought to implement the policy priorities of the Administration which she serves. She shares the President's concern about making government more efficient. She has consistently worked to align the IAF with this Administration's policy priorities, including with respect to addressing migration and countering violence and international narcotics trafficking throughout Latin America. She seeks only to follow the law.

If the President wished to have Ms. Aviel terminated, the law provided a clear means: direct the Board to do so. He did not. Now the government complains that the President cannot terminate

Ms. Aviel because the President fired the entire Board, a problem completely of the President's own making. But self-inflicted harm does not irreparable injury make. The President's constitutional power does not expand merely because he has terminated various officials. Indeed, there is still a clear lawful path to fire Ms. Aviel: appoint and confirm Board members, as the Constitution and the law requires. Until then, the removal of Ms. Aviel from her position by anyone other than the lawfully-constituted Board of the IAF is illegal. If all the President had to do to negate the Appointments Clause were to fire the Board before firing an inferior officer, that would vitiate the holding and logic of *Free Enterprise Fund* and its progeny. What's more, the government's radical theory of Article II power would upend the law, allowing the President to potentially stuff every multimember board in government with acting officials who have bypassed Senate-confirmation requirements for the entire duration of his administration. That is not what the Framers intended.

As this Court properly found at the preliminary injunction stage, Ms. Aviel's argument is supported by the facts, the law, and the Constitution of the United States. This Court should therefore grant summary judgment for Ms. Aviel and enter permanent relief in this matter.

## FACTUAL BACKGROUND

### A.    The Inter-American Foundation

The IAF is a "nimble and transformative U.S. government agency" that invests in community-led development across Latin America and the Caribbean. Statement of Undisputed Material Fact ("SUMF") ¶ 3 (quoting the IAF website). The IAF directly engages with community leaders, innovators, and entrepreneurs working to promote prosperity, peace, and democracy in the region. *Id.* Since 1972, the IAF has funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country. *Id.*

2

The United States Congress established the Inter-American Foundation in 1969 as a "body corporate." Pub. L. 91-175, 83 Stat. 805, 821–24 (Dec. 30, 1969). The lean, flexible model the IAF has honed since its creation in 1969 has enabled the agency to propel responsive development designed and led by target communities for lasting impact. This model has allowed the IAF to quickly shift resources toward emerging areas of U.S. interests, including providing viable alternatives to migration and responding to the proliferation of organized crime.

The IAF serves the United States' strategic interests throughout Latin America and the Caribbean in a cost-effective manner. *Id.* ¶ 4. Over 70% of IAF grantees independently and anonymously surveyed reported that their opinion of the United States had improved as a result of their work with the IAF. *Id.* For every dollar the IAF invested in fiscal year 2024, grantees committed $1.36 in co-investment. *Id.* Philanthropic and corporate partners have recognized the effectiveness of the IAF's approach by channeling their own resources through the IAF. *Id.*

Until a couple months ago, the IAF had over 400 active grantees. *Id.* ¶ 5. These local organizations are working to stabilize communities affected by transnational crime, foster sustainable economic prosperity, provide alternatives to migration, and increase communities' goodwill towards the United States in the face of increasing pressures from actors like the People's Republic of China. *Id.*

Through the IAF's enabling legislation, 22 U.S.C. § 290f *et seq.*, Congress specified that the IAF "shall have perpetual succession unless sooner dissolved by an Act of Congress," 22 U.S.C. § 290f(e)(1). The management of the IAF is vested in a bipartisan board of directors, composed of "nine members appointed by the President, by and with the advice and consent of the Senate," of which no more than five members may belong to any one political party. 22 U.S.C. § 290f(g). New members of the Board are appointed to terms of six years by default, and "upon

the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified." *Id.* "The Board shall direct the exercise of all the powers of the Foundation." 22 U.S.C. § 290f(i). As such, the Board "may prescribe, amend, and repeal bylaws, rules, and regulations governing the manner in which the business of the Foundation may be conducted and in which the powers granted to it by law may be exercised and enjoyed." 22 U.S.C. § 290f(j).

The Board of the IAF manages the entity through the appointment of a president[1] who serves as the IAF's Chief Executive Officer. 22 U.S.C. § 290f(*l*)(1). The Board determines the terms of the president's appointment. *Id.* In March 2022, Sara Aviel was lawfully appointed by the Board of the IAF to be the president and Chief Executive Officer of the agency, effective April 24, 2022.

Last year, Congress appropriated to the IAF, "[f]or necessary expenses to carry out the Inter-American Foundation," $47 million to remain available until September 30, 2025. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, § 7063(a), Div. F. tit. III, 138 Stat. 460, 746 (Mar. 23, 2024). Congress directed that the IAF may not use appropriated funds "to implement a reorganization, redesign, or other plan" to "expand, eliminate, consolidate, or downsize" the agency without first consulting with Congressional appropriations committees, and providing the committees with a detailed justification for any such plan. *Id.*, 138 Stat. at 843–44.

The IAF has long had bipartisan support and remains accounted for in recent Congressional appropriation bills. SUMF ¶ 6. The House Bill Report for the most recent State, Foreign Operations, and Related Programs Appropriations Bill states, "[t]he Committee recognizes the strong track record of the Inter-America Foundation (IAF) in achieving cost-share from new

---

[1] In keeping with the convention adopted by the Court in its prior order, this memorandum of law uses "President" to refer to the President of the United States and "president" to refer to the president of the IAF.

grantees that is greater, on average by 20 percent, than IAF's initial support for new projects.  The Committee encourages USAID to learn best practices from IAF in this regard . . . ."  *Id.* (quoting bill report).  Similarly, a Senate resolution in 2019 "commending the Inter-American Foundation on the occasion of its 50th Anniversary for its significant accomplishments and contributions to the economic and social development of the Americas" was co-sponsored by Senators Rubio, Cruz, Kaine, and Cardin.  *Id.* (quoting resolution name).

## B.    President Trump's Executive Orders

On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy."  The stated purpose of the executive order is to "dramatically reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary."

The executive order lists federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."  The executive order lists the IAF as one of the targeted entities.

Under the executive order, "the head of each unnecessary governmental entity" identified in the order had 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent."

In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order."

The executive order "shall [not] be construed to impair or otherwise effect," among other things, "the authority granted by law to an executive department, agency, or the head thereof" and "shall be implemented consistent with applicable law and subject to the availability of appropriations."

On January 20, 2025, President Trump signed Executive Order 14158, "Establishing and Implementing the President's 'Department of Government Efficiency,'" which reorganized and renamed the United States Digital Service as the United States DOGE Service, to be "established in the Executive Office of the President." Executive Order 14158 established the role of U.S. DOGE Service Administrator within the Executive Office of the President, reporting to the White House Chief of Staff.

The Executive Order further established a temporary organization within the U.S. DOGE Service, "the U.S. DOGE Service Temporary Organization." The U.S DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing the "President's 18-month DOGE agenda."

## C.    DOGE's Attempts to Shut Down the IAF

On the morning of February 20, 2025, Ms. Aviel learned that representatives from the Department of Government Efficiency ("DOGE") had requested a meeting for that afternoon. SUMF ¶ 16. Ms. Aviel and other IAF personnel prepared for the meeting on short notice by assembling discussion points describing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the recently issued Executive Orders. *Id.* Ms. Aviel sought to align the agency with the President's stated policy instructions as permissible by law. *Id.*

On February 20, 2025, representatives of the U.S. DOGE Service—Nate Cavanaugh and Ethan Shaotran—met with representatives of the IAF, including Ms. Aviel. *Id.* ¶ 17. Cavanaugh

and Shaotran represented to the IAF that they were based at the General Services Administration ("GSA").  *Id.*  The DOGE representatives further informed the IAF that their goal was to verify the IAF's compliance with the President's Executive Orders.  *Id.*  During the meeting, IAF staff members sought to facilitate Cavanaugh and Shaotran's requests by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others.  *Id.* ¶ 18.  Additionally, Ms. Aviel attempted to share information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities.  *Id.*  The DOGE representatives showed minimal interest in the initiatives and instead indicated that their focus was on obtaining access to the IAF's systems.  *Id.*

The next day—Friday, February 21, 2025—IAF personnel, including Ms. Aviel, met again with Cavanaugh and Shaotran, as well as Jacob Altik, a lawyer for the Executive Office of the President.  *Id.* ¶ 19.  Altik stated his view that the minimum statutory requirements for the IAF entailed the existence of a Board and a president, a presence in the District of Columbia, and a minimum level of grants and contracts.  *Id.*  He further indicated that DOGE intended to conduct a reduction in force ("RIF") of almost all employees, and a termination of almost all grants and contracts.  *Id.*

The DOGE representatives asked Ms. Aviel to contact the Board immediately to determine if the Board was in alignment on this plan, and suggested that if the Board were not so aligned, the Board would be terminated and replaced with individuals who were aligned with President Trump's vision.  *Id.* ¶ 20.  Ms. Aviel explained that it would be difficult to convene the Board immediately, that matters of this consequence required a Board meeting to discuss, and that the Board was subject to certain legal requirements before convening.  *Id.*  The DOGE representatives

indicated their belief that they did not need to call a Board meeting, and that they just needed a quick "yes-or-no" answer from the Board on alignment. *Id.* Ms. Aviel asked that the specific request be put in writing. *Id.* Shortly after the meeting, at 4:27 p.m. on Friday, February 21, Cavanaugh sent an email to Ms. Aviel and the IAF's chief operating officer from a GSA email address. The email, on which Altik and Shaotran were copied, consisted of six bullet points, each of which contained a brief provision from the IAF's organic statute in which Congress used the word "shall." *Id.*; Ex. C.

After the meeting, Ms. Aviel heard from Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees. SUMF ¶ 21. For example, on February 22 and 23, 2025, Ms. Aviel heard from senior Republican and Democratic staff for the Senate Appropriations Committee and the House Appropriations Committee who noted that the IAF's annual funding was already provided to "cover only the minimum statutory requirements" and that if Ms. Aviel were to take actions to reduce staff, it "would be in contravention of the appropriations enacted into law." *Id.* Ms. Aviel shared this information with the IAF Board. *Id.*

From February 21, through the weekend, and on Monday, February 24, Ms. Aviel spoke with each member of the IAF Board multiple times to analyze all options and identify the best lawful path forward. *Id.* ¶ 22. Ms. Aviel also heard from multiple congressional stakeholders and legal experts who believed that the DOGE plan was unlawful and contrary to congressional intent. *Id.*

On February 24, 2025, Ms. Aviel spoke on the telephone with Cavanaugh and Altik.  *Id.* ¶ 23.  During this call, the DOGE representatives claimed that with one exception, all members of the Board had been terminated.  *Id.*  Ms. Aviel expressed surprise at this news, given that she had been in recent touch with each Board member.  *Id.*  The DOGE representatives asked Ms. Aviel to confirm that she would implement DOGE's agenda in the absence of a Board, and they threatened that the President would terminate her if she declined to do so.  *Id.*  Ms. Aviel responded that she could not further respond to DOGE's requests without more specificity as to those requests in writing and the opportunity to determine whether they were legal.  *Id.*  She further stated that she was committed to always doing what was lawful, and to following all of her legal obligations and responsibilities.  *Id.*  The DOGE representatives asked Ms. Aviel to sign a memorandum of understanding agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems.  *Id.*  Ms. Aviel declined, stating that she did not believe she had the authority to do so, given her understanding that her Board still remained.  After the call, Ms. Aviel confirmed that no Board member had yet received a termination letter from the President, or anyone else.

In fact, neither President Trump nor anyone from his Office ever asked the Board to terminate Ms. Aviel from her position as the IAF's president and CEO.  *Id.* ¶ 24; Ex. B, Arriola Decl. ¶ 3.  To this day, at least one Board member still has not received any communication from President Trump or anyone from his Office dismissing him from the Board.  SUMF ¶ 24; Ex. B, Arriola Decl. ¶ 3.

In the morning of February 26, 2025, DOGE representatives ordered the Senior Procurement Executive ("SPE") at the Department of Treasury to unilaterally "cancel all IAF contracts" by the close of business on Thursday, February 27, 2025.  SUMF ¶ 25; Ex. D.  These

contracts included everything from the field contractors that provide grantees with programmatic support and oversight, to contracts for basic services like email and agency grant-management software.  SUMF ¶ 25.  The Administrative Resource Center ("ARC")—which is housed at the Treasury Department's Bureau of the Fiscal Service and supports the IAF's procurement and finance functions—shared that they had not yet received a request in writing from the SPE and were "concern[ed] about the legality of this."  *Id.*; Ex. D.

## D.    DOGE's Attempts to Fire Plaintiff And Gut the IAF

On the evening of Wednesday, February 26, 2025, Ms. Aviel received an email from Trent Morse of the Presidential Personnel Office informing her that, at the direction of President Trump, her position at the IAF had been terminated, effectively immediately.  SUMF ¶ 26; Ex. E.

In addition, Ms. Aviel's Leave and Earnings Statement that she received from the Government after her purported firing shows that she accrued twenty-four (24) hours of work from the pay period beginning February 24 and ending March 8, meaning that her employment was considered by the Government to have terminated on February 26, 2025.  SUMF ¶ 27; Ex. F.  Additionally, the Notice of Personnel Action that she received after her termination was cancelled on April 4 similarly shows that the effective date of her termination was February 26, 2025.  SUMF ¶ 27; Ex. G.  Ms. Aviel never received an email from Marocco stating that her position had been terminated.  SUMF ¶ 27.  She has never had any direct communication with Marocco.  *Id.*

On the afternoon of February 28, 2025, Trent Morse sent an email to the IAF's chief operating officer, stating that President Trump had exercised a purported authority to temporarily appoint Pete Marocco as the acting chairman and board member of the IAF.  SUMF ¶ 28; Ex. H.  The communication acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting Board

members but asserted that President Trump had inherent authority under Article II to do so.  SUMF ¶ 28;  Ex. H.

Following his purported appointment as acting Chair of the Board of the IAF, Marocco visited the IAF headquarters, seeking to hold an "emergency board meeting."  SUMF ¶ 29; Ex. I. Marocco determined that because "no one [wa]s [t]here to let [him] in," he was permitted to hold the meeting directly outside the IAF office.  SUMF ¶ 29.  Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member in attendance.  *Id.*  He voted to close the Board meeting to the public.  *Id.*  He then voted to appoint himself as the acting president and CEO of the IAF.  *Id.*  Marocco later circulated a Board Resolution, naming himself as acting Board Chair, president, and CEO of the IAF.  *Id.*; Ex. J.

1.    That same evening, the Administrative Resource Center received a directive authorized by Marocco, now representing himself to be the president of the IAF, to terminate all IAF contracts.  SUMF ¶ 30; Ex. K.  The ARC procurement team subsequently informed a member of the IAF's leadership team that they intended to "immediately" execute those terminations, as authorized by the IAF's "newly appointed President Peter Marocco."  SUMF ¶ 30; Ex. K.  Almost all IAF contracts were ultimately terminated that Friday evening and into Saturday morning with the exception of a handful, such as those for human resources and information technology.  SUMF ¶ 30.

On March 2, 2025, members of the Board of the IAF wrote to Ms. Aviel, stating their intent to serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law.  SUMF ¶ 31; Ex. L.  They communicated their view that, accordingly, the governance of the IAF remained unaltered and in place, no duly qualified members of the Board had fired Ms. Aviel, and that she remained the Foundation's president and

CEO.  SUMF ¶ 31; Ex. L.  The Board directed Ms. Aviel to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the Foundation's grantees.  SUMF ¶ 31; Ex. L.

On or around March 4, 2025, Marocco and DOGE began implementing a RIF of the IAF's employees.  SUMF ¶ 32.  At that time, the IAF had 36 employees (not including Ms. Aviel), although three had previously signed agreements to depart through voluntary early retirement or the "Fork in the Road" deferred resignation offer.  *Id.*  Thirty-three staff were issued RIF notices, which were sent on behalf of Marocco and identified an official separation date of Friday, April 4, 2025.  *Id.*  Thirty staff were placed on administrative leave, shut out of the IT systems, and barred from accessing the IAF's offices.  *Id.*  Three staff were not placed on administrative leave so that they could assist in the winddown activities.  *Id.*  Marocco and the DOGE team later voided the RIF of one employee—Dominic Bumbaca, the chief information security officer—and purportedly appointed him as CEO.  *Id.*  In addition, the IAF's website was taken down.  *Id.*

In addition, on or around March 4, Marocco terminated virtually all existing IAF grants.  SUMF ¶ 33.  The only exception was a single grant that only had limited funds remaining— approximately $66,000—that was set to expire soon.  *Id.*  The IAF also continues to own a single equity investment in a microfinance institution.  *Id.*

Grantees were notified that their grants had been canceled in form letters sent on March 4, 2025, stating that the grant was "inconsistent with the agency's priorities," and that "the President's February 19, 2025 executive order mandates that the [Foundation] eliminate all non-statutorily required activities and functions."  SUMF ¶ 34; Ex. M.  The letter further instructed grantees to "send remaining, unspent funds to the [Foundation], in accordance with the termination clause and local law, within fifteen (15) days or as soon as practicable."  SUMF ¶ 34; Ex. M.  In

direct response to DOGE's actions, IAF philanthropic partners have asked that their donations be returned.  SUMF ¶ 35.

Upon returning to the IAF offices after April 4, 2025, and after she had her access to the system restored, Ms. Aviel discovered that on April 4, 2025, at 3:52PM EST, a team@iaf.gov account that was created for the exclusive use of the DOGE representatives, Nate Cavanaugh and Ethan Shaotran, deactivated administrative access for Dominic Bumbaca.  *Id.* ¶ 36; Ex. N (Google Admin Logs).

## ARGUMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is only "'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.* (quoting *Anderson*, 477 U.S. at 248).

## A.    There Is No Genuine Dispute That the President Unlawfully Fired Ms. Aviel on February 26, 2025.

Defendants have never meaningfully challenged that the President's firing of Ms. Aviel on February 26, 2025, was unlawful.  *See generally* ECF No. 19; Mot. to Stay, *Aviel v. Gor*, No. 25-5105 (D.C. Cir. Apr. 7, 2025) (hereinafter, "COA Mot. to Stay") (not challenging this Court's conclusion regarding the February 26th firing).  There is no genuine dispute: on February 26, 2025, the Board, and only the Board, "retain[ed] the authority to hire and fire the IAF's president."  *Aviel v. Gor*, No. CV 25-778 (LLA), --- F. Supp. 3d ----, 2025 WL 1009035, at *6 (D.D.C. Apr. 4, 2025),

*appeal filed*, No. 25-5105 (D.C. Cir.) (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561

U.S.  477, 509 (2010)).

*    *    *

The Appointments Clause of the United States Constitution provides:

> [The President] shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of
> the supreme Court, and all other Officers of the United States, whose Appointments
> are not herein otherwise provided for, and which shall be established by Law: but
> the Congress may by Law vest the Appointment of such inferior Officers, as they
> think proper, in the President alone, in the Courts of Law, or in the Heads of
> Departments.

U.S. Const., art. II, § 2, cl. 2.

"Only the President, with the advice and consent of the Senate, can appoint . . . 'principal'

officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021).  In contrast, "the Appointments

Clause permits Congress to dispense with joint appointment . . . for inferior officers.  Congress

may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the

Heads of Departments.'"  *Id.* at 12–13 (citation omitted).

"Generally speaking, the term 'inferior officer' connotes a relationship with some higher

ranking officer or officers below the President: Whether one is an 'inferior' officer depends on

whether he has a superior." *Edmond v. United States,* 520 U.S. 651, 662 (1997).  In other words,

an officer of the United States is "inferior" if her "work is directed and supervised at some level

by" principal officers.  *Id.* at 663.  The D.C. Circuit applies *Edmond* by looking to three factors:

"(i) whether the officer is subject to supervision and oversight by a principal officer; (ii) whether

the officer is subject to removal by a principal officer; and (iii) whether the officer has final

decisionmaking authority." *Fleming v. U.S. Dep't of Agric.,* 987 F.3d 1093, 1103 (D.C. Cir. 2021);

*see also Al Bahlul v. United States,* 967 F.3d 858, 871 (D.C. Cir. 2020); *Intercollegiate Broad.*

14

*Sys., Inc. v. Copyright Royalty Bd.,* 684 F.3d 1332, 1339 (D.C. Cir. 2012).  Removability at will is central to this analysis; if a principal officer may remove another officer at will, this provides "a powerful tool for control," suggesting that "an officer who may be removed at will by another officer is the latter's 'alter ego' for constitutional purposes."  *Fleming,* 987 F.3d at 1103.

The IAF's enabling legislation follows these constitutional principles to establish the IAF's Board as its principal officer and the IAF's president as an inferior officer.  By statute, Congress has vested the "management of the Foundation" in a board of directors, "composed of nine members appointed by the President, by and with the advice and consent of the Senate."  22 U.S.C. § 290f(g).  "The Board shall direct the exercise of all the powers of the Foundation."  22 U.S.C. § 290f(i).  The Board is accordingly the principal officer of the IAF for constitutional purposes.

In contrast, "[t]he chief executive officer of the Foundation shall be a President who shall be appointed by the Board of Directors on such terms as the Board may determine."  22 U.S.C. § 290f(*l*)(1).  Pursuant to this authority, the Board has adopted bylaws, under which the Board reserves to itself "all powers of the Foundation," Ex. O (IAF Bylaws) at Art. I, § 1, but delegates to the president of the Foundation the power of "general supervision" of the organization, "*responsible to and under the general direction of the Board*."  *Id.* at Art. III, § 2 (emphasis added).

Each of the three *Edmond* factors applied here leaves no doubt that the president of the IAF is an inferior officer.  At all times, she is "subject to supervision and oversight" by the principal officer of the organization, the Board.  *Fleming,* 987 F.3d at 1103.  She is appointed by the Board to her position as the president of the Foundation, and no provision of IAF's organic statute or any other provision of law limits the Board's authority to remove her from that position.  The Board thus retains the authority to replace the president of the Foundation at will, as "removal is incident to the power of appointment."  *Free Enter. Fund,* 561 U.S. at 508–09.  And she enjoys decision-

15

making authority on behalf of the Foundation only to the extent that she is "permitted to do so by other Executive officers," *i.e.,* the Board.  *Arthrex, Inc.,* 594 U.S. at 14 (quotation marks omitted).  Indeed, Defendants have repeatedly acknowledged that Ms. Aviel is an inferior officer in the course of this litigation.  *See, e.g.*, COA Mot. to Stay at 5 ("[T]he Foundation's president is an inferior officer appointed by the Board.").

Because the president of the Foundation is an inferior officer, Ms. Aviel may be removed from her position only by her "principal officer"—the Board—and not by the President of the United States or any other person.  Where, as here, Congress vests the appointment of an inferior officer in the head of a department, "it is ordinarily the department head, rather than the President, who enjoys the power of removal."  *Free Enter. Fund,* 561 U.S. at 493; *see also id.* at 508–09 (remedying Appointments Clause violation by leaving an inferior officer removable by a principal officer at will and not by the President).  In other words, generally, the power to hire is the power to fire.  Congress may depart from this ordinary rule, but, "[a]bsent relevant legislation," "the power to remove is held by the appointing authority, and *only by* the appointing authority."  *Nat'l Treasury Emps. Union v. Reagan,* 663 F.2d 239, 247 (D.C. Cir. 1981) (emphasis added).  "Thus, for example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President."  *Id.*; *see also In re Hennen,* 38 U.S. 230, 260 (1839) (where Congress has vested appointment power in the head of a department, that officer holds the power of removal, and "the President has certainly no power to remove").

Accordingly, the purported termination of Ms. Aviel from her position as the president of the IAF by the Presidential Personnel Office, on behalf of the President, was *ultra vires*, and Ms. Aviel lawfully retains that position.  There is no question that the Board of IAF has not removed Ms. Aviel from her position as president of IAF.  Ex A, Aviel Decl. ¶ 19; Ex. L (Letter from IAF

Board).  The statutory violation could not be plainer, and thus this court need not look further than the fact that Defendants' actions run afoul of the statutory text.

In prior filings, including on appeal of this Court's preliminary injunction, Defendants have tried to obscure the issue by arguing that if the President cannot appoint Marocco as an acting Board member, then the President must have the authority to fire Aviel himself—suggesting impliedly that the President acted to terminate Ms. Aviel as a backstop after Marocco sought to do the same.  *See* ECF No. 32 at 1; COA Mot. to Stay at 10.  But this skews the timeline: Ms. Aviel *first* received an email on February 26 from Morse, informing her that President Trump had terminated her from her position, effectively immediately.

There is no genuine dispute of material fact that the President fired Ms. Aviel on February 26, 2025.  One hour before the April 2nd hearing before the Court in this matter, Defendants filed a notice purporting to show minutes of a "Board meeting" that Marocco held on February 28, 2025.  ECF No. 21-1.  These "minutes" had previously been redacted when published in the Federal Register.  *Compare* ECF No. 21-1 at 1 (email of meeting minutes filed by the government showing Ms. Aviel's second firing), *with* Ex. I (minutes published in Federal Register redacting section related to Ms. Aviel's termination).[2]  Despite the information contained in these "minutes," the Earnings Statement Ms. Aviel received after her purported firing, *issued by the government*, shows her pay only through February 26, 2025.  *See* Ex. F (Earnings Statement).  Ms. Aviel's formal Notice of Personnel Action that she received after her termination was cancelled likewise stated that she had been terminated on February 26, 2025.  Ex. G (Notice of Personnel Action).  Thus, it appears that the government has taken the consistent position in other contexts that the

---

[2] Counsel notes that the unredacted transcript filed by the government contains different spacing and additional redactions at the beginning of the document from what was published in the Federal Register.  No reason is given for these discrepancies by.  Nevertheless, counsel is willing to take the government at its word that the previously-redacted section contains a heretofore secret second firing of Aviel.

President terminated Ms. Aviel on February 26. That firing was contrary to the law, and Defendants cannot meaningfully argue otherwise. Summary judgment in favor of Ms. Aviel on this February 26, 2025 firing (which the government continues to treat as her actual termination date) is unambiguously warranted.

**B.    The President's Appointment of Mr. Marocco As An Acting Member of The IAF Was Unlawful, and Marocco's Subsequent Actions, Including the February 28, 2025 Purported Termination of Ms. Aviel, Are Therefore Invalid.**

The Appointments Clause forecloses a Presidential power to unilaterally appoint principal officers of the United States. The Framers believed that such an unchecked power was "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Commissioner*, 501 U.S. 868, 883 (1991) (quotation marks omitted). The Appointments Clause accordingly limits Constitution that power by "dividing" it "between the Executive and Legislative Branches." *Id.* at 884.

"The Senate's advice and consent power is a critical 'structural safeguard [] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.,* 580 U.S. 288, 293–94 (2017) (quoting *Edmond,* 520 U.S. at 659) (alterations in the original). To be sure, Congress recognized that the process of nomination and Senate confirmation "can take time," and that in some instances neither the President nor the Senate "may desire to see the duties of the vacant office go unperformed in the interim." *Id.* at 293–94. Accordingly, "*Congress* has given the President *limited authority* to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval." *Id.* at 294 (emphasis added). Yet even this grant of limited authority is a departure from the constitutional "norm." *NLRB v. Noel Canning,* 573 U.S. 513, 523 (2014); *see United States v. Maurice,* 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (Marshall, C.J., sitting by designation) ("[T]he president shall nominate, and by and with the consent of the senate,

appoint to *all* offices of the United States, with *such exceptions only* as are made in the Constitution[.]") (emphasis added).

Congress implemented this limited authority to appoint acting officials primarily in the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, which describes certain circumstances under which Congress has delegated to the President the authority to appoint acting officials while a permanent officer awaits confirmation. *See SW Gen.,* 580 U.S. at 293–94. These provisions "are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless another "statutory provision expressly" authorizes the President or another official to appoint an acting official, or such a provision itself expressly designates an acting official, or the President validly makes a recess appointment. 5 U.S.C. § 3347(a).

The FVRA explicitly does not extend to the President this limited grant of appointment authority to vacancies arising in boards "composed of multiple members" and boards that control a "Government corporation." 5 U.S.C. § 3349c(1). Defendants have not disputed that the IAF is such an entity, *see* ECF No. 19 at 7, nor could they. The Inter-American Foundation is governed by a bipartisan nine-member board, 22 U.S.C. § 290f(g), and it operates as a government corporation, 22 U.S.C. § 290f(e) (setting forth the powers and functions of "[t]he Foundation, as a corporation"). Although the FVRA acknowledges that other statutes might provide such an appointment authority, no provision in the IAF's organic statute (or any other source of law) grants the President the power to appoint acting Board members. Instead, the statute specifies that Board members may only be appointed pursuant to the process of nomination and confirmation by the Senate. 22 U.S.C. § 290f(g). And the statute explicitly allows members to continue serving until

the confirmation of their successor. *Id.* Accordingly, the FVRA does not grant the President the authority to appoint acting members to the Board of the IAF.

Because neither the FVRA nor any other provision of law contemplates the possibility of acting Board members, any vacancy in the Board of the IAF "shall remain vacant," 5 U.S.C. § 3348(b)(1), until such time as the position is filled through the process of Senate confirmation. And the FVRA clearly states that any action taken by a person who purports to be an acting member of the Foundation's Board "shall have no force or effect," 5 U.S.C. § 3348(d)(1), and "may not be ratified," 5 U.S.C. § 3348(d)(2).

The purported appointment of Marocco as acting chairman of the IAF Board is therefore void and must be treated as having no force or effect. Previously, Defendants attempted to circumvent the FVRA's limitations by arguing that the Constitution grants the President broad authority to name acting officials—thus bypassing the Senate and violating the FVRA—because it is the President's responsibility to keep executive branch agencies filled and in operation. *See, e.g.*, ECF No. 32 at 2. This argument "asserts a broad, heretofore unrecognized expansion of Executive power that would eviscerate key parts of the Constitution." *Aviel*, 2025 WL 1009035, at *8. This Court properly described the logical extension of these arguments as "frightening." *Id.* at *9. Although "the 'burdens on governmental processes' that the Appointments Clause imposes may 'often seem clumsy, inefficient, even unworkable,' "the Appointments Clause is not an empty formality." *SW Gen.*, 580 U.S. at 316–17 (Thomas, J., concurring) (quoting *INS v. Chadha*, 462 U.S. 919, 959 (1983)). The Framers specifically recognized that there would be "serious risk for abuse and corruption posed by permitting one person to fill every office in the Government." *Id.* But Defendants effectively ask that the Court to "cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative

20

convenience or efficiency." *Id.*; *see also Chadha*, 462 U.S. at 944 ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.").

The Court previously placed its finger on the pulse of this issue, extensively questioning the government and noting the lack of any "limiting principle" in the government's position. *Aviel*, 2025 WL 1009035, at *9. If the government is right that the President holds unbridled authority to fill any principal vacancy with an acting official—and if the FVRA's time limits do not apply, as the government claims—then the President could appoint an "acting" Board member indefinitely without ever needing to seek the advice and consent of the Senate. Such a scheme is exactly what the Founders warned against, and why they crafted the Appointments Clause.

Indeed, the government has been clear about the scope of this proposed power, stating at the April 2nd hearing in this matter that the acting appointment could continue into "the foreseeable future," and refusing to "comment on when it ceases to exist." *Aviel v. Gor*, Hr'g Tr. 55:15, 55:25 (D.D.C. April 2, 2025). This risks creating exactly the "insidious and powerful weapon of . . . despotism" the Court warned against in *Freytag*. 501 U.S. at 883 (quotation marks omitted).

Apart from promoting an untenable reading of the Appointments Clause, there is no basis in the Constitution for the President to arrogate such a power to himself. Article II's background principles do not provide the President's ability to name acting Board members, as the government has contended. No court has ever endorsed the sweeping power grab the government has proposed. *See George v. Ishimaru*, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994), *order vacated and appeal dismissed as moot*, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994).

Indeed, this Court previously observed that Defendants could cite "no binding legal authority" in support of their broad reading of Article II. *Aviel*, 2025 WL 1009035, at *8. Rather,

Defendants cited two opinions by the Office of Legal Counsel. The first opinion, *Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation,* 49 Op. O.L.C. __ (Mar. 14, 2025), was properly called into question by the Court. *See Aviel*, 2025 WL 1009035, at *8 (explaining that the opinion "contravened OLC's general 'prudential' principle that it 'avoids opining on questions likely to arise in pending or imminent litigation involving the United States as a party.'") (quoting Office of Legal Counsel, *Mem. for Att'ys of the Off.* (July 16, 2010)). Moreover, the OLC opinion cites no binding authority of its own and merely echoes the rejected Article II absolutism reflected in Defendants' arguments to the Court.

The second opinion is similarly unavailing. That opinion concerned a vacant seat on the Federal Home Loan Bank Board. *See Power of the President to Designate Acting Member of the Federal Home Loan Bank Board,* 1 Op. O.L.C. 150 (1977) (cited at ECF No. 19 at 8). But that opinion predated Congress's 1998 enactment of the modern FVRA, and as such, it presumed that Congress had left a gap for the Administration to fill by failing to enact a "holdover provision" for Senate-confirmed members to retain their seats pending the confirmation of a successor. *Id.* Here, Congress did enact such a holdover provision, *see* 22 U.S.C. § 290f(h), and Congress further underscored, when enacting the FVRA, that its limited statutory grant of authority for the appointment of acting officials is exclusive, leaving no gap for the Administration to fill. Additionally, the opinion concluded that, without the appointment of an additional acting member, the bank board would be left with only one member, who could not by himself exercise the authority of the entire board. 1 Op. O.L.C. at 150 (citing *FTC v. Flotill Prods., Inc.,* 389 U.S. 179, 183 (1967)). This opinion could not possibly support Marocco's claim to exercise, by himself, the authority of the entire Board of the IAF.

What's more, Defendants' interpretation is internally inconsistent. If the President had such expansive power under Article II to name acting officials who can carry out the full duties of a covered Senate-confirmed position when it is vacant, the FVRA would violate the Constitution, as it would intrude on the President's Article II power. And such a power would render the Recess Appointments Clause surplusage, because the President could make indefinite acting appointments whenever he pleased. But if the government retreats to arguing that the President has inherent authority under Article II to name acting officials *only* when the FVRA does not apply, that assertion runs contrary to the government's expansive interpretation of Article II.

In any case, the FVRA *does* apply. Defendants have in this case advanced a contorted interpretation of the FVRA: that its non-applicability to the IAF (through Section 3349c) means that the IAF falls entirely out of the statute's scope. Not so. First, Congress has specified that the FVRA provides the "exclusive means" for the appointment of acting officials in the absence of Senate confirmation. 5 U.S.C. § 3347(a); *see also* S. Rep. No. 105-250, at 11 (1998) (explaining that Congress enacted the FVRA "to ensure the exclusivity of the applicability of the Vacancies Act"). Moreover, the government's selective embrace of Section 3349c ignores that Section 3348(d)(1), which invalidates actions by improperly appointed officers, expressly encompasses "vacant office[s] to which . . . [Section] 3349c appl[ies]." 5 U.S.C. § 3348(d)(1).

There is no basis for the government to sidestep this point by arguing that Section 3348(d)(1)'s cross-reference to Section 3349c merely clarifies that the FVRA applies to offices without multimember boards. *See* COA Mot. to Stay at 16; 49 Op. O.L.C. at *7. This is a strained reading that needlessly places provisions of the FVRA "at war with itself." *U.S. ex rel. Polansky v. Exec. Health Res., Inc.,* 599 U.S. 419, 434 (2023) (quoting *United States v. Am. Tobacco Co.,* 221 U.S. 106, 180 (1911)). For one, Section 3348(d)(1) refers to sections other than Section 3349c

as sections providing for "a vacant office" that would "hav[e] no force or effect" in the absence of a proper appointment. And Section 3348(d)(1)'s operative phrase is "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347," such that the reference to section 3349c is confirmatory, and the provisions apply in harmony. In any event, even if there *were* a conflict between Section 3348 and Section 3349c, the specific language of the first provision invalidating any actions of invalidly appointed board members would control over the general language of the latter provision. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 646 (2012).

*    *    *

In the absence of a grant of authority from Congress to appoint an acting member of the Board of the IAF, the President lacked the authority to appoint Marocco to that Board. And because Marocco was never validly appointed as an acting member of the Board, any actions he has taken or intends to take in that capacity, or as Ms. Aviel's replacement as president of the IAF, must be treated as void and as without effect. Summary judgment is warranted in Ms. Aviel's favor, and she is entitled to permanent relief precluding Marocco from exercising authority on behalf of the Inter-American Foundation.

**C.    Ms. Aviel Is Entitled Relief.**

Moving from merits to remedy, this Court should award the full measure of relief that Ms. Aviel seeks, including declaratory relief, permanent injunctive relief, mandamus, and backpay, as well as any other remedy the Court deems appropriate.

**I.    Ms. Aviel is entitled to declaratory relief.**

Ms. Aviel is entitled to declaratory relief. There are "no dispositive factors" for when declaratory judgment should issue, but courts typically rely on "two criteria" when determining whether to issue declaratory relief: (1) whether the judgment will "clarify[] the legal relations at

issue," and (2) whether it will "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)).

Both factors warrant declaratory relief here.  There is no question that a judgment would settle a "substantial controversy" as to the parties' relations—namely whether Ms. Aviel remains the president and CEO of the IAF.  *See Glenn,* 222 F. Supp. 3d at 36 (quotation marks omitted). Declaratory relief would similarly remove the uncertainty at the heart of this case: whether Marocco can be appointed to an acting position on the Board without "advice and consent of the Senate," 22 U.S.C. § 290f(g).

Nor would any of the typical concerns that might weigh against declaratory relief apply. There are no questions about the "equity" of Ms. Aviel's conduct; the "state of the record" is fully developed as to all facts relevant to the legal issue before this Court; the parties are plainly "adverse[]"; and the "question to be decided" is one of substantial "public importance."  *POM Wonderful LLC v. F.T.C.,* 894 F. Supp. 2d 40, 44 (D.D.C. 2012) (noting several "useful considerations" found by the D.C. Circuit).

Indeed, declaratory relief is the simplest way to resolve this dispute.  The government has suggested (albeit for the very first time) in its motion to stay filed in the D.C. Circuit that it would be inappropriate to provide injunctive relief in this case due to separation of powers concerns. Specifically, the government argued that this Court did not have the equitable power to reinstate Ms. Aviel because "appointment and removal of the Foundation's president is specifically entrusted to the Executive."  COA Mot. to Stay at 21.  The government's argument mirrors those it has made in recent cases confronting whether courts have the authority to reinstate fired members

of other agencies.  Regardless of how the courts come out on that issue, this case is entirely distinct precisely because of the declaratory relief available here.

This declaratory relief sought here is that Marocco's actions be voided under the FVRA. That remedy does *not* raise "questions about the remedial authority of the Article III courts." *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting).  Upon finding that a violation of the FVRA has occurred, this Court's inquiry is at an end, as the relief in that case would be to unwind Defendants' actions.  When Congress enacted the FVRA, it explicitly removed discretion from the federal courts and mandated that relief be awarded in cases involving actions based on a putative acting officer's invalid claim of authority. 5 U.S.C. § 3348(d) provides that "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which [*inter alia*, Section 3349c applies] shall have no force or effect," and "may not be ratified."  Thus, absent an exception specified in the statute itself, "actions taken in violation of the FVRA are void *ab initio*."  *SW Gen.*, 580 U.S. at 298 n.2.

In other words, "[t]he plain terms of the FVRA remove remedial discretion by directing that unlawful actions under that statute are void ab initio, thereby rendering the rules without 'force or effect' and requiring vacatur."  *Asylumworks v. Mayorkas,* 590 F. Supp. 3d 11, 26 (D.D.C. 2022).  This Court should therefore order that all the actions taken by Defendants under Marocco's invalid claim of authority, including the purported termination of Ms. Aviel from her position as president of the IAF, were invalid from the start, and must be unwound.  "[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation."  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001).  "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to

enforce them when enforcement is sought." *Id.*; *see also Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988) (explaining that declaratory judgments "are neither legal nor equitable").

## II.    Ms. Aviel is entitled to permanent injunctive relief.

In any case, Ms. Aviel also satisfies the requirements for a permanent injunction.  This Court previously granted a preliminary injunction that found Marocco's appointment as "acting" member of the IAF Board to be improper, ordered that any actions taken by Marocco in his role as "acting" Board member were "*void ab initio* and without any legal effect," and enjoined Defendants from, *inter alia*, removing Ms. Aviel from her position as president and CEO.  ECF No. 23.  Permanent injunctive relief is similarly appropriate for judgment on the merits.

The requirements for a permanent injunction are similar to those for a preliminary injunction and are satisfied here.  (1) Ms. Aviel will suffer irreparable injury if an injunction is denied; (2) remedies "available at law" cannot remedy that injury; and (3) the balance of hardships and public interest favor Ms. Aviel.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Where, as here, the "enforce[ment] of federal law" hangs in the balance, courts "must not hesitate in awarding necessary relief."  *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) (quoting *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017)).  All the reasons this Court presented for why this case is a "genuinely extraordinary situation" warranting such relief apply with even greater force at this stage.  *See Aviel*, 2025 WL 1009035, at *10 (quoting *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)).

*First*, the harms at issue here are irreparable and "sufficient in kind and degree" to override the factors typically weighing against relief in "personnel cases."  *Sampson*, 415 U.S. at 84.  Defendants' actions from approximately March 4 to April 4, 2025, show the kind of irreparable harm they mean to cause the Inter-American Foundation.  Defendants have made no secret of their

intent to wipe out the Foundation, and they would have been successful in cancelling virtually all contracts and reducing the Foundation to a single-person entity were it not for the Court's preliminary injunction.  As Ms. Aviel explained in her motion for a preliminary injunction, harm to the IAF and harm to Ms. Aviel are mutually reinforcing.  *See, e.g.*, ECF No. 5-1 at 24 ("Here, the injury is not just, '[a]t worst,' [Ms. Aviel] remaining out of office; losing her statutorily guaranteed position means losing authority over the fundamental direction, culture, and work of an entire agency.") (quoting and distinguishing *Dellinger v. Bessent ("Dellinger I")*, No. 25-5052, 2025 WL 887518, at *4 (D.C. Cir. Mar. 10, 2025) (per curiam)); *id.* at 26 ("By demanding the termination of all existing IAF grants . . . Defendants will destroy the reputation of the IAF, undoing *precisely* what Congress sought to establish when they created [Ms. Aviel]'s position."). Where, as here, the injury to Ms. Aviel is intertwined with the very survival of the IAF, this case presents exactly the type of "genuinely extraordinary situation" discussed in *Sampson*, 415 U.S. at 92 n.68.

*Second*, the nature of the irreparable harm makes plain why legal remedies are inadequate. Ms. Aviel's loss of a statutory right to perform her congressionally-directed mission transcends the loss of income involved in a typical employment action and cannot be restored by an award of damages.  That is especially true at this posture.  If permanent injunctive relief is denied, and if no other relief is available, Ms. Aviel would *never* resume performing the functions that have lawfully been entrusted to her.  And Defendants would then use Ms. Aviel's office to effectively shutter the agency, consistent with their actions prior to April 4.  Ms. Aviel would thus suffer harm that could not otherwise be remedied due to "the obviously disruptive effect" that Defendants' actions would have on the IAF.  *Berry v. Reagan*, No. CV 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983)).  The Court recognized as much, explaining that

when an officer of a government organization faces the prospect of "return[ing] to a pile of rubble," "[t]his unique, irremediable harm distinguishes this case from those where the plaintiff only pleads the loss of her own right to function in a role." *Aviel*, 2025 WL 1009035, at *10–11.  Because Ms. Aviel "is the lawful president of the organization," depriving her of the right to lead the IAF harms the IAF, and Defendants' unlawful dismantling of the IAF directly and irreparably harms Ms. Aviel.  As the Court noted, "her right to serve in that role is inextricably intertwined with the organization's survival." *Id.*  In short, no amount of money paid to Ms. Aviel (even though she is also entitled to salary) will reanimate the IAF once it is eviscerated.

*Third*, as at the TRO and preliminary injunction stage, the balance of the equities and public interest favor Ms. Aviel.  There is an extremely strong interest in "having governmental agencies abide by the federal laws that govern their existence and operations." *Aviel*, 2025 WL 1009035, at *12 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).  In their stay papers, Defendants asserted a countervailing harm when an official is granted "executive power over the President's objection and freed from any oversight or control."  COA Mot. to Stay at 27 (citing *Dellinger v. Bessent ("Dellinger II")*, No. 25-5025, 2025 WL 559669 (D.C. Cir. Feb. 15, 2015) (Katsas, J., dissenting)).  This Court should reject that sleight of hand.  First, unlike the plaintiff in *Dellinger*, Ms. Aviel is an inferior officer who reports to a multimember board and is not "the sole head of an agency" who "only the President may remove." *Dellinger II*, 2025 WL 559669, at *15 (Katsas, J., dissenting).  An inferior officer like Ms. Aviel does not necessarily exercise the same degree of power as a principal officer like Dellinger.  Defendants also make much of the fact that "a person the President has chosen to remove from office is exercising executive power . . . in the face of his objection."  COA Mot. to Stay at 24.  But that could be true for *every* inferior officer who is appointed by a principal officer.  If the President wishes to fire an

29

inferior officer, he must *always* order the principal officer to do so unless the statute allows otherwise. *See Free Enter. Fund*, 561 U.S. at 509. The real question is whether the President may *enlarge* his power by firing principal officers. And there is no evidence in the record the President even directed the principal officers—here, the Board—to fire Ms. Aviel; indeed, the record shows just the opposite. *See* Ex. B, Arriola Decl. ¶ 3 (Board member stating that "[n]either President Trump nor anyone from his Office ever asked me to terminate the IAF's president and CEO, Sara Aviel"). If the President may circumvent removal requirements in this manner, there would be no purpose in ever creating inferior officers protected from direct removal by the President. Such a holding would eviscerate completely the Court's reasoning in *Free Enterprise Fund*. All the President would have to do to fire an otherwise-protected inferior officer would be to fire her principal officers first.

In addition, the only reason no Board is left to supervise Aviel is because the President fired them. The act of firing principal officers by statute (whom Congress provided could remain in office until their successors were confirmed, *see Noel Canning v. NLRB*, 705 F.3d 490, 511 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014)), does not enlarge the President's constitutional power to fire inferior officers. As this Court properly pointed out, "a litigant cannot cry foul over a 'self-inflicted' injury." ECF No. 34 at 3 (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)); *accord Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) ("[T]hat the government's asserted harm is largely self-inflicted 'severely undermines' its claim for equitable relief."); *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable."); *Hirschfeld v. Bd. of Elections in City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993); *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not irreparable injury."); *Caplan v. Fellheimer*

*Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1 (3d ed. 2025) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."); *see also Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.  Such harm does not amount to an 'injury' cognizable under Article III.").  And there is an easy solution to this problem the President (and only the President) has created: he can follow the constitutional "norm" of Senate advice and consent for the IAF Board.  *Noel Canning*, 573 U.S. at 523.  That is not an irreparable harm to the President; it is how the Framers intended the Constitution to function.  The President is not harmed by following the law.

Indeed, the expansive logic of the Government's position here, combined with the sweeping removal powers it has argued for in *Harris v. Bessent*, No. 25-5055, 2025 WL 980278 (D.C. Cir. Mar. 6, 2025), present precisely the "frightening" situation this Court warned of, *Aviel*, 2025 WL 1009035, at *9.  In *Harris*, the government argues that the President may remove any person from a multimember Board for any reason whatsoever.  Appellants' Mot. for Stay at 10-17, *Harris v. Bessent*, No. 25-5055 (D.C. Cir. Mar. 6, 2025).  Here, the President argues he may *appoint* any person in an acting capacity to any multimember board for an indefinite period.  Put together, the government's theory would allow the President to fire anyone he wanted and appoint anyone as an acting board member indefinitely.  The President could fire the entire Federal Reserve Board tomorrow and appoint acting members for the next-nearly-four years.  The Securities and Exchange Commission, the Commodities Future Trading Commission, the Federal Communications Commission, the Federal Energy Regulatory Commission, the Nuclear

31

Regulatory Commission, and a host of other multimember agencies could be gutted tomorrow and replaced with acting board members. All of whom could serve indefinitely in their positions, rendering the Constitution's advice-and-consent function a dead letter.

**III.     Ms. Aviel is entitled to a writ of mandamus.**

Even if relief under 5 U.S.C. § 3348(d) or under the standard for injunctive relief were unavailable, Ms. Aviel would be entitled to a writ of mandamus. Courts have jurisdiction "to determine the title to a public office . . . either by *certiorari*, error, appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*." *In re Sawyer,* 124 U.S. 200, 212 (1888). To be clear, the fact that so many remedies have long been available in personnel cases proves that no grave separation-of-powers concerns arise from issuing an injunction. But in this particular case, the Complaint includes a request for mandamus relief. Compl. ¶ 14. If the Court concludes other relief is unavailable, a writ of mandamus should issue (or may issue in the alternative). In that situation, "no other adequate means to attain relief" would exist; Ms. Aviel's entitlement to relief is "clear and indisputable"; and mandamus would be "appropriate under the circumstances." *See In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020) (quoting *Cheney v. U.S. Dist. Ct. for D.C.,* 542 U.S. 367, 380 (2004)).[3]

---

[3] In addition, Ms. Aviel is entitled to backpay for her time that she was out of her office, and the Court should so order that payment. It is counsel's understanding that as a result of the preliminary injunction, Ms. Aviel has been provided with backpay, but she is still owed a significant amount of missing contributions for various benefits. An order here should enshrine her legal right to that pay and benefits as a matter of final judgment.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should grant summary judgment in favor of Plaintiff.


Dated: April 18, 2025                                    Respectfully submitted,


                                                        */s/ Aaron S.J. Zelinsky*
                                                        Aaron S.J. Zelinsky*
                                                        ZUCKERMAN SPAEDER LLP
                                                        100 East Pratt Street, Suite 2440
                                                        Baltimore, MD 21202
                                                        Tel: (410) 332-0444
                                                        Fax: (410) 659-0436
                                                        azelinsky@zuckerman.com

                                                        Aaron Chou (DC Bar No. 90020425)*
                                                        M Moore (DC Bar No. 90004368)
                                                        ZUCKERMAN SPAEDER LLP
                                                        2100 L Street NW, Suite 400
                                                        Washington, DC 20037
                                                        Tel: (202) 778-1800
                                                        Fax: (202) 822-8106
                                                        achou@zuckerman.com
                                                        mmoore@zuckerman.com

                                                        *Attorneys for Plaintiff Sara Aviel*

                                                        *\*Admitted pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this 18th day of April, 2025, I caused the foregoing to be served on counsel of record via the Court's electronic case filing system.

*/s/ Aaron S.J. Zelinsky*
Aaron S.J. Zelinsky

*Attorney for Plaintiff Sara Aviel*
