## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SARA AVIEL,<br><br>    *Plaintiff,*<br><br>    –v.–<br><br>SERGIO GOR, *et. al.*,<br><br>    *Defendants.* | Case No. 25-cv-00778 |

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

  Pursuant to Local Civil Rule 7(h), Plaintiffs hereby provide the following statement of material facts as to which there is no genuine issue:

### CREATION AND BACKGROUND OF THE INTER-AMERICAN FOUNDATION

  1. In 1969, Congress established the Inter-American Social Development Institute ("ISDI") as a "body corporate." Pub. L. 91-175, 83 Stat. 805, 821–24 (Dec. 30, 1969). In 1971, the ISDI changed its name to the Inter-American Foundation ("IAF").

  2. A bipartisan group in the U.S. Congress founded the IAF to address their concern that the U.S. government needed to do better at directing its foreign development aid to the most vulnerable and underserved people. Congress formed the agency as an alternative to large foreign assistance programs and charged the agency with disbursing smaller amounts to local, community-led organizations that worked directly on grassroots projects in Latin America.

  3. Today, the IAF describes itself as a "nimble and transformative U.S. government agency that invests in locally-led development across Latin America and the Caribbean." Inter-American Foundation, *Who We Are* (last accessed Apr. 17, 2025), https://www.iaf.gov/. The IAF

directly engages with community leaders, innovators, and entrepreneurs working to promote prosperity, peace, and democracy in the region. *Id.* Since 1972, the IAF has funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country. *Id.*

4.      According to its website, the IAF serves the United States' strategic interests throughout Latin America and the Caribbean in a cost-efficient manner. *Id.* Over 70% of IAF grantees independently and anonymously surveyed reported that their opinion of the United States had improved as a result of their work with the IAF. *Id.* For every dollar the IAF invested in fiscal year 2024, grantees committed $1.36 in co-investment. *Id.* Philanthropic and corporate partners have recognized the effectiveness of the IAF's approach by channeling their own resources through the IAF. *Id.*

5.      Until a couple months ago, the IAF had over 400 active grantees in 27 countries. Ex. A, Aviel Decl. ¶ 2. These local organizations work to stabilize communities affected by transnational crime, foster sustainable economic prosperity, provide alternatives to migration, and increase communities' goodwill towards the United States in the face of increasing pressures from actors like the People's Republic of China. *Id.*

6.      The IAF has long had bipartisan support and remains accounted for in recent Congressional appropriation bills. The House Bill Report for the most recent State, Foreign Operations, and Related Programs Appropriations Bill states: "[t]he Committee recognizes the strong track record of the Inter-America Foundation (IAF) in achieving cost-share from new grantees that is greater, on average by 20 percent, than IAF's initial support for new projects. The Committee encourages USAID to learn best practices from IAF in this regard . . . ." *See* Report 118-XXX, at *60–61, https://docs.house.gov/meetings/AP/AP00/20240612/117434/HMKP-118-

AP00-20240612-SD002.pdf.   Similarly, a Senate resolution in 2019 "commending the Inter-American Foundation on the occasion of its 50th Anniversary for its significant accomplishments and contributions to the economic and social development of the Americas" was co-sponsored by Senators Rubio, Cruz, Kaine, and Cardin.   *See* S. Res. 297, *Cosponsors*, https://www.congress.gov/bill/116th-congress/senate-resolution/297/cosponsors.

## THE IAF BOARD AND PRESIDENT

7.      As provided in the IAF's organic statute, 22 U.S.C. § 290f(h), the IAF's board of directors (the "IAF Board") consists of "nine members appointed by the President, by and with the advice and consent of the Senate."

8.      As of at least February 24, 2025, the IAF Board had four members, consisting of two Republicans and two Democrats.

9.      Eduardo "Eddy" Arriola was confirmed by the U.S. Senate as a member of the IAF Board on March 29, 2012.  158 CONG. REC. D332 (daily ed. Mar. 29, 2012) (confirmations); Ex. B, Arriola Decl. ¶ 1.

10.      Juan Carlos Iturregui was confirmed by the U.S. Senate as a member of the IAF Board on November 19, 2015.  161 CONG. REC. S8179 (daily ed. Nov. 19, 2015) (confirmations).

11.      J. Kelly Ryan was confirmed by the U.S. Senate as a member of the IAF Board on March 29, 2012.  158 CONG. REC. D332 (daily ed. Mar. 29, 2012) (confirmations).

12.      Luis A. Viada was confirmed by the U.S. Senate as a member of the IAF Board on November 19, 2015.  161 CONG. REC. S8179 (daily ed. Nov. 19, 2015) (confirmations).

13.      The remaining five appointed positions on the Board are vacant.

14.      The Board of the IAF confirmed the appointment of Sara Aviel as the president and CEO of the IAF on March 7, 2022.  Ex. A, Aviel Decl. ¶ 3.  Ms. Aviel began her service as president

and CEO of the IAF on April 24, 2022, and has served in that role since that date.  *Id.*  Prior to assuming the position at the IAF, Ms. Aviel was a Senior Advisor at the Center for Strategic and International Studies—a bipartisan, non-profit research institution—and was the Founder and Principal of Margalit Strategies.  *Id.* ¶ 4.  She previously served various roles in the Department of the Treasury, the National Security Council, the World Bank Group, and the Office of Management and Budget, and for international development organizations including Root Capital, Mercy Corps and CARE.  *Id.*

**DEFENDANTS' ACTIONS PURSUANT TO EXECUTIVE ORDERS**

15.     On February 19, 2025, President Trump signed an executive order with the purpose "to dramatically reduce the size of the Federal Government" by "commenc[ing] a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary."  Exec. Order No. 14217, *Commencing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 10577. The EO targeted four independent agencies, including the Foundation.  *Id.*

16.     On the morning of February 20, 2025, Ms. Aviel learned that representatives from the Department of Government Efficiency ("DOGE") had requested a meeting for that afternoon. Ex. A, Aviel Decl. ¶ 5.  Ms. Aviel and other IAF personnel prepared for the meeting on short notice by assembling discussion points describing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the recently issued Executive Orders.  *Id.*  Ms. Aviel sought to align the agency with the President's stated policy instructions as permissible by law.  *Id.*

17.     On February 20, 2025, representatives of the U.S. DOGE Service—Nate Cavanaugh and Ethan Shaotran—met with representatives of the IAF, including Ms. Aviel.  *Id.* ¶ 6.  Cavanaugh and Shaotran represented to the IAF that they were based at the General Services

Administration ("GSA"). *Id.* The DOGE representatives further informed the IAF that their goal was to verify the IAF's compliance with the President's Executive Orders. *Id.*

18.     During the meeting, IAF staff members sought to facilitate Cavanaugh and Shaotran's requests by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others. *Id.* Additionally, Ms. Aviel attempted to share information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities. *Id.* The DOGE representatives showed minimal interest in the initiatives and instead indicated that their focus was on obtaining access to the IAF's systems. *Id.*

19.     The next day—Friday, February 21, 2025—IAF personnel, including Ms. Aviel, met again with Cavanaugh and Shaotran, as well as Jacob Altik, a lawyer for the Executive Office of the President. *Id.* ¶ 7. Altik stated his view that the minimum statutory requirements for the IAF entailed the existence of a Board and a president, a presence in the District of Columbia, and a minimum level of grants and contracts. *Id.* He further indicated that DOGE intended to conduct a reduction in force ("RIF") of almost all employees, and a termination of almost all grants and contracts. *Id.*

20.     The DOGE representatives asked Ms. Aviel to contact the Board immediately to determine if the Board was in alignment on this plan, and suggested that if the Board were not so aligned, the Board would be terminated and replaced with individuals who were aligned with President Trump's vision. *Id.* ¶ 8. Ms. Aviel explained that it would be difficult to convene the Board immediately, that matters of this consequence required a Board meeting to discuss, and that the Board was subject to certain legal requirements before convening. *Id.* The DOGE representatives indicated their belief that they did not need to call a Board meeting, and that they

just needed a quick "yes-or-no" answer from the Board on alignment.  *Id.*  Ms. Aviel asked that the specific request be put in writing.  *Id.*  Shortly after the meeting, at 4:27 p.m. on Friday, February 21, Cavanaugh sent an email to Ms. Aviel and the IAF's chief operating officer from a GSA email address.  The email, on which Altik and Shaotran were copied, consisted of six bullet points, each of which contained a brief provision from the IAF's organic statute in which Congress used the word "shall."  Ex. C (Email from N. Cavanaugh).

21.    After the meeting, Ms. Aviel heard from Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees.  *Id.* ¶ 9.  For example, on February 22 and 23, 2025, Ms. Aviel heard from senior Republican and Democratic staff for the Senate Appropriations Committee and the House Appropriations Committee who noted that the IAF's annual funding was already provided to "cover only the minimum statutory requirements" and that if Ms. Aviel were to take actions to reduce staff, it "would be in contravention of the appropriations enacted into law."  *Id.*  Ms. Aviel shared this information with the IAF Board.  *Id.*

22.    From February 21, through the weekend, and on Monday, February 24, Ms. Aviel spoke with each member of the IAF Board multiple times to analyze all options and identify the best lawful path forward.  *Id.* ¶ 10.  Ms. Aviel also heard from multiple congressional stakeholders and legal experts who believed that the DOGE plan was unlawful and contrary to congressional intent.  *Id.*

23.    On February 24, 2025, Ms. Aviel spoke on the telephone with Cavanaugh and Altik.  *Id.* ¶ 11.  During this call, the DOGE representatives claimed that with one exception, all members

of the Board had been terminated. *Id.* Ms. Aviel expressed surprise at this news, given that she had been in recent touch with each Board member. *Id.* The DOGE representatives asked Ms. Aviel to confirm that she would implement DOGE's agenda in the absence of a Board, and they threatened that the President would terminate her if she declined to do so. *Id.* Ms. Aviel responded that she could not further respond to DOGE's requests without more specificity as to those requests in writing and the opportunity to determine whether they were legal. *Id.* She further stated that she was committed to always doing what was lawful, and to following all of her legal obligations and responsibilities. *Id.* The DOGE representatives asked Ms. Aviel to sign a memorandum of understanding agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems. *Id.* Ms. Aviel declined, stating that she did not believe she had the authority to do so, given her understanding that her Board still remained. After the call, Ms. Aviel confirmed that no Board member had yet received a termination letter from the President, or anyone else.

24.    In fact, neither President Trump nor anyone from his Office ever asked the Board to terminate Ms. Aviel from her position as the IAF's president and CEO. Ex. B, Arriola Decl. ¶ 3. To this day, at least one Board member still has not received any communication from President Trump or anyone from his Office dismissing him from the Board. *Id.*

25.    In the morning of February 26, 2025, DOGE representatives ordered the Senior Procurement Executive ("SPE") at the Department of Treasury to unilaterally "cancel all IAF contracts" by the close of business on Thursday, February 27, 2025. Ex. D (2/26 Email re IAF Contracts). These contracts included everything from the field contractors that provide grantees with programmatic support and oversight, to contracts for basic services like email and agency grant-management software. Ex. A, Aviel Decl. ¶ 12. The Administrative Resource Center

("ARC")—which is housed at the Treasury Department's Bureau of the Fiscal Service and supports the IAF's procurement and finance functions—shared that they had not yet received a request in writing from the SPE and were "concern[ed] about the legality of this."  Ex. D.

## THE PURPORTED TERMINATION OF MS. AVIEL

26.     On the evening of Wednesday, February 26, 2025, Ms. Aviel received an email from Trent Morse of the Presidential Personnel Office informing her that, at the direction of President Trump, her position at the IAF had been terminated, effectively immediately.  Ex. E (Email from Morse to Aviel).

27.     In addition, Ms. Aviel's Leave and Earnings Statement that she received from the Government after her purported firing shows that she accrued twenty-four (24) hours of work from the pay period beginning February 24 and ending March 8, meaning that her employment was considered by the Government to have terminated on February 26, 2025.  Ex. F (Leave & Earnings Statement).  Additionally, the Notice of Personnel Action that she received after her termination was cancelled on April 4 similarly shows that the effective date of her termination was February 26, 2025.  Ex. G (Notification of Personnel Action).  Ms. Aviel never received an email from Marocco stating that her position had been terminated.  Ex. A, Aviel Decl. ¶ 15.  She has never had any direct communication with Marocco.  *Id.*

28.     On the afternoon of February 28, 2025, Trent Morse sent an email to the IAF's chief operating officer, stating that President Trump had exercised a purported authority to temporarily appoint Pete Marocco as the acting chairman and board member of the IAF.  Ex. H (Email from Morse to COO).  The communication acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act

to appoint acting Board members but asserted that President Trump had inherent authority under Article II to do so.  *Id.*

29.    Following his purported appointment as acting Chair of the Board of the IAF, Marocco visited the IAF headquarters, seeking to hold an "emergency board meeting."  Ex. I (Federal Register Minutes).  Marocco determined that because "no one [wa]s [t]here to let [him] in," he was permitted to hold the meeting directly outside the IAF office.  *Id.*  Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member in attendance.  *See id.*  He voted to close the Board meeting to the public.  *Id.*  He then voted to appoint himself as the acting president and CEO of the IAF.  *Id.*  Marocco later circulated a Board Resolution, naming himself as acting Board Chair, president, and CEO of the IAF.  Ex. J (Board Resolution).

30.    That same evening, the Administrative Resource Center received a directive authorized by Marocco, now representing himself to be the president of the IAF, to terminate all IAF contracts.  Ex. K (2/28 Email re IAF Contracts).  The ARC procurement team subsequently informed a member of the IAF's leadership team that they intended to "immediately" execute those terminations, as authorized by the IAF's "newly appointed President Peter Marocco."  *Id.*  Almost all IAF contracts were ultimately terminated that Friday evening and into Saturday morning with the exception of a handful, such as those for human resources and information technology.  Ex. A, Aviel Decl. ¶ 18.

31.    On March 2, 2025, members of the Board of the IAF wrote to Ms. Aviel, stating their intent to serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law.  Ex. L (Letter from IAF Board).  They communicated their view that, accordingly, the governance of the IAF remained unaltered and in place, no duly

qualified members of the Board had fired Ms. Aviel, and that she remained the Foundation's president and CEO. *Id.* The Board directed Ms. Aviel to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the Foundation's grantees. *Id.*

32. On or around March 4, 2025, Marocco and DOGE began implementing a RIF of the IAF's employees. Ex. A, Aviel Decl. ¶ 20. At that time, the IAF had 36 employees (not including Ms. Aviel), although three had previously signed agreements to depart through voluntary early retirement or the "Fork in the Road" deferred resignation offer. *Id.* Thirty-three staff were issued RIF notices, which were sent on behalf of Marocco and identified an official separation date of Friday, April 4, 2025. *Id.* Thirty staff were placed on administrative leave, shut out of the IT systems, and barred from accessing the IAF's offices. *Id.* Three staff were not placed on administrative leave so that they could assist in the winddown activities. *Id.* Marocco and the DOGE team later voided the RIF of one employee—Dominic Bumbaca, the chief information security officer—and purportedly appointed him as CEO. *Id.* In addition, the IAF's website was taken down. *Id.*

33. In addition, on or around March 4, Marocco terminated virtually all existing IAF grants. *Id.* ¶ 21. The only exception was a single grant that only had limited funds remaining— approximately $66,000—that was set to expire soon. *Id.* The IAF also continues to own a single equity investment in a microfinance institution. *Id.*

34. Grantees were notified that their grants had been canceled in form letters sent on March 4, 2025, stating that the grant was "inconsistent with the agency's priorities," and that "the President's February 19, 2025 executive order mandates that the [Foundation] eliminate all non-statutorily required activities and functions." Ex. M (Grantee Letter). The letter further instructed

grantees to "send remaining, unspent funds to the [Foundation], in accordance with the termination clause and local law, within fifteen (15) days or as soon as practicable." *Id.*

35.    In direct response to DOGE's actions, IAF philanthropic partners have asked that their donations be returned. Ex. A, Aviel Decl. ¶ 22.

36.    Upon returning to the IAF offices after April 4, 2025, and after she had her access to the system restored, Ms. Aviel discovered that on April 4, 2025, at 3:52PM EST, a team@iaf.gov account that was created for the exclusive use of the DOGE representatives, Nate Cavanaugh and Ethan Shaotran, deactivated administrative access for Dominic Bumbaca. *Id.* ¶ 23; Ex. N (Google Admin Logs).


Dated: April 18, 2025                              Respectfully submitted,

                                                   */s/ Aaron S.J. Zelinsky*
                                                   Aaron S.J. Zelinsky*
                                                   ZUCKERMAN SPAEDER LLP
                                                   100 East Pratt Street, Suite 2440
                                                   Baltimore, MD 21202
                                                   Tel: (410) 332-0444
                                                   Fax: (410) 659-0436
                                                   azelinsky@zuckerman.com

                                                   Aaron Chou (DC Bar No. 90020425)*
                                                   M Moore (DC Bar No. 90004368)
                                                   ZUCKERMAN SPAEDER LLP
                                                   2100 L Street NW, Suite 400
                                                   Washington, DC 20037
                                                   Tel: (202) 778-1800
                                                   Fax: (202) 822-8106
                                                   achou@zuckerman.com
                                                   mmoore@zuckerman.com

                                                   *Attorneys for Plaintiff Sara Aviel*

                                                   *\*Admitted pro hac vice*