UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

        *Plaintiff,*

        –v.–

SERGIO GOR, *et. al.*,

        *Defendants.*

Case No. 25-cv-00778-LLA

**DECLARATION OF SARA AVIEL**

1. I am the president and CEO of the Inter-American Foundation ("IAF"). The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me.

2. The IAF is an independent government corporation that was established by Congress to invest in locally-led development across Latin America and the Caribbean. Until a couple months ago, the IAF had over 400 active grantees in 27 countries. These local organizations work to stabilize communities affected by transnational crime, foster sustainable economic prosperity, provide alternatives to migration, and increase communities' goodwill towards the United States in the face of increasing pressures from actors like the People's Republic of China.

3. On February 16, 2022, I had my final interview with the full Board of Directors for the role of president and CEO of the IAF. On March 7, 2022, I received confirmation that the Board of the IAF had appointed me to be the position. I began my service as president and CEO of the IAF on April 24, 2022.

4. Prior to becoming the president of the IAF, I was a Senior Advisor at the Center for Strategic and International Studies, a bipartisan, non-profit research institution, and was the Founder and Principal of Margalit Strategies. I previously served various roles in the Department of the Treasury, the National Security Council, the World Bank Group, and the Office of Management and Budget, and for international development organizations including Root Capital, Mercy Corps and CARE. Leading the IAF was of particular interest to me because it uniquely took advantage of my experience serving at the highest levels of government, implementing community development programs, and mobilizing private sector investment.

5. On the morning of February 20, 2025, I learned that representatives from the Department of Government Efficiency ("DOGE") had requested a meeting for that afternoon. I worked with other IAF personnel to prepare for the meeting on short notice by assembling discussion points showing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the recently issued Executive Orders. I sought to align the agency with the President's stated policy instructions as permissible by law.

6. Our team then met with DOGE representatives Nate Cavanaugh and Ethan Shaotran, who represented that they were based at the General Services Administration. They informed us that their goal was to verify the IAF's compliance with the President's Executive Orders. IAF staff members and I sought to facilitate Cavanaugh and Shaotran's requests by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others. Additionally, I attempted to share information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities. The DOGE representatives

showed minimal interest in the initiatives and instead indicated that their purpose was to focus on obtaining access to the IAF's systems.

7. The next day—Friday, February 21, 2025—other IAF personnel and I met again with Cavanaugh and Shaotran, as well as Jacob Altik, a lawyer for the Executive Office of the President. Altik stated his view that the minimum statutory requirements for the IAF entailed the existence of a Board and a president, a presence in the District of Columbia, and a minimum level of grants and contracts. He further indicated that DOGE intended to conduct a reduction in force ("RIF") of almost all employees and a termination of almost all grants and contracts.

8. The DOGE representatives asked me to contact the Board immediately to determine if the Board was in alignment on this plan, and suggested that if the Board was not so aligned, the Board would be terminated and replaced with individuals who were aligned with President Trump's vision. I explained that it would be difficult to convene the Board immediately, that matters of this consequence required a Board meeting to discuss, and that the Board was subject to certain legal requirements before convening. The DOGE representatives indicated their belief that they did not need to call a Board meeting, and that they just needed a quick "yes-or-no" answer from the Board on alignment. I asked that the specific request be put in writing. Shortly after the meeting, at 4:27 p.m. on Friday, February 21, Cavanaugh sent an email to me and the IAF's chief operating officer from a GSA email address. The email, on which Altik and Shaotran were copied, consisted of six bullet points, each of which contained a brief provision from the Foundation's originating statute in which Congress used the word "shall." Exhibit C is a true and correct copy of that email.

9. After the meeting, I heard from Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section

7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (2024) from initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees. For example, on February 22 and 23, 2025, I heard from senior Republican and Democratic staff for the Senate Appropriations Committee and the House Appropriations Committee who noted that the IAF's annual funding was already provided to "cover only the minimum statutory requirements" and that if I were to take actions to reduce staff, it "would be in contravention of the appropriations enacted into law." I shared this information with the IAF Board.

10. From February 21, through the weekend, and on Monday, February 24, I spoke with each member of the IAF Board multiple times to analyze all options and identify the best lawful path forward. I also heard from multiple congressional stakeholders and legal experts that they believed the DOGE plan was unlawful and contrary to congressional intent.

11. On February 24, 2025, I spoke on the telephone with Cavanaugh and Altik. During this call, the DOGE representatives claimed that with one exception, all members of the Board had been terminated. I expressed surprise at this news, given that I had been in recent touch with each Board member. They asked me to confirm that I would implement DOGE's agenda in the absence of a Board, and they threatened that the President would terminate me if I declined to do so. I responded that I could not further respond to DOGE's requests without more specificity as to those requests in writing and the opportunity to determine whether they were legal. I further stated that I was committed to always doing what was lawful, and to following all of my legal obligations and responsibilities. The DOGE representatives asked me to sign a memorandum of understanding agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems. I declined, stating that I did not believe I had the authority to do

so, given my understanding that my Board still remained. After the call, I confirmed that no Board member had yet received a termination letter from the President, or anyone else.

12. In the morning of February 26, 2025, I received notice from another member of the IAF's leadership team that the Senior Procurement Executive (SPE) at the Treasury Department had been ordered to unilaterally "cancel all IAF contracts" by the close of business on Thursday, February 27, 2025. These contracts included everything from the field contractors that provide grantees with programmatic support and oversight, to contracts for basic services like email and grant-management software. That member of the IAF leadership team shared that the Administrative Resource Center (ARC), which is part of the Treasury Department's Bureau of the Fiscal Service and supports the IAF's procurement and finance functions, had not yet received a request in writing from the SPE and were "concern[ed] about the legality of this." Exhibit D is a true and correct copy of the email that I received regarding this matter.

13. On the evening of February 26, 2025, I received an email from Trent Morse from the Presidential Personnel Office informing me that, at the direction of President Trump, my position at the IAF had been terminated, effectively immediately. Exhibit E is a true and correct copy of that email.

14. My Leave and Earnings Statement that I received from the Government after my purported firing shows that I accrued twenty-four (24) hours of work from the pay period beginning February 24 and ending March 8, meaning that my employment was considered by the Government to have terminated on February 26. Exhibit F is a true and correct copy of that earnings statement. Additionally, the Notice of Personnel Action that I received after my termination was cancelled on April 4 similarly shows that the effective date of my termination was February 26, 2025. Exhibit G is a true and correct copy of my Notification of Personnel Action.

15. To my knowledge, I never received an email from Marocco stating that my position had been terminated. I have never had any direct communication with Marocco.

16. I was provided with a subsequent email from Trent Morse, dated February 28, 2025, stating to the IAF's chief operating officer that President Trump had exercised a purported authority to temporarily appoint Pete Marocco as the acting chairman and board member of the IAF. Exhibit H is a true and correct copy of the email I subsequently found had been sent to an email account that I have access to.

17. I have come to learn that following his purported appointment as acting Chair of the Board of the IAF, Marocco held a closed-door meeting where he voted to appoint himself as acting president and CEO of the IAF.

18. I have also come to learn in the evening of February 28, the Administrative Resource Center received a directive authorized by Marocco, now representing himself to be the president of the IAF, to terminate all IAF contracts. The ARC procurement team subsequently informed a member of the IAF's leadership team that they intended to "immediately" execute those terminations, as authorized by the IAF's "newly appointed President Peter Marocco." Almost all IAF contracts were ultimately terminated that Friday evening and into Saturday morning with the exception of a handful, such as those for human resources and information technology. Exhibit K is a true and correct copy of the email I subsequently found had been sent to an email account that I have access to.

19. On March 2, 2025, members of the Board of the IAF wrote to me, stating their intent to serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law. They communicated their view that, accordingly, the governance of the IAF remained unaltered and in place, no duly qualified members of the Board

had fired me, and that I remained the IAF's president and CEO. The Board directed me to oversee the continuation of the IAF's regular operations, including monitoring and oversight of grantees. Exhibit L is the letter that the IAF Board sent to me.

20. I have come to learn that on or around March 4, 2025, Marocco and DOGE began implementing a RIF of the IAF's employees. At that time, the IAF had 36 employees (not including myself), although three had previously signed agreements to depart through voluntary early retirement or the "Fork in the Road" deferred resignation offer. Thirty-three staff were issued RIF notices, which were sent on behalf of Marocco and identified an official separation date of Friday, April 4, 2025. Thirty staff were placed on administrative leave, shut out of the IT systems, and barred from accessing Foundation's offices. Three staff were not placed on administrative leave so that they could assist in the winddown activities. My understanding is that Marocco and the DOGE team later voided the RIF of one employee—Dominic Bumbaca, the chief information security officer—and purportedly appointed him as CEO. In addition, the IAF's website was taken down.

21. In addition, on or about March 4, Marocco terminated almost all existing IAF grants. The only exception was a single grant that only has limited funds remaining—approximately $66,000—that was set to expire soon. The IAF also continues to own a single equity investment in a microfinance institution. Grantees were notified that their grants had been canceled in a form letter sent on March 4, 2025, stating that the grant was "inconsistent with the agency's priorities," and that "the President's February 19, 2025 executive order mandates that the IAF eliminate all non-statutorily required activities and functions." The letter further instructed grantees to "send remaining, unspent funds to the IAF, in accordance with the termination clause

and local law, within fifteen (15) days or as soon as practicable." Exhibit M is an example of the letter sent to the grantees.

22. In direct response to DOGE's actions, IAF's philanthropic partners have asked that their donations be returned.

23. Upon returning to the IAF offices after April 4, 2025, and after I had my access to the system restored, I discovered, in addition to much of the information above, that on April 4, 2025, at 3:52PM EST, a team@iaf.gov account that was created for the exclusive use of the DOGE representatives, Nate Cavanaugh and Ethan Shaotran, deactivated administrative access for Dominic Bumbaca. Exhibit N is a spreadsheet excerpt taken from the IAF's Google admin logs.

24. If I am illegally removed from my position of the IAF, I will suffer irreparable harm in my ability to advance the commitment I made to this agency and its critical mission. Serving as the president of the IAF uniquely leverages the blend of experience I have related to international development, government service, and mobilizing private sector investment, and the agency has no counterpart in the private sector. The IAF is a unique agency dedicated to investing in community-led development while also advancing American strategic interests in the region. As the president of IAF, I have the pleasure and responsibility of overseeing this mission and the work of professional public servants every day. Nothing will compensate for my loss of this role.

25. I accepted my appointment to be the president of the IAF with the knowledge and understanding that the position is established by federal law, through the IAF's organic statute, 22 U.S.C. § 290f(*l*)(1). Further, I accepted my appointment with the knowledge that I can only be removed from my position by the bipartisan Board of the IAF. The IAF's statute prescribes that I shall continue serving as president of the IAF until then. My termination contrary to the statute is an irreparable injury.

26.     Unless permanently enjoined by this Court, Defendants will return to causing immeasurable damage to the mission of the IAF if they illegally remove me from my position. Though this damage to the IAF, and by implication to U.S. interests abroad, is irreparable in its own right, I am similarly irreparably harmed by the damage done to the IAF because it defeats the reason why I chose to join the IAF: to further the agency's unique approach in reaching millions of people in the Western Hemisphere.  In other words, the harm to me and the harm to the IAF are intertwined.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing declaration is true and correct.

Dated this 18th day of April, 2025, and executed in Washington, D.C.

Signed:      */s/ Sara Aviel*

Print Name:   Sara Aviel