**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SARA AVIEL,

           *Plaintiff,*

        –v.–

SERGIO GOR, *et. al.*,

           *Defendants.*

Case No. 25-cv-00778-LLA

## PLAINTIFF'S CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    A.   The President Lacked the Power to Fire Ms. Aviel Himself on February 26, 2025. .......... 2

    B.   The President Cannot Appoint Mr. Marocco as an Acting Board Member. ...................... 5

    C.   The President Does Not Have the Power to Fire Ms. Aviel Himself, Even if He Fired the Entire Board. ......................................................................................................................11

    D.   Ms. Aviel Is Entitled to Relief.......................................................................................... 14

        I.    Ms. Aviel Was Properly Reinstated. ...................................................................... 14

        II.   Ms. Aviel Is Entitled to Declaratory Judgment. ...................................................... 17

        III.  Ms. Aviel is Entitled to Declaratory Relief. ............................................................. 20

        IV.  Ms. Aviel is Entitled to Mandamus Relief............................................................... 21

**CONCLUSION** ..................................................................................................................... **22**

# TABLE OF AUTHORITIES

## CASES

*Asylumworks v. Mayorkas*,
   590 F. Supp. 3d 11 (D.D.C. 2022) ................................................................... 15, 20

*Aviel v. Gor*, No.
   CV 25-778 (LLA), 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ......................................... *passim*

*Berry v. Reagan*,
   1983 WL 538 (D.D.C. Nov. 14, 1983) .................................................................. 17

*Davis v. Billington*,
   76 F. Supp. 3d 59 (D.D.C. 2014) ...................................................................... 18

*Dellinger v. Bessent*,
   No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ........................................... 14, 15

*Edmonds v. United States*,
   520 U.S. 651 (1997) ................................................................................... 5

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ................................................................................ 16, 20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ................................................................................. 4, 11

*George v. Ishimaru*,
   1994 WL 517746 (D.C. Cir. Aug. 25, 1994) ........................................................... 10

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) .................................................................................. 16

*Harris v. Bessent*,
   No. 25-5037, 2025 WL 980278 (D.C. Cir. March 28, 2025) ........................................... 16, 19

*Harris v. Bessent*,
   No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) ............................................ 14, 17

*In re Hennen*,
   38 U.S. 230 (1839) ................................................................................... 12

*In re Olson*,
   818 F.2d 34 (D.C. Circ. 1987) ....................................................................... 12

*Kalbfus v. Siddons*,
   42 App. D.C. 310 (D.C. Ct. App. 1914) ............................................................... 21

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................ 18

*Marbury v. Madison*,
    5 U.S. 137 (1803) .............................................................. 10, 20, 21

*Miller v. Clinton*,
    687 F.3d 1332 (D.C. Cir. 2012) ........................................................ 17

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................ 4

*N.L.R.B. v. Noel Canning*,
    573 U.S. 513 (2014) .......................................................................... 12

*Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*,
    580 U.S. 288 (2017) .......................................................... 5, 7, 15, 20

*Nat'l Treasure Emps. Union v. Reagan*,
    663 F.2d 239 (D.C. Cir. 1981) ............................................................ 5

*New York v. Biden*,
    6636 F. Supp. 3d 1 (D.D.C. 2022) .................................................... 20

*Nkem v. Holder*,
    556 U.S. 418 (2009) .......................................................................... 15

*Noel Canning v. NLRB*,
    705 F.3d 490 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014) .............. 13

*President v. Vance*,
    627 F.2d 353 (D.C. Cir. 1980) .......................................................... 24

*R v. Mayor, Bailiffs, & Common Council of the Town of Liverpool*,
    (1759) 97 Eng. Rep. 533; 2 Burr. 730 .............................................. 21

*Sampson v. Murray*,
    415 U.S. 61 (1974) ............................................................................ 16

*Samuels v. Mackell*,
    401 U.S. 66 (1971) ............................................................................ 20

*Seilia L. LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ............................................................................ 4

*Service v. Dulles*,
    354 U.S. 363 (1957) .......................................................................... 16

*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023) ............................................................................ 16

*Swan v. Clinton*
    100 F.3d 973 (D.C. Cir. 1996) .............................................................................. 16

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) ..................................................................................................... 9

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001) ............................................................................................... 21

*Vitarelli v. Seaton*,
    359 U.S. 535 (1959) ............................................................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................................................... 8, 12, 16

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ..................................................................................................... 8

## STATUTES

22 U.S.C. § 290f ........................................................................................................ 13

5 U.S.C. § 3347 (1996) ........................................................................................... 6, 7, 8

5 U.S.C. § 3347 (1998) ................................................................................................ 6

5 U.S.C. § 3348(d) ............................................................................................ 8, 9, 15, 20, 21

## OTHER AUTHORITIES

3 William Blackstone, Commentaries ......................................................................... 21

James L. High, *A Treatise on Extraordinary Remedies* (2d ed. 1884) ........................ 22

John Shortt, *Informations (Criminal and Quo Warranto), Mandamus and Prohibition* (1888).. 22

Oliver Field, *Civil Service Law*, ch. XI § V (1939) ...................................................... 21

Opinions of the Office of Legal Counsel (1977) ............................................................ 7

Samuel Slaughter Merril, *Law of Mandamus* (1892) .................................................. 22

Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus* (1853) ..... 22

**RULES**

D.C. Cir. R. 36(e)(2) .................................................................................................................. 15

**LEGISLATIVE MATERIALS**

Further Consolidated Appropriations Act of 2024, Div. F, Pub. L. No. 118-47, 138 Stat. 460 ... 18

S. Rep. No. 105-250 ................................................................................................................. 6, 7

**EXECUTIVE MATERIALS**

1 Op. OLC 150, 152 (1977) ........................................................................................................ 7

## INTRODUCTION

Defendants seek to reframe this case around a question carrying sweeping constitutional implications: Can the President, by purporting to fire principal officers, assume powers the Constitution, Congress, and the Courts have expressly denied him?  Defendants say yes—and in so doing, they ask this Court to upend centuries of settled law, ignore the plain text of the Appointments Clause and the Federal Vacancies Reform Act ("FVRA"), and embrace a capacious theory of executive power that knows virtually no limits.

This Court has properly recognized that "accepting Defendants' arguments would leave parts of the Constitution in tatters."  *Aviel v. Gor*, No. CV 25-778 (LLA), 2025 WL 1009035, at *9 (D.D.C. Apr. 4, 2025).  Far from addressing the "frightening" (*id.*) implications of their legal arguments, Defendants now double down on their power grab.  Plaintiff Sara Aviel ("Ms. Aviel") does not seek to entrench herself in office.  She does not deny that the IAF Board may remove her. She supports attempts to make government more efficient, and she seeks to align the IAF's congressionally mandated mission with the President's policy priorities. All she asks is that the Government act consistent with the law—which it has failed to do here.

Defendants do not dispute that Ms. Aviel was appointed by the IAF Board, not the President.  They do not argue that the Board has never removed her.  In their many repeated filings, Defendants have never advanced a coherent legal rationale for Ms. Aviel's February 26, 2025 termination.  Instead, they rely on a chain of novel and increasingly radical claims: that the President may appoint acting principal officers without statutory authority, that he may fire inferior officers directly when they are deemed to be "*de facto*" leading the agency, and that even when those actions plainly violate the Constitution and federal law, courts are powerless to do anything about it.

Those arguments fail at every level.  The sources Defendants use to justify Mr. Marocco's acting appointment, particularly the Senate Report on the Federal Vacancies Reform Act ("FVRA"), cut in precisely the opposite direction and in fact support Ms. Aviel.  Other sources—like the Office of Legal Counsel memorandum opinions that Plaintiff has already addressed—are inapplicable at best and resemble cooked-up legal support at worst.

The Constitution draws a clear line between principal and inferior officers; Congress has built on that framework with detailed statutes defining the lawful mechanisms of appointment and removal, and the Supreme Court has long reaffirmed those rules.  The power to hire is the power to fire.  The President does not hire the CEO of the IAF, and so he may not fire her.  The President may not circumvent those guardrails by firing the Board.  And he certainly may not claim inherent authority to do what Article II and the FVRA explicitly prevent: install an acting member Board of the IAF indefinitely and completely sidestep Senate approval.  Under Defendants' theory, the President could evade constitutional and statutory removal constraints simply by firing principal officers.  The Government's arguments would collapse the separation of powers in precisely the manner the Appointments Clause was explicitly designed to prevent.  The Court should rebuff those efforts and grant Ms. Aviel relief in this case.

<u>**ARGUMENT**</u>

**A.    The President Lacked the Power to Fire Ms. Aviel Himself on February 26, 2025.**

At no time in this litigation have Defendants ever argued explicitly that the President had the power to fire Ms. Aviel on February 26, 2025.  There is no dispute as to the following material facts:

- Neither President Trump nor anyone from his Office ever asked the Board to terminate Ms. Aviel.  *See* ECF No. 35-1 (hereinafter, "Pl's SUMF") ¶ 24; ECF No. 40-2, Defs' Resp. to Pl's SUMF, at 6 (not objecting to Pl's SUMF ¶ 24).

- At least one Board member has still *to this day* never received notification of his termination.  Pl's SUMF ¶ 24 (citing Ex. B, Arriola Decl. ¶ 3); ECF No. 40-2 at 6.

- On Wednesday, February 26, 2025, at 6:45 p.m., Ms. Aviel received an email from Trent Morse of the Presidential Personnel Office informing her that, at the direction of President Trump, her position at the IAF had been terminated, effective immediately. Pl's SUMF ¶ 26; ECF No. 40-2 at 6 (not objecting to Pl's SUMF ¶ 26).

- At the very same minute, 6:45 p.m., Mr. Morse emailed Luis Viada, the (purportedly) last remaining director of the IAF, informing him that "At the direction of President Donald J. Trump . . . your position as a Board member of the Inter-American Foundation is terminated, effective immediately." Ex. P.

Thus, the record is clear: on February 26, 2026, at least one IAF Board member, Mr. Viada, still remained.  That Board member was terminated by President Trump at the *very same minute* he purported to terminate Ms. Aviel.  In their cross-motion for summary judgment, Defendants argue that the President can remove Board members "for any reason, which would include their refusal to remove a subordinate officer."  ECF No. 40 (hereinafter, "Cross-MSJ") at 13.  Perhaps. But that is not what happened here.  It is now apparent that no Board member was ever instructed to fire Ms. Aviel, and when Ms. Aviel was terminated on February 26, 2025, at 6:45 p.m., there was indeed still an active Board member—who was then terminated the very same instant that Ms. Aviel was fired.

Defendants have never argued that the President had the power to fire Ms. Aviel while there was still an active member of the Board.  Nor could they with a straight face, because the law on this matter is pellucidly clear: the President cannot fire inferior officers.  Only their principal officers can.  Defendants never grapple with this Court's proper finding that "to the extent President Trump purported to terminate Ms. Aviel from her role on February 26, that termination violated the Appointments Clause."  *Aviel*, 2025 WL 1009035, at *7; *see also* ECF No. 35, Pl's Mot. for Summary Judgment, at 13–18.  The Court was right then, and it is right now.

Defendants state that "the Supreme Court has only recognized exceptions to the President's removal authority for 'inferior officers with limited duties and no policymaking or administrative authority.'"  Cross-MSJ at 14 (quoting *Seilia L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 204 (2020), and internally citing *Morrison v. Olson*, 487 U.S. 654 (1988)).  Not so.  The full quote which Defendants cite reads as follows:[1] "[I]n *United States v. Perkins* and *Morrison v. Olson*, we held that Congress could provide *tenure protections* to certain inferior officers with narrowly defined duties."  *Seila L. LLC,* 591 U.S. at 204 (cleaned up and emphasis added).  Thus, *Seila Law* was concerned with whether for-cause removal protection could be given to certain executive officers.  As to the question here of whether the President could fire an inferior officer, *Seila Law* was completely silent and uninterested.  Instead, the straightforward answer to that question is found in *Free Enterprise Fund*: "*Humphrey's Executor* did not address the removal of inferior officers, whose appointment Congress may vest in heads of departments.  If Congress does so, it is ordinarily the department head, rather than the President, who enjoys the power of removal."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010).  This Court should not accept Defendants' bowdlerized and cherry-picked misreading of *Seila Law*.  The Supreme Court has spoken to this issue, and its holding is crystal clear.

What's more, even assuming Defendants' mistaken contention is correct—and engaging in the counterfactual that the Supreme Court has never addressed this precise issue (even though it has)—their point is irrelevant.  The D.C. Circuit has (also) spoken directly and unequivocally to

---

[1] Perplexingly, the line Defendants quote in their brief—"inferior officers with limited duties and no policymaking or administrative authority," Cross-MSJ at 14—does not appear on page 204 of Volume 591 of the U.S. Reports, as they indicate in their accompanying citation.  *See id.* (citing *Seila L., LLC*, 591 U.S. at 204 and internally citing *Morrison*, 487 U.S. 654).  Plaintiff has made her best attempt to find similar language with a cite to *Morrison* as noted in Defendants' cross-motion, and that is addressed here, above the line.  To the extent Defendants intended to cite to 591 U.S. at 218 *vice* 204, where the excerpted quote does appear, the same logic applies: the Court is engaged in a discussion of "removal protections" rather than the question of *who* can remove.  *See* 591 U.S. at 217–18 (explaining "that the removal protections did not unduly interfere with the functioning of the Executive Branch because the independent counsel [was] an inferior officer under the Appointments Clause") (quotation marks omitted).

4

the matter, stating that "the power to remove is held by the appointing authority, and *only by the appointing authority.* Absent relevant legislation, this continues to be the rule to the present day." *Nat'l Treasure Emps. Union v. Reagan*, 663 F.2d 239, 247 (D.C. Cir. 1981) (emphasis added). To underscore the point, the D.C. Circuit went on to directly and completely flesh out—and reject— the precise situation that occurred here:

> The only one authorized to revoke an appointment is one authorized to make it. Thus, for example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President. The President can, of course, order the Secretary of Defense to revoke the appointment, and can fire the Secretary of Defense if he refuses to revoke it, *but the President cannot revoke the appointment himself.*

*Id.* (citation and footnote omitted, and emphasis added). That is the end of the matter.

**B.    The President Cannot Appoint Mr. Marocco as an Acting Board Member.**

The Supreme Court has been clear that the Appointments Clause "is more than a matter of 'etiquette or protocol'; it is among the most significant structural safeguards of the constitutional scheme." *Edmonds v. United States*, 520 U.S. 651, 659 (1997). Treating this important constitutional requirement as a mere nuisance, as Defendants do, threatens to undermine this "critical structural safeguard of the constitutional scheme." *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (cleaned up). This contorted reading of the FVRA is "frightening" and would completely "eviscerate[]" the Appointments Clause. *Aviel*, 2025 WL 1009035, at *9.

In their attempt to twist the plain meaning of the FVRA, Defendants place much weight on the Senate Report issued with the 1998 legislation. *See* Cross-MSJ at 9–10. But they read that report selectively, failing to focus on the entirety of the report itself, which severely undercuts their argument that there is an unlimited power to appoint individuals as acting members of a multi-member board. Far from supporting Defendants' position, the Senate Report that Defendants invoke is crystal clear:

> Vacancies occur in such positions, and since the President *lacks any inherent appointment authority for government officers*, legislation authorizing some non-Senate confirmed persons to perform the functions and duties of vacant offices is necessary if the government's operations are going to be performed. The President's duty is to submit nominees for offices to the Senate, not to fill those offices himself. *In the absence of affirmative statutory authority to fill a vacancy, the office must remain vacant.*

S. Rep. No. 105-250, at 5 (1998) (emphases added). The very source on which Defendants so ardently rely expressly contradicts their main argument. The President has no inherent authority to appoint officers. Defendants' contention—that "Congress did not intend to alter the status quo by limiting or revoking the inherent authority that previous Presidents claimed gave them the authority to make temporary designations to multi-member boards," Cross-MSJ at 9–10—is absurd, when the *very report* Defendants cite for their proposition explicitly states that the President "lacks any inherent appointment authority," S. Rep. No. 105-250, at 5. Congress understood the status quo to be exactly what the Court found was the law: there is no free-floating Article II power to appoint acting officials willy-nilly.

Next, consider the other thin reed on which Defendants attempt to perch a constitutional colossus: two Office of Legal Counsel opinions. Defendants never seriously grapple with what this Court properly noted was the "suspiciously timed" OLC memorandum that was the result of "curious motives." *See Aviel*, 2025 WL 1009035, at *8. Instead, Defendants simply repeat that the 1977 *Home Loan Bank Board* opinion also supports their view. *See* Cross-MSJ at 8–9; *but see* ECF No. 35 at 22 (addressing *Home Loan Bank Board*). The problems with relying on the 1977 memorandum opinion are legion. For starters, the opinion was issued before the 1998 change explicitly stating that the FVRA was the exclusive means of filling all vacancies. *Compare* 5 U.S.C. § 3347 (1996) (titled "Details; Presidential authority," and containing no exclusivity provision), *with* 5 U.S.C. § 3347 (effective Nov. 20, 1998) (titled "Exclusivity," and providing that

"Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of any Executive agency"); *see also* S. Rep. No. 105-250, at 11 (stating that Congress enacted the FVRA "to ensure the exclusivity of the applicability of the Vacancies Act").

In response, Defendants argue that "the Federal Vacancies Act itself existed since 1868." Cross-MSJ at 9.  First, this is at best factually imprecise; some form of a Vacancies Act has existed since 1791.  *See SW Gen.*, 580 U.S. at 294 (detailing how, "since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant office [that requires Presidential appointment and Senate confirmation] without first obtaining Senate approval").  And during those more than 234 years, *no Court has ever upheld an appointment like the one Mr. Marocco claims here.*  But even more importantly, Defendants miss the point that the 1998 Amendments were put in expressly to stop the overbroad reading of the type the Executive Branch is attempting here.  *See* S. Rep. No. 105-250, at 3 ("Congress must explicitly reject the position that general organic statutes for various agencies and departments . . . trump the specific provisions of the Vacancies Act.").  Finally, even on its own terms, *Home Loan Bank Board* doesn't support what happened here.  The opinion is clear that such an acting appointment "would certainly be strengthened if this [acting] person designated by the President were, in analogy to 5 U.S.C. § 3347, a current official appointed after Senate confirmation."  1 Op. OLC 150, 152 (1977).  Mr. Marocco may wear many hats, but he has never been confirmed by the Senate to any position.

In addition, Defendants do not address in any meaningful way this Court's careful analysis that the FVRA explicitly disallows temporary appointments of the type made here.  *Compare Aviel*, 2025 WL 1009035, at *8 ("Accordingly, even if the President purports to appoint an officer to a

Board-like entity in an acting capacity—something he cannot do under the FVRA in the first place—any actions by that officer are null and void."), *with* Cross-MSJ at 7 ("There is no statute that limits the President's prerogative to ensure that the Foundation has temporary leadership while the Senate considers his nominees for permanent Board positions.").  Defendants argue that the President is operating in *Youngstown*'s second category, *i.e.*, where "[t]he President[] [has] authority to designate in the face of statutory silence."  Cross-MSJ at 12; *see also id.* at 7 (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring)).  But since the FVRA speaks directly to this issue, there is no question that the President is operating in *Youngstown*'s third category—where his power is at its "lowest ebb."  *Youngstown Sheet & Tube Co.*, 343 U.S. at 637 (Jackson, J. concurring); *see also Zivotofsky ex rel. Zivotofsky v. Kerry,* 576 U.S. 1, 10 (2015) (explaining that the second category applies "in absence of either a congressional grant or denial of authority," such that "there is a 'zone of twilight in which [the President] and Congress may have concurrent authority'") (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

Although Defendants complain that Plaintiff's motion fails to place statutory provisions "in context," Cross-MSJ at 9, it is Defendants whose reading of the FVRA is strained.  *See* ECF No. 35 at 23–24.  For example, Defendants rely on § 3349c to argue that multi-member boards are excluded from 5 U.S.C. § 3348(d)(1).  But § 3348(d)(1) applies more broadly—referencing not just § 3349c, but also §§ 3346, 3347, 3349, and others.  *See* 5 U.S.C. § 3348(d)(1) ("An action taken by any person . . . in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect.").  Defendants' interpretation ignores this statutory structure and renders large parts of the FVRA meaningless.  Put another way, Defendants argue (at Cross-MSJ at 10) that Section

3348(d)(1) confirms "Marocco was lawfully designated as an acting board member" because Section 3349c already excludes multi-member boards—essentially arguing that the phrase "shall have no force or effect" has no other purpose.  But that would not make sense for the other sections named alongside Section 3349c, such as Section 3349a, which governs inaugural transitions and does not exclude certain officers from provisions of the FVRA.  Defendants' reading simply makes no sense.

And again, the Government's interpretation of Article II is internally inconsistent.  If Defendants are right about the President's inherent power, the FVRA as a concept would violate the Constitution, as it would intrude on the President's supposed Article II power to name acting officials who can carry out the full duties of a Senate-confirmed position when it is vacant. Defendants argue (at Cross-MSJ at 10–11) that the President is only acting here because Congress has not spoken on multi-member boards.  But make no mistake: Defendants have previously argued that "[t]he President must be able to designate acting officials to fulfill his duty to 'take care that the laws be faithfully executed.'"  *E.g.*, ECF No. 19 at 6.  Under this view, in purported adherence to the Take Care Clause, the ability to dictate terms in the FVRA for when the President may appoint temporary officers should have never been ceded to Congress in the first place, and provisions allowing the President to direct a person to perform the functions and duties of a vacant office under certain circumstances would have been unnecessary.  That cannot be so.  Rather, the President must take care to faithfully execute the Appointments Clause, which imposes mandatory duties on him to appoint principal officers only upon Senate confirmation, and to adhere to such other laws as Congress thinks proper for the appointment of other officers.  *See United States v. Arthrex, Inc.*, 594 U.S. 1, 6 (2021) (describing the interplay between the two clauses).

Finally, if the President had such expansive power under Article II to name acting officials who can carry out the full duties of a covered Senate-confirmed position when it is vacant, why would there be a Recess Appointments Clause at all?  If the President can create vacancies, then rely on an inherent authority to fill those vacancies for an indeterminate time with an "acting" principal,[2] it is hard to see when the Recess Appointments Clause would ever come into play.  As this Court properly found, "[i]t would violate every bedrock principle of judicial review to assume that any part of the Constitution is surplusage."  *Aviel*, 2025 WL 1009035, at *9 (citing *Marbury v. Madison*, 5 U.S. 137, 174 (1803)) ("It cannot be presumed that any clause in the constitution is intended to be without effect[.]").

No provision of law, whether in Article II or the Constitution or otherwise, permits Defendants to disregard the limits of the authority that Congress has granted for the appointment of acting officers.  "No court has ever recognized that the President has such inherent authority." *George v. Ishimaru*, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994), *order vacated and appeal dismissed as moot*, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994).  This Court previously recognized that no court had ever endorsed the sweeping executive power Defendants now claim—and that remain the case.  This Court should not be the first in the 246 years of the Republic to grant the President this hitherto rejected power.

---

[2] Defendants' attempts to walk back their prior statements about the indefinite nature of the acting appointments (discussed at ECF No. 35 at 21) by arguing that Kenneth Jackson and Russell Vought's nominations to the IAF Board have been referred to the Senate Committee on Foreign Relations are unavailing.  *See* Cross-MSJ at 12.  The point remains that "Defendants could not deny that [installing an acting principal indefinitely] would be permissible under their reading of the Constitution."  *Aviel*, 2025 WL 1009035, at *9.  Under Defendants' theory, there would be *no difference* if nominations had not been made; the President could appoint an acting principal indefinitely—no matter whether the Senate were in session or not.

**C.    The President Does Not Have the Power to Fire Ms. Aviel Himself, Even if He Fired the Entire Board.**

Next, Defendants advance the counterintuitive argument that "even if the Court determines that the President lacked the authority to designate Marocco as the acting board chair, Aviel's removal as President of the Foundation was still lawful because the Board's removal made Aviel the *de facto* leader of the Foundation." Cross-MSJ at 12. Unless Defendants have a time machine, that's not what happened. As discussed above, Ms. Aviel was terminated at *precisely* the same instant—6:45 p.m. on February 26, 2025—as the (purportedly) sole remaining IAF Board member. Thus, there was never a moment when the President terminated Ms. Aviel as the "*de facto*" leader of the Foundation. The President terminated her and the Board in the same fell swoop.

But even putting aside the factual impossibility of Defendants' arguments, the legal implications of it are breathtaking. For starters, the President could easily destroy the carefully-wrought constitutional protections of the Appointments Clause and *Free Enterprise Fund*. All he would need to do is fire all the principal officers first, and then fire the inferior officers. Defendants would re-write *Free Enterprise Fund*; rather than stating that "the power to remove is held . . . only by the appointing authority," 561 U.S. at 493, Defendants would amend the Supreme Court's decision to say, "the power to remove is held only by the appointing authority *unless the President fires the appointing authority first (or maybe at the same time too)*." But the President cannot expand his constitutional power by terminating his officers. Self-inflicted wounds do not strength create.

Consider the following historical counterfactual: If Defendants' argument had its day, there would have been no Saturday Night Massacre. In October 1973, when Richard Nixon ordered Attorney General Elliot Richardson to fire Special Counsel Archibald Cox for refusing to drop the subpoena for the presidential tapes, Richardson refuses. In Defendants' alternate universe, Nixon

could have fired the Attorney General, and then, with the Office of Attorney General vacant, Nixon could have fired Archibald Cox himself (or done both at the same time). *See generally In re Olson*, 818 F.2d 34, 41–42 (D.C. Circ. 1987) (discussing the Saturday Night Massacre). In reality, the onus for firing Cox landed with the Solicitor General, in his capacity as Acting Attorney General, because Nixon recognized he lacked that authority. *See id*.

Indeed, Defendants provides no legal support—not even a hastily-published OLC opinion—to undergird their newly-created "*de facto*" principal officer doctrine. *See* Cross-MSJ at 12 (asserting that "[e]ven if the Court determines the President lacked the authority to designate Marocco as the acting board chair, Aviel's removal as President of the Foundation was still unlawful because the Board's removal made Aviel the *de facto* leader of the Foundation."). There is no support for this newfound doctrine in the text, history, or structure of the Constitution, nor has any President ever previously asserted such a power. *Cf. Youngstown Sheet & Tube Co.*, 343 U.S. at 610 (Frankfurter, J., concurring) (arguing that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned" should inform interpretation of the " Executive Power" vested in the President); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 515 (2014) ("[I]n sum, Presidents have made intra-session recess appointments for a century and a half, and the Senate has never taken formal action to oppose them.").

Indeed, there is an additional factual issue that Defendants have failed to address: As a practical matter, Lou Viada's termination email, Ex. P—which Defendants did not even submit— is the first correspondence Plaintiff has seen that was sent to a Board member. As Plaintiff earmarked during briefing on her Motion for Temporary Restraining Order and Preliminary Injunction, it was always Defendants' burden to "show[] that removal was 'made either by express notification, or [] by appointing another person to the same office.'" ECF No. 20 at 4 n.1 (quoting

*In re Hennen*, 38 U.S. 230, 247 (1839)).  At least one Board member has stated that he never received a termination letter.  *See* SUMF ¶ 24 (citing Arriola Decl. ¶ 3).  And as a legal matter, there is very much the factual possibility that Ms. Aviel remains lawfully supervised, as Defendants—who presumably have access to any documentation regarding the terminations if they exist—have failed to produce the records.

Defendants are right that there is no succession provision permitting acting service for the Board in the IAF's organic statute.  But Congress specifically "addressed the problem of vacancies on various multimember agencies [including the IAF], providing that members may continue to serve for some period past the expiration of their commissions until successors are nominated and confirmed."  *Noel Canning v. NLRB,* 705 F.3d 490, 511 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014).  Without further information, which the Defendants (and only the Defendants) have access to, it is unclear whether the entire Board has even been terminated.  Congress addressed the possibility that seats on the IAF Board would become vacant—not by authorizing the appointment of acting Board members, but instead by permitting Senate-confirmed Board members to remain in their positions until a successor is nominated and confirmed.  22 U.S.C. § 290f(g) ("A member of the Board appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the remainder of such term; *upon the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified*.").  Defendants introduce a new reading of this provision, arguing that it only applies to "a Board member whose term has expired."  Cross-MSJ at 11.  But Congress specifically wrote that the provision at issue applies to "*a member*," not specifying that the provision apply only to the aforementioned member appointed to the remainder of a predecessor's term.

Finally, and if nothing else, even though "Congress has chosen not to provide for acting [Board] members[,] that choice cannot support" Defendants' interpretation that would instead allow the President to disregard the strictures of the Appointments Clause and the FVRA. *Noel Canning*, 705 F.3d at 511. The D.C. Circuit recognized that it could not read more into Congress's choice not to provide for acting Board members, because it could not " accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and equally remediable by—the executive and legislative branches." *Id.* There is no "*de facto*" leader exception that allows Defendants to get around the issue either.

**D.     Ms. Aviel Is Entitled to Relief.**

The Defendants next argue that even if what they have done violates the Constitution and laws, the courts cannot provide a remedy. But for centuries, courts have provided relief to improperly-removed office holders. This case is no different.

**I.      Ms. Aviel Was Properly Reinstated.**

This Court properly reinstated Ms. Aviel in her role as president of the IAF. As this Court properly held, Mr. Marocco intended to fire every member of the IAF save one, and reduce the organization to ashes. *See Aviel*, 2025 WL 1009035, at *10–11. "To argue that the IAF remains functioning when it has one employee, one grant, and little else is comically difficult to believe." *Id.* at *10. Defendants argue that such a remedy transgresses on the President's power, citing two dissenting opinions. *See* Cross-MSJ at 16 (citing *Dellinger v. Bessent,* No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J. dissenting)); *Harris v. Bessent ("Harris I")*, No. 25-5037, 2025 WL 1021435, at *4 (D.C. Cir. Apr. 7, 2025) (Rao, J., dissenting). Neither dissent helps the Defendants. First, they are dissents, not majority opinions. Judge Rao's dissent, arguing that the "government is likely to succeed on its remedial challenge," was rejected by the

14

*en banc* panel, which held just the opposite: "The government has not demonstrated the requisite 'strong showing that [it] is likely to succeed on the merits." *Harris I*, 2025 WL 1021435, at *2 (quoting *Nkem v. Holder*, 556 U.S. 418, 434 (2009)). What's more, unpublished opinions—be they dissents or even majority opinions—are not binding precedent on the District Court. *See* D.C. Cir. R. 36(e)(2). As for Judge Katsas's dissent, it expressly relied on the fact that the President was forced to work with an "*agency head* whom he has already removed." *Dellinger v. Bessent*, 2025 WL 559669, at *12. Ms. Aviel is not an agency head—all agree she in an inferior officer. *See* Cross-MSJ at 14.

Next, Defendants argue that an injunction reinstating Ms. Aviel "exceeds the scope of the district court's equitable powers." *Id.* at 16. But that isn't so. First, Defendants never grapple with the issue that the FVRA unequivocally instructs the courts that actions taken in violation of the FVRA—here, those of Defendants—must be unwound. *See* ECF No. 35 at 31–33 (discussing the FVRA's explicit instruction under 5 U.S.C. § 3348(d) that actions taken in violation of the FVRA "shall have no force or effect"); *SW Gen.*, 580 U.S. at 298 n.2 (absent an exception in the statute itself, "actions taken in violation of the FVRA are void *ab initio*"). Defendants never address the argument that "[t]he plain terms of the FVRA remove remedial discretion by directing that unlawful actions under that statute are void *ab initio*, thereby rendering the rules without 'force or effect' and requiring vacatur." *Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 26 (D.D.C. 2022) (quoting 5 U.S.C. § 3348(d)(1)). But ignoring the problem does not make it disappear. Defendants would turn the FVRA into a statute with no remedy. Under their logic, the President could flagrantly violate it without consequence. That is not how our laws work.

To the extent Defendants argue—either notwithstanding the FVRA's provisions or because the FVRA does not apply—that the Court lacks the power to compel the President's subordinates

to return Ms. Aviel to office, that argument still flies in the face of well-established precedent.  *See* Cross-MSJ at 21 ("This principle applies equally where, as here, relief is directed to the President's subordinate officers.").  Indeed, "[i]njunctions against subordinate executive officials to prevent illegal action by the Executive Branch are" commonplace.  *Harris v. Bessent ("Harris II")*, No. 25-5037, 2025 WL 980278, at \*44 (D.C. Cir. March 28, 2025) (Millett, J., dissenting); *see, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 567 (2006); *Youngstown Sheet & Tube Co.*, 343 U.S. at 583; *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in judgment) ("Review of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.").

There is a long history of courts issuing equitable relief of precisely this type.  *See Sampson v. Murray*, 415 U.S. 61, 71 (1974); *Service v. Dulles*, 354 U.S. 363, 370, 389 (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023); *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996).  The Supreme Court's precedent confirms such injunctions are available in removal cases. In *Sampson v. Murray*, the Court recognized that "in disputes over tenure of governmental employees," courts of law rather than courts of equity historically provided relief.  415 U.S. at 71.  But Justice Rehnquist explained for the Court that "[m]uch water has flowed over the dam," and that modern "federal courts do have authority to review the claim of a discharged governmental employee."  *Id*.  Or consider *Service v. Dulles*, on which *Sampson* relied.  In that case, a foreign service officer had sought both injunctive and declaratory relief, *Service*, 354 U.S. at 389, and obtained that relief on remand after this Court held his termination unlawful, *In re Service*, B-134614, 1958 WL 1888 (Comp. Gen. Mar. 3, 1958).  Similarly, in *Vitarelli v. Seaton*, a federal employee sought judgment declaring his dismissal unlawful and "an injunction requiring his reinstatement," and the Court held that he was

"entitled to the reinstatement which he seeks."  359 U.S. at 546; *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (noting public servants facing "unconstitutional discrimination" may obtain "an injunction").  In short, the District Court had authority power to issue an injunction.

## II.    Ms. Aviel Is Entitled to Declaratory Judgment.

In arguing that Ms. Aviel did not suffer irreparable harm under the permanent injunction factors, Defendants offer a tepidly re-warmed version of their arguments that this Court already properly rejected at the preliminary injunction stage.  Reduced to its essence, the argument is: "pay Ms. Aviel, but destroy the IAF and violate the Constitution and the FVRA."  First, to the extent the D.C. Circuit has addressed the issue most recently, the *en banc* court in *Harris v. Bessent* found that MSPB member Cathy Harris was likely to succeed in her action and to be granted relief, including reinstatement.  *See Harris I*, 2025 WL 1021435, at *2 ("The government likewise has not shown a strong likelihood of success on the merits of its claim that there is no available remedy for Harris or Wilcox[.]").  As Plaintiff argues in her initial summary judgment brief and prior preliminary injunction briefs, there is a statutory right to function, and she has it.

Next, Defendants argue that Plaintiff's situation is not a "genuinely extraordinary situation" where loss of employment constitutes an irreparable harm under *Sampson*.  *See* Cross-MSJ at 17.  But this Court's careful analysis of the relevant line of cases is as compelling now as it was a month ago, and Defendants offer no substantive response.  *See Aviel*, 2025 WL 1009035, at *10–11.  Defendants also argue that *Berry v. Reagan*, 1983 WL 538 (D.D.C. Nov. 14, 1983), is distinguishable because "removing Aviel from her position as president of the Foundation does not prevent the Foundation from operating [because t]he Foundation will continue to operate and in a manner consistent with Executive Order 14,217."  Cross-MSJ at 19–20.  But that is no

17

operation at all.  As this Court properly found, "[t]o argue that the IAF remains functioning when it has one employee, one grant, and little else is comically difficult to believe."  *Aviel*, 2025 WL 1009035, at *10; *contra Davis v. Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014) (finding irreparable harm did not arise from the plaintiff's termination because "he ha[d] no concrete proof that the vacancy . . . or some other comparable position w[ould] not be available when th[e] [case] [wa]s ultimately resolved").  If Ms. Aviel is not reinstated, the IAF will be completely destroyed— as Defendants were well on their way to doing prior to issuance of the preliminary injunction.  She will not have an agency to return to.

As for the balance of equities and public interest, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  As this Court has already found, Defendants' plans for the IAF are directly opposed to the mandates that Congress has provided to the Foundation, including with regard to its use of funds.  *Aviel*, 2025 WL 1009035, at *12 ("Congress directed that the IAF may not use appropriated funds to "expand, eliminate, consolidate, or downsize" the agency without "prior consultation . . . with the appropriate congressional committees" and "a detailed justification for any proposed action.") (citing Further Consolidated Appropriations Act of 2024, Div. F, Pub. L. No. 118-47, 138 Stat. 460, 843–44 (2024)).  Defendants argue that "[f]orcing the President to retain a Foundation Board against his will would undermine" his foreign affairs prerogative and cause "harm to the executive branch."  Cross-MSJ at 21.  But Plaintiff is not asking the President to "retain" any Board.  All that Plaintiff is asking is that the President appoint Board members consistent with the law and Constitution.  The President is not being "forc[ed]" to keep any Board members.  If anything, he would be forced to follow the law.

As for the concerns Ms. Aviel expresses about the sweep of the Government's argument, ECF No. 35 at 31–32, Defendants counter that "[t]he President can only remove members of the Federal Reserve Board 'for cause.'" Cross-MSJ at 22. But this entirely misses Ms. Aviel's critical point: the Government is *at this very moment* seeking to strip away those for-cause removal protections. *See Trump v. Wilcox*, No. 24A (S. Ct. Apr. 9, 2025), Application to Stay the Judgments of the U.S. Dist. Ct. for the D.C. & Request for Admin. Stay at 3, available at https://www.supremecourt.gov/DocketPDF/24/24A966/355164/20250409132337552_Wilcox-Harris%20Appl.pdf ("*Humphrey's Executor v. United States*, 295 U.S. 602 (1935), does not dictate a contrary result as to members of the MSPB and NLRB. That case recognized a narrow exception to the President's removal power that, properly construed, extends only to multimember expert agencies that do not wield substantial executive power.") (quotation marks omitted).

Plaintiff is not the first to observe this troubling power-grab playing out. *See Harris II*, 2025 WL 980278, at 52 (Millett, J., dissenting) ("That would mean that a century-plus of politically independent monetary policy is set to vanish . . . . A constitutional ruling that the President has unrestricted removal power over all multimember agencies exercising any executive power directly threatens the independence of numerous multimember agencies, including the Federal Reserve Board, the Open Market Committee, the Nuclear Regulatory Commission, the National Transportation Safety Board, the Chemical Safety and Hazard Investigation Board, and the National Mediation Board, among others."); *see also Aviel*, 2025 WL 1009035, at *9 ("The logical extension of Defendants' inherent-power argument is frightening."). The Government should not be able to disclaim its briefing before the Supreme Court merely by walking down the street to the District Court for the District of Columbia. It has made its bed, and it should lie in it.

III.        **Ms. Aviel is Entitled to Declaratory Relief.**

This Court had the authority to enter declaratory relief.  It is the basic duty of this Court to "say what the law is," *Marbury*, 5 U.S. at 177, and our system relies on "executive" "officials" abiding "by an authoritative interpretation" of the law, *Franklin*, 505 U.S. at 803 (plurality op.).  Defendants argue that a declaratory judgment is the functional equivalent of an injunction and should not be issued if an injunction is unavailable.  Cross-MSJ at 22 (citing *Samuels v. Mackell*, 401 U.S. 66, 73 (1971)).  But *Samuels* concerned the application of abstention doctrines to prevent federal courts from interfering in state criminal proceedings.  That does not apply here, so *Samuels* does not apply, and the ordinary principles for declaratory relief, as outlined in Plaintiff's opening motion, govern instead.  *See* ECF No. 35 at 24–25 (citing *New York v. Biden*, 6636 F. Supp. 3d 1, 31 (D.D.C. 2022)); *see also President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (discussing factors).

And as outlined above, declaratory relief here is straightforward.[3]  Again, Defendants do not at all challenge that the Court has the authority to declare "actions taken in violation of the FVRA [] void *ab initio*."  *SW Gen.*, 580 U.S. at 298 n.2.  Instead, they argue that this "relief would only be available if the Court agrees with Aviel that President Trump designated Marocco [to] the Foundation Board in violation of the [FVRA]."  Cross-MSJ at 23.  The parties agree there.  And because the FVRA does not extend to the President a limited grant of appointment authority for the IAF Board, Congress has determined that the appointment of Marocco to the IAF Board and all his ensuing actions should be declared void *ab initio*.  "Once Congress, exercising its delegated

---

[3] Although Plaintiff framed relief under the FVRA as a form of declaratory relief in her opening motion, simply enforcing the terms of the FVRA is arguably a legal remedy—and not an equitable remedy at all—given that courts have specifically observed that "[t]he plain terms of the FVRA remove remedial discretion."  *Asylumworks*, 590 F. Supp. 3d at 26.  Either way, the remedy under 5 U.S.C. § 3348(d)(1) would provide for all the relief Plaintiff seeks here.

powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001).

## IV.        Ms. Aviel is Entitled to Mandamus Relief.

Even if relief under 5 U.S.C. § 3348(d) or under the standard for injunctive relief were unavailable, Ms. Aviel is entitled to a writ of mandamus.  There is an extremely long Anglo-American history and tradition of courts issuing relief in the form of mandamus to provide "full and effectual remedy" "for wrongful removal."  3 W. Blackstone, Commentaries on the Laws of England *264; *see Marbury v. Madison*, 5 U.S. at 173 (wrongful divestment of Senate-confirmed position presented "a plain case for a mandamus").  There is "overwhelming" English authority that "mandamus" lies where a person removable only for "causes specified" "is wrongfully dispossessed."  *Kalbfus v. Siddons*, 42 App. D.C. 310, 319 (D.C. Ct. App. 1914) (quoting *Rex v. Blooer*, (1760) 97 Eng. Rep. 697; 2 Burr. 1043, 1045).  "[M]andamus" provides a "full and effectual remedy" "for refusal or admission where a person is [e]ntitled to an office" and "for wrongful removal, where a person is legally possessed" and "the franchise[] concern[s] the public."  Blackstone, *supra*, *264; *see, e.g.*, *R v. Mayor, Bailiffs, & Common Council of the Town of Liverpool*, (1759) 97 Eng. Rep. 533; 2 Burr. 730, 730–32.  That English tradition of mandamus crossed the Atlantic and is etched into the cornerstone of judicial review.  *Marbury v. Madison* involved a Senate-confirmed official whose commission was wrongfully withheld—a circumstance analogous to wrongful removal.  According to Chief Justice Marshall, that scenario presented "a plain case for a mandamus."  *Marbury*, 5 U.S. at 173.  Those cases are the rule, not the exception. *See* Oliver Field, *Civil Service Law*, ch. XI § V (1939) ("Mandamus to reinstate" is "commonly used remedy in civil service removal cases."); James L. High, *A Treatise on*

*Extraordinary Remedies* 71 (2d ed. 1884) ("[C]ivil courts" may "restore one [to office] who has been wrongfully removed."); Samuel Slaughter Merril, *Law of Mandamus* 182 (1892) (officer "will be restored" "by the writ of mandamus"); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus* 240 (1853) (mandamus lies as a "remedy for a wrongful dispossession of an office"); John Shortt, *Informations (Criminal and Quo Warranto), Mandamus and Prohibition* 302 (1888) ("mandamus" is "true specific remedy" for person "wrongfully dispossessed" (quotation marks omitted)).  Ms. Aviel is entitled to the same mandamus that so many other wrongfully-removed officeholders have received for centuries before her.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant her motion for summary judgment, order the declaratory and/or injunctive relief she requests, and deny Defendants' cross-motion for summary judgment.


Dated: May 14, 2025                                Respectfully submitted,


                                                   */s/ Aaron S.J. Zelinsky*
                                                   Aaron S.J. Zelinsky
                                                   ZUCKERMAN SPAEDER LLP
                                                   100 East Pratt Street, Suite 2440
                                                   Baltimore, MD 21202
                                                   Tel: (410) 332-0444
                                                   Fax: (410) 659-0436
                                                   azelinsky@zuckerman.com

                                                   Aaron Chou (DC Bar No. 90020425)
                                                   ZUCKERMAN SPAEDER LLP
                                                   2100 L Street NW, Suite 400
                                                   Washington, DC 20037
                                                   Tel: (202) 778-1800
                                                   Fax: (202) 822-8106
                                                   achou@zuckerman.com

                                                   *Attorneys for Plaintiff Sara Aviel*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 14th day of May, 2025, I caused the foregoing to be served

on counsel of record via the Court's electronic case filing system.

*/s/ Aaron S.J. Zelinsky*
Aaron S.J. Zelinsky

*Attorney for Plaintiff Sara Aviel*