## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SARA AVIEL,

    *Plaintiff*,

  v.

SERGIO GOR, *et al.*,

    *Defendants*.

Civil Action No. 25 - 778 (LLA)

## <u>MEMORANDUM OPINION</u>

After her purported termination as president and chief executive officer ("CEO") of the Inter-American Foundation (the "IAF" or the "Foundation"), Plaintiff Sara Aviel sued President Donald Trump, supposed IAF Board member Pete Marocco, and various other government officials (collectively, "Defendants") to declare her termination legally void.  ECF No. 1.[1]  She sought a temporary restraining order and a preliminary injunction, which this court granted in April 2025.  ECF No. 23.  The parties have now filed cross-motions for summary judgment.  ECF Nos. 35, 40.  For the reasons explained below, the court will grant Ms. Aviel's motion for summary judgment and deny Defendants' motion for summary judgment.

## I.    FACTUAL BACKGROUND

In the interest of completeness, the court recounts the facts from its opinion granting Ms. Aviel's motion for a preliminary injunction.  ECF No. 22.

---

[1] Throughout this opinion, the court will use lowercase to refer to Ms. Aviel's contested position at the IAF and uppercase to refer to the President of the United States.

### A. The Inter-American Foundation

The Inter-American Foundation is a half-century-old independent agency created by Congress to "serve[] the United States' strategic interests throughout Latin America and the Caribbean in a cost-efficient manner." ECF No. 35-1 ¶¶ 1, 4; ECF No. 40-2 ¶ 4. The IAF "engages with community leaders, innovators, and entrepreneurs working to promote prosperity, peace, and democracy in the region." ECF No. 35-1 ¶ 3; ECF No. 40-2 ¶ 3. Since its founding, it has "funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country." ECF No. 35-1 ¶ 3; ECF No. 40-2 ¶ 3. More than "70% of IAF grantees . . . reported that their opinion of the United States had improved as a result of their work with the IAF." ECF No. 35-1 ¶ 4; ECF No. 40-2 ¶ 4.

Congress created the IAF through the Foreign Assistance Act of 1969, 22 U.S.C. § 290f, Pub. L. 91-175, 83 Stat. 805, 821-24 (Dec. 30, 1969), and directed that it "shall have perpetual succession unless sooner dissolved by an Act of Congress," *id.* § 290f(e)(1). The Act requires that the IAF have a bipartisan Board of Directors comprised of "nine members appointed by the President, by and with the advice and consent of the Senate," of which no more than five members may belong to a single political party. *Id.* § 290f(g). Members of the Board serve six-year terms and, "upon the expiration of [a member's] term of office[, the] member shall continue to serve until his successor is appointed and shall have qualified." *Id.* The IAF "Board . . . direct[s] the exercise of all the powers of the Foundation." *Id.* § 290f(i). The Act also specifies that "[t]he chief executive officer of the Foundation shall be a President who shall be appointed by the Board of Directors." *Id.* § 290f(*l*)(1).

In March 2022, the IAF Board appointed Ms. Aviel as the Foundation's president.  ECF No. 35-1 ¶ 14; ECF No. 40-2 ¶ 14.  She began her service in that role in April 2022.  No. 35-1 ¶ 14; ECF No. 40-2 ¶ 14.

### B.    Executive Order Nos. 14,158 and 14,217

On January 20, 2025, President Trump signed Executive Order 14,158 ("Establishing and Implementing the President's 'Department of Government Efficiency'").  Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025).  That order reorganized the United States Digital Service, renamed it the "United States DOGE Service" ("DOGE"), and "established [it] in the Executive Office of the President."  *Id.* § 3(a).  It also created the role of the United States DOGE Service Administrator and put the Administrator in charge of "the U.S. DOGE Service Temporary Organization," which the executive order also established.  *Id.* § 3(b).  The U.S. DOGE Service Temporary Organization works to "advanc[e] the President's 18-month DOGE agenda" of "modernizing Federal technology and software to maximize governmental efficiency and productivity."  *Id.* §§ 1, 3(b).

On February 19, 2025, President Trump issued Executive Order 14,217 ("Commencing the Reduction of the Federal Bureaucracy"), which has a stated purpose of "reduc[ing] the size of the Federal Government . . . [by] reduc[ing] . . . the elements of the Federal bureaucracy that the President has determined are unnecessary."  Exec. Order No. 14,217 § 1, 90 Fed. Reg. 10577 (Feb. 19, 2025).  The order identifies several federal entities, including the IAF, that "shall be eliminated to the maximum extent consistent with applicable law" and "shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."  *Id.* § 2(a).  The executive order also requires "the head of each unnecessary governmental entity listed in [the executive order to] . . . submit a report to the

Director of the Office of Management and Budget (OMB Director) confirming compliance with th[e] order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id.* § 2(b).  Executive Order 14,217 further directs that when reviewing grant requests made by the entities listed in the executive order, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests . . . shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with th[e] order." *Id.*

### C.    Purported Termination of Ms. Aviel and other IAF employees

On February 20, the day after President Trump issued Executive Order 14,217, Ms. Aviel learned that DOGE representatives wanted to meet with her and her staff.  ECF No. 35-1 ¶ 16; ECF No. 40-2 ¶ 16.  To prepare for the meeting, Ms. Aviel and others "assembl[ed] discussion points describing how the IAF had functioned in service of efficiency, and how the agency was in alignment with the administration's aims stated in the recently issued Executive Orders."  ECF No. 35-1 ¶ 16; ECF No. 40-2 ¶ 16.  "Ms. Aviel sought to align the agency with the President's stated policy instructions as permissible by law."  ECF No. 35-1 ¶ 16; ECF No. 40-2 ¶ 16.

Later that afternoon, two DOGE representatives—Nate Cavanaugh and Ethan Shaotran—met with Ms. Aviel and the other IAF officials.  ECF No. 35-1 ¶ 17; ECF No. 40-2 ¶ 17.  The DOGE representatives explained that they "were based at the General Services Administration" and sought "to verify the IAF's compliance with the President's Executive Orders."  ECF No. 35-1 ¶ 17; ECF No. 40-2 ¶ 17.  Ms. Aviel and IAF employees tried "to facilitate [Mr.] Cavanaugh and [Mr.] Shaotran's requests by initiating the process of providing access to IAF systems, including grants management, human resources, finance, and procurement systems, among others."  ECF

No. 35-1 ¶ 18; ECF No. 40-2 ¶ 18.  Ms. Aviel also "share[d] information on the IAF's compliance with the President's Executive Orders and sought to highlight the agency's efforts to align with the administration's priorities."  ECF No. 35-1 ¶ 18; ECF No. 40-2 ¶ 18.

On February 21, Ms. Aviel and other IAF representatives again met with Mr. Cavanaugh and Mr. Shaotran, as well as Jacob Altik, a lawyer from the Executive Office of the President. ECF No. 35-1 ¶ 19; ECF No. 40-2 ¶ 19.  Mr. Altik explained that, in his view, "the minimum statutory requirements for the IAF entailed the existence of a Board and a president, a presence in the District of Columbia, and a minimum level of grants and contracts."  ECF No. 35-1 ¶ 19; ECF No. 40-2 ¶ 19.  Accordingly, "DOGE intended to conduct a reduction in force ("RIF") of almost all employees, and a termination of almost all grants and contracts."  ECF No. 35-1 ¶ 19; ECF No. 40-2 ¶ 19.  The DOGE representatives instructed Ms. Aviel "to contact the Board immediately to determine if the Board was in alignment on this plan, and suggested that if the Board were not so aligned, the Board would be terminated and replaced with individuals who were aligned with President Trump's vision."  ECF No. 35-1 ¶ 20; ECF No. 40-2 ¶ 20.  When Ms. Aviel explained that such a significant matter would require a formal Board meeting, and that arranging such a meeting on short notice would be difficult because "the Board was subject to certain legal requirements before convening," the DOGE representatives explained that a Board meeting was not necessary because "they just needed a quick 'yes-or-no' answer from the Board on alignment." ECF No. 35-1 ¶ 20; ECF No. 40-2 ¶ 20.

After meeting with Mr. Cavanaugh, Mr. Shaotran, and Mr. Altik, Ms. Aviel was informed by "Congressional stakeholders from both parties, and from both the Senate and House, that the IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47[, 138 Stat. 460, 843] (2024)[,] from

initiating any reduction in the IAF's functions without first providing notice to Congressional appropriations committees." ECF No. 35-1 ¶ 21; ECF No. 40-2 ¶ 21.[2]  Congressional staff also told Ms. Aviel that if she took actions to reduce staff, it "would be in contravention of the appropriations enacted into law." ECF No. 35-1 ¶ 21 (quoting ECF No. 35-2 ¶ 9); ECF No. 40-2 ¶ 21.  From February 21 through February 24, Ms. Aviel "spoke with each member of the IAF Board multiple times to analyze all options and identify the best lawful path forward," and she "heard from multiple congressional stakeholders and legal experts who believed that the DOGE plan was unlawful and contrary to congressional intent." ECF No. 35-1 ¶ 22; ECF No. 40-2 ¶ 22.

On February 24, Mr. Altik and Mr. Cavanaugh informed Ms. Aviel that, "with one exception, all members of the Board had been terminated." ECF No. 35-1 ¶ 23; ECF No. 40-2 ¶ 23.  The DOGE representatives then "asked Ms. Aviel to confirm that she would implement DOGE's agenda in the absence of a Board" and "threatened that the President would terminate her if she declined to do so." ECF No. 35-1 ¶ 23; ECF No. 40-2 ¶ 23.  Ms. Aviel declined to respond to DOGE's requests "without more specificity as to those requests in writing and the opportunity to determine whether they were legal," but emphasized that she remained committed to "following all of her legal obligations and responsibilities." ECF No. 35-1 ¶ 23; ECF No. 40-2 ¶ 23.  The DOGE representatives subsequently "asked Ms. Aviel to sign a memorandum of understanding agreeing that a DOGE representative would be detailed to the agency and would be permitted access to the agency's systems." ECF No. 35-1 ¶ 23; ECF No. 40-2 ¶ 23.  Because she believed

---

[2] The Further Consolidated Appropriations Act of 2024 appropriated $47 million to the IAF through September 30, 2025, "[f]or necessary expenses to carry out the functions of the Inter-American Foundation."  Further Consolidated Appropriations Act of 2024, Div. F, 138 Stat. at 746.  Congress also specified that the IAF may not use appropriated funds to "expand, eliminate, consolidate, or downsize" the agency without "prior consultation . . . with the appropriate congressional committees" and "a detailed justification for any proposed action." *Id.* at 843-44.

that the full Board remained intact, and that she therefore did not have the authority to unilaterally

sign the memorandum, Ms. Aviel declined to sign.  ECF No. 35-1 ¶ 23; ECF No. 40-2 ¶ 23.

Shortly after this interaction, Ms. Aviel confirmed that the IAF Board members had not received

any termination letters.  ECF No. 35-1 ¶ 23; ECF No. 40-2 ¶ 23.  As of the parties' filing of their

motions, "at least one Board member still ha[d] not received any communication from President

Trump or anyone from his Office dismissing him from the Board."  ECF No. 35-1 ¶ 24; ECF

No. 40-2 ¶ 24.

On February 26, DOGE representatives directed the Senior Procurement Executive

("SPE") at the Department of the Treasury to "cancel all IAF contracts" by the close of business

on February 27.  ECF No. 35-1 ¶ 25 (quoting ECF No. 35-5); ECF No. 40-2 ¶ 25.  The cancellation

order encompassed "everything from the field contractors that provide grantees with programmatic

support and oversight, to contracts for basic services like email and agency grant-management

software." ECF No. 35-1 ¶ 25; ECF No. 40-2 ¶ 25.  Upon receiving this request, the Administrative

Resource Center ("ARC")—housed within the Department of the Treasury and partly responsible

for the IAF's finances—expressed "concern[] about the legality of [the directive]."  ECF No. 35-1

¶ 25 (quoting ECF No. 35-5); ECF No. 40-2 ¶ 25.

Later that evening, Trent Morse from the Presidential Personnel Office sent Ms. Aviel an

email stating: "At the direction of President Donald J. Trump, I am writing to inform you that your

position on the Inter-American Foundation is terminated, effective immediately."  ECF No. 35-6;

*see* ECF No. 35-1 ¶ 26; ECF No. 40-2 ¶ 26.  The immediacy of Ms. Aviel's termination was

corroborated by her Leave and Earnings Statement and her Notice of Personnel Action.  ECF

No. 35-1 ¶ 27; ECF No. 40-2 ¶ 27; ECF No. 35-7 (Leave and Earnings Statement); ECF No. 35-8 (Notice of Personnel Action).[3]

On February 28, Mr. Morse informed the IAF's Chief Operating Officer that President Trump had exercised his "inherent authority under Article II" to appoint Mr. Marocco as the "acting chairman and board member of the Inter-American Foundation." ECF No. 35-9; *see* ECF No. 35-1 ¶ 28; ECF No. 40-2 ¶ 28. Mr. Morse represented that the IAF was, at that time, without a "Board." ECF No. 35-9. That same day, Mr. Marocco "visited the IAF headquarters[] seeking to hold an 'emergency board meeting.'" ECF No. 35-1 ¶ 29 (quoting ECF No. 35-10); ECF No. 40-2 ¶ 29. Unable to gain access to the building, Mr. Marocco held the meeting directly outside the IAF headquarters. ECF No. 35-1 ¶ 29; ECF No. 40-2 ¶ 29. While Mr. Cavanaugh and Mr. Shaotran were present at this meeting, Mr. Marocco "was the only purported Board member in attendance." ECF No. 35-1 ¶ 29; ECF No. 40-2 ¶ 29. Mr. Marocco closed the meeting to the public and then voted to appoint himself as the IAF's acting president and CEO. ECF No. 35-1 ¶ 29; ECF No. 40-2 ¶ 29; *see* ECF No. 35-11.

Mr. Marocco then sent a directive to the ARC commanding it to terminate the IAF's grants. ECF No. 35-1 ¶ 30; ECF No. 40-2 ¶ 30. The ARC thereafter informed an IAF representative that it would be taking immediate steps to comply with the order, "as authorized by [the] IAF[']s newly appointed President Peter Marocco." ECF No. 35-12. Almost all of the IAF's grants, save for a

---

[3] Defendants assert that this fact is incomplete because "[Mr.] Marocco removed [Ms.] Aviel from her position as [p]resident of the Foundation on February 28, 2025." ECF No. 40-2 ¶ 27. Whether Mr. Marocco was indeed a member of the IAF Board at any point in time is a core issue in this case. However, Defendants do not dispute that Mr. Morse sent Ms. Aviel the email in question. *See* ECF No. 35-1 ¶ 26; ECF No. 40-2 ¶ 26.

handful of agreements related to human resources and information technology, were terminated over the next two days.  ECF No. 35-1 ¶ 30; ECF No. 40-2 ¶ 30.

On March 2, the purportedly terminated IAF Board members informed Ms. Aviel that they planned to "serve in their positions until new Board members were duly appointed and confirmed by the Senate, consistent with statutory law"; explained that they believed that Ms. Aviel remained the IAF's president and CEO; and "directed Ms. Aviel to oversee the continuation of the IAF's regular operations, including monitoring and oversight of the Foundation's grantees."  ECF No. 35-1 ¶ 31; ECF No. 40-2 ¶ 31; *see* ECF No. 35-13.[4]

Around March 4, Mr. Marocco and DOGE sent RIF notices to thirty-three employees of the IAF (comprising its entire staff, except for Ms. Aviel and three employees who had voluntarily departed).  ECF No. 35-1 ¶ 32; ECF No. 40-2 ¶ 32.  Thirty staff members were placed on administrative leave and shut out of the IAF's computer systems, while three were enlisted to assist in winding down the Foundation.  ECF No. 35-1 ¶ 32; ECF No. 40-2 ¶ 32.  Mr. Marocco later voided the RIF of Dominic Bumbaca, the IAF's chief information security officer, and purportedly named him the Foundation's new CEO.  ECF No. 35-1 ¶ 32; ECF No. 40-2 ¶ 32.  Mr. Marocco also terminated all of the IAF's remaining grants, with the exception of a single grant worth approximately $66,000 that was set to expire soon.  ECF No. 35-1 ¶ 33; ECF No. 40-2 ¶ 33.

Also on March 4, the IAF sent letters to its grantees notifying them that it was canceling all existing grants because they were "inconsistent with the agency's priorities" and President

---

[4] Defendants assert that President Trump removed the IAF Board members, ECF No. 40-2 ¶ 31, while Ms. Aviel disputes whether he did so "in accordance with the law, including by express notification," ECF No. 43-1 ¶ 31.  That said, Defendants do not dispute whether the purportedly terminated Board members made the above communications to Ms. Aviel.  *See* ECF No. 35-1 ¶ 31; ECF No. 40-2 ¶ 31.

Trump's February 19 executive order.  ECF No. 35-1 ¶ 34 (quoting ECF No. 35-14); ECF No. 40-2 ¶ 34.  The letter instructed all grantees to "send remaining, unspent funds to the [Foundation], in accordance with the termination clause and local law, [by March 19] or as soon as practicable."  ECF No. 35-1 ¶ 34 (quoting ECF No. 35-14); ECF No. 40-2 ¶ 34; ECF No. 43-1 ¶ 34.[5]  As a result of these developments, many of the IAF's philanthropic partners have asked for their donations to be returned.  ECF No. 35-1 ¶ 35; ECF No. 40-2 ¶ 35.

## II.      PROCEDURAL HISTORY

### A.      Temporary Restraining Order and Preliminary Injunction

Ms. Aviel filed this action on March 17, 2025.  ECF No. 1.  The same day, she moved for a temporary restraining order and a preliminary injunction.  ECF No. 5.  On March 19, the parties appeared before the court for a status conference.  *See* Mar. 19, 2025 Minute Entry.  To give the parties time to fully brief Ms. Aviel's motion, Defendants agreed to (1) suspend the deadline by which the IAF's grantees would be required to return grant funds until the resolution of Ms. Aviel's motion, and (2) hold any already returned funds at the IAF.  *See* Tr. of Status Conf., at 29:22-31:7 (D.D.C. Mar. 19, 2025).  The court then set a briefing schedule and scheduled a motions hearing for April 2.  *See* Mar. 19, 2025 Minute Order.  On March 27, the court consolidated the motions hearing in this case with the one in *Cristosal Human Rights v. Marocco*, No. 25-CV-857—a suit brought by several of the IAF's grantees.  *See* Mar. 27, 2025 Minute Order.  On April 2, the court heard oral argument on the pending motions in both cases.  *See* Apr. 2, 2025 Minute Entry.

---

[5] At an emergency status conference on March 19, 2025, Defendants agreed to extend the deadline for returning unspent funds until the court issued its ruling on Ms. Aviel's then-pending motion for a preliminary injunction.  *See* Mar. 19, 2025 Minute Entry; ECF No. 13.  Pursuant to that representation, Defendants informed the IAF's grantees that the deadline had been "extended indefinitely" later that day.  ECF No. 18.

On April 4, the court issued an opinion and a separate order granting Ms. Aviel's motion for a preliminary injunction. ECF Nos. 22, 23. The court held that Ms. Aviel had satisfied each of the preliminary-injunction factors. *Aviel v. Gor*, No. 25-CV-778, 2025 WL 1009035, at \*5-12 (D.D.C. Apr. 4, 2025). Specifically, she had demonstrated a substantial likelihood of success on the merits because the President lacked the power to fire her under the Appointments Clause. *Id.* at \*6-7. She had also shown that the President likely lacked the ability to appoint Mr. Marocco as an acting IAF Board Member under the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq. Id.* at \*7-9. On irreparable harm, the court concluded that—in addition to losing the statutory right to function—Ms. Aviel faced a unique, irremediable injury in the absence of injunctive relief: the complete destruction of her organization. *Id.* at \*9-11. Finally, the court held that the balance of the equities and the public interest heavily favored enforcing the FVRA and upholding constitutional limitations on Presidential appointment power. *Id.* at \*12.

### B.    Post-Injunction Appeal and Motion to Stay

On April 6, Defendants appealed the court's preliminary-injunction order to the D.C. Circuit, ECF No. 26, and simultaneously moved to stay the effect of the court's order pending the appeal, ECF No. 27. The court denied Defendants' motion, which largely rehashed failed arguments from the preliminary-injunction phase. ECF No. 34.

On April 7, Defendants filed an emergency motion asking the D.C. Circuit to stay this court's preliminary-injunction order. *See* Mot., *Aviel v. Gor*, No. 25-5105 (D.C. Cir. Apr. 7, 2025). The parties finished briefing the emergency motion on April 15. *See* Resp., *Aviel*, No. 25-5105 (D.C. Cir. Apr. 14, 2025); Reply, *Aviel*, No. 25-5105 (D.C. Cir. Apr. 15, 2025). On June 5, the D.C. Circuit denied Defendants' emergency motion in a short, per curiam order because they

"ha[d] not satisfied the stringent requirements for a stay pending appeal."  *Aviel v. Gor*, No. 25-5105, 2025 WL 1600446, at *1 (D.C. Cir. June 5, 2025) (per curiam).

Judge Katsas, joined by Judge Pillard, filed a concurring opinion.  In it, he explained that "[i]t is unlikely that either the President or [Mr.] Marocco permissibly removed [Ms.] Aviel" from her position as president of the IAF.  *Id.* (Katsas, J., concurring).  Because the organization's governing statute "authorizes the IAF Board of Directors—not the President [of the United States]—to appoint the CEO," only the Board "has the power to remove [Ms.] Aviel."  *Id.* (citing *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493, 509 (2010)); *see id.* ("[I]f Congress vests a department head with the power to appoint and remove an inferior officer, 'the President has certainly no power to remove' the inferior officer directly." (quoting *In re Hennen*, 38 U.S. 230, 260 (1839))).  Judge Katsas also concluded that Mr. Marocco lacked the power to remove Ms. Aviel because he had "not [been] appointed with the advice and consent of the Senate, as required by the Appointments Clause of the Constitution [or] by the [IAF]'s organic statute."  *Id.* at *2 (citations omitted).[6]

Turning to Defendants' argument that the President possesses "inherent Article II authority to designate acting principal officers to ensure that he may faithfully execute federal law," Judge Katsas wrote that this argument was "unlikely to succeed."  *Id.*  He emphasized that such a contention contravened the advice-and-consent requirement of the Appointments Clause—"'a critical structural safeguard' against presidential overreach."  *Id.* (quoting *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017)).  He continued, "[g]iven these specific checks and

---

[6] While the parties "vigorously dispute[d] whether the [FVRA] separately prohibits the President from designating individuals to serve as acting members of multi-member boards like that of the [IAF]," Judge Katsas opined that "the FVRA's temporary-designation provisions do not apply to such boards."  *Aviel*, 2025 WL 1600446, at *2 (Katsas, J., concurring) (citing 5 U.S.C. § 3349c(1)).

balances regarding appointments, it is unlikely that the Take Care Clause gives the President unfettered discretion to designate acting principal officers with neither Senate confirmation[,] nor a Senate recess[,] nor even statutory authorization through the FVRA." *Id.*

Judge Katsas then addressed remedies. While an injunction running directly against the President would have raised "serious and important question[s]" about the court's equitable powers, he reasoned that the injunction—which instead ran "against the 'Defendants' generally"— was "best construed not to reach the President." *Id.* There still remained a question, however, as to whether the court had the ability to order Ms. Aviel's formal "reinstatement." *Id.* On that front, Judge Katsas deferred to the D.C. Circuit's *en banc* ruling in *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc), which "found the government unlikely to succeed in its contention that reinstatement is rarely[,] if ever[,] an available remedy for unlawfully removed officials." *Aviel*, 2025 WL 1600446, at *2 (Katsas, J., concurring). Finally, on the issue of remedies, Judge Katsas acknowledged the Supreme Court's recent stay in *Harris* and its companion case, which permitted the government to remove members of the National Labor Relations Board ("NLRB") and Merit Systems Protection Board ("MSPB"). *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Although the stay reflected the Supreme Court's judgment that the government was likely to show that members of the NLRB and MSPB "exercise considerable executive power," the Supreme Court did not opine on whether reinstatement was an available remedy. *Id.* And, as Judge Katsas observed, the entirety of the Supreme Court's per curiam decision "rested on the proposition that the removals at issue in those cases *were likely lawful*." *Aviel*, 2025 WL 1600446, at *2 n.2 (Katsas, J., concurring) (emphasis added). "Accordingly, [the D.C. Circuit's] *en banc* order is the last word on [the remedies] question until either the Supreme Court or a merits panel of [the D.C. Circuit] more definitively resolves [it]." *Id.*

Judge Rao dissented from the order because she believed that "the President's removal of [Ms.] Aviel was lawful" and that "the remedy issued by the district court [was] inconsistent with equitable remedies traditionally available for the allegedly unlawful removal of an executive branch officer." *Id.* at *3 (Rao, J., dissenting). On the first issue, Judge Rao concluded that the President's power to remove officers who exercise executive power on his behalf enabled him to remove Ms. Aviel, an inferior officer. *Id.* While Judge Rao agreed with Judges Katsas and Pillard "that the Board has authority to remove [Ms.] Aviel as an incident of its appointment power," she wrote that "[n]othing . . . renders the Board's removal authority *exclusive* or forecloses the President's ability to remove [Ms. Aviel]." *Id.* at *4 (emphasis added). And because Ms. Aviel "refused to follow the President's directives[,] [h]er removal for insubordination is within the heartland of the Article II power." *Id.* at *5.

Judge Rao did, however, acknowledge that "the text and structure of the Constitution strongly suggest the President has no inherent authority to appoint officers of the United States, like IAF Board members, outside the strictures of the Appointments Clause." *Id.* at *4 n.1. Therefore, President Trump could not have appointed Mr. Marocco as an acting IAF Board member without the Senate's advice and consent. *See id.*

On remedies, Judge Rao concluded that "a sweeping injunction against the President, the removal of an appointed officer, and the reinstatement of an ousted officer[] are beyond the equity powers of the federal courts." *Id.* at *5. In her view, this court's injunction "necessarily runs against the President" in violation of established Supreme Court precedent. *Id.* Next, she opined that the court erred in finding irreparable harm because the loss of employment is ordinarily insufficient and because any threat to the IAF's existence was not a personal harm to Ms. Aviel. *Id.* at *6. Additionally, any injury to Ms. Aviel by virtue of her purported removal could be cured

by damages in the form of backpay. *Id.* at *7. Finally, Judge Rao concluded that the balance of harms favored a stay because, according to the Supreme Court, "the Government faces greater risk of harm from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty." *Id.* (quoting *Wilcox*, 145 S. Ct. at 1415).[7]

### C.    Summary Judgment

During the pendency of the emergency stay motion before the D.C. Circuit, the parties proceeded to brief summary judgment. ECF Nos. 35, 42, 44 (Ms. Aviel's motion for summary judgment); ECF Nos. 40, 43, 45 (Defendants' cross-motion for summary judgment).

## III.    LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the parties do not dispute any *material* facts, the case is "particularly amenable to resolution on summary judgment" because all that remains is the application of law. *W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 164 (D.D.C. 2014).[8]

---

[7] While the separate writings of the D.C. Circuit's motions panel are not technically binding, they may certainly "guide [this] [c]ourt's decision." *Kim v. Fin. Indus. Regul. Auth., Inc.*, 698 F. Supp. 3d 147, 154 (D.D.C. 2023). Because Judge Katsas's concurrence was joined by Judge Pillard and thus constitutes the panel's majority view, the court will defer to that opinion.

[8] While the parties quibble about factual details, the court concludes that any such disputes are not material to the court's resolution of the cross-motions. To the extent the parties disagree about the legal effect of specific acts, like Mr. Marocco's purported termination of Ms. Aviel on February 28, that is a question of law. *See* ECF No. 40-1 ¶ 5 (stating that "[Mr.] Marocco removed [Ms.] Aviel from her position as president of the Foundation"); ECF No. 43-1 ¶ 5 ("As discussed throughout the litigation, [Ms. Aviel] contends that [Mr.] Marocco was not properly an acting member of the Board at the time he took these actions."). The parties' filings make clear that Mr. Marocco *purported* to carry out the termination, but that is distinct from whether it was lawful or valid.

# IV.    DISCUSSION

At the preliminary-injunction stage, Defendants led with their argument that President Trump possessed inherent power to terminate Ms. Aviel before arguing, in the alternative, that Mr. Marocco had the power to do the same as an acting Board member.  *See* ECF No. 19, at 5-9. Defendants now reverse the order of their arguments and begin by claiming that President Trump lawfully appointed Mr. Marocco to the IAF Board.  *See* ECF No. 40, at 6-12.  If that appointment was invalid, Defendants then suggest—as a backstop—that President Trump must have residual authority to terminate Ms. Aviel himself.  *Id.* at 12-14.  The court addresses both arguments in turn before discussing Ms. Aviel's entitlement to declaratory, injunctive, and mandamus relief.

## A.    Merits

### 1.    Whether Mr. Marocco had the power to terminate Ms. Aviel

In the simplest terms, executive officers within the federal government fit into two broad categories: principal officers and inferior officers.  Whether a particular officer is a "principal officer" or an "inferior officer" "depends on whether [s]he has a superior."  *Edmond v. United States*, 520 U.S. 651, 662 (1997).  Generally speaking, an officer whose work is "directed and supervised" by a principal officer is an inferior officer.  *Id.* at 663.

The Appointments Clause of the United States Constitution sets the parameters for appointing *principal* officers.  It reads:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.  This clause permits the President to appoint principal officers with the advice and consent of the U.S. Senate.  *United States v. Arthrex, Inc.*, 594 U.S. 1, 12-13 (2021).

Here, the members of the IAF Board are principal officers because the Board "direct[s] the exercise of all the powers of the Foundation," 22 U.S.C. § 290f(i), and its members "report[] to nobody except the President," *Aviel*, 2025 WL 1600446, at *2 (Katsas, J., concurring).  Neither party disputes this.  *See* ECF No. 5-1, at 17; ECF No. 19, at 6-7.

As the court explained in its previous opinion, "[t]he President's ability to appoint principal officers simultaneously flows from and is limited by the text of the Appointments Clause."  *Aviel v. Gor*, No. 25-CV-778, 2025 WL 1009035, at *7 (D.D.C. Apr. 4, 2025).  The Framers wanted to give the President the power to "take Care that the Laws be faithfully executed," U.S. Const., art. II, § 3, but also recognized the perils of concentrating unbridled power in a single person, *see SW Gen., Inc.*, 580 U.S. at 317 (Thomas, J., concurring) ("[T]he Framers . . . recognized the serious risk for abuse and corruption posed by permitting one person to fill every office in the Government . . . [and] knew that liberty could be preserved only by ensuring that the powers of Government would never be consolidated in one body." (citing The Federalist No. 76, at 513 (J. Cooke ed. 1961); 3 J. Story, *Commentaries on the Constitution of the United States* § 1524, at 376 (1833); The Federalist No. 51, at 348)).  Because "the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth[-]century despotism," *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991) (internal quotation marks and quoted source omitted), the Framers mandated Senate approval for *all* principal officers within the federal government.  This advice-and-consent requirement is a "critical 'structural safeguard[] of the constitutional scheme.'"  *SW Gen., Inc.*, 580 U.S. at 293 (alteration in original) (quoting *Edmond*, 520 U.S. at 659).

That said, the "process of Presidential appointment and Senate confirmation . . . can take time" and "neither [Congress nor the President] may desire to see the duties of [a] vacant office go unperformed in the interim." *SW Gen., Inc.*, 580 U.S. at 293-94.  To address this issue, Congress enacted the Vacancies Act of 1868 and, in 1998, eventually "replaced the Vacancies Act with the FVRA." *Id.* at 294-95.  For certain offices, the FVRA allows the President to direct a person "to perform the functions and duties of the vacant office temporarily [and] in an acting capacity subject to the time limitations" set forth in the statute.  5 U.S.C. § 3345.  If no acting officer has been appointed pursuant to the FVRA, "the office shall remain vacant." *Id.* § 3348(b)(1).  Any action taken by a person who was not properly appointed pursuant to the FVRA "shall have no force or effect." *Id.* § 3348(d)(1).  Critically, the FVRA provides "*the exclusive means* for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate." *Id.* § 3347(a) (emphasis added).  The only exceptions are if another "statutory provision expressly authorizes" the designation of an acting officer, if another statute "expressly designates" an acting officer, or if the President makes an appointment under the Recess Appointments Clause of the Constitution. *Id.*  None of these exceptions applies here.  So, if the vacancy ordinarily requires advice and consent by the Senate, which an IAF Board vacancy does, then the only path to appointing an acting Board member must go through the FVRA.

But here is where Defendants encounter a problem.  The FVRA's acting-appointment provisions "[do] not apply to any member who is appointed by the President, by and with the advice and consent of the Senate[,] to any board, commission, or similar entity that is composed of multiple members[] and governs an independent establishment or Government corporation." *Id.* § 3349c(1).  The parties agree that the IAF is such an entity.  *See* ECF No. 35, at 19; ECF

No. 40, at 8.  As a result, the FVRA, which is the "exclusive means" for appointing acting officers, does not provide a mechanism for appointing temporary IAF Board members.  5 U.S.C. § 3347(a); *see Aviel*, 2025 WL 1600446, at *2 (Katsas, J., concurring) (explaining that "the FVRA's temporary-designation provisions do not apply to [the IAF] [B]oard[]"); *id.* at *4 n.1 (Rao, J., dissenting) ("[T]he Federal Vacancies Reform Act does not apply to the IAF.").  President Trump therefore did not have the authority to appoint Mr. Marocco as an acting Board member, and Mr. Marocco did not have the authority to terminate Ms. Aviel.  Accordingly, Mr. Marocco's attempt to terminate Ms. Aviel "ha[d] no force or effect."  5 U.S.C. § 3348(d)(1).

Defendants attack the FVRA from multiple angles, but each fails.  They first argue that if Section 3349c excludes Board-like entities from its scope, then the FVRA does not govern the IAF *at all*.  *See* ECF No. 40, at 8-10.  The upshot of this argument is that Section 3348(d)(1), which invalidates any action taken by an improperly appointed officer, would not apply either.  *See id.* at 9.  But this misreads the statute.  Section 3348(d)(1), which nullifies all actions taken by improperly appointed officers, expressly applies to "vacant office[s] to which . . . [Section] 3349c appl[ies]."  5 U.S.C. § 3348(d)(1).  In other words, the neutralizing effect of Section 3348(d)(1) *does* affect entities like the IAF Board.  Read in context and reduced to its simplest terms, "acting" officers who are not appointed through the FVRA's acting-appointment provisions lack authority to "perform[] . . . any function or duty of a vacant office."  *Id.*  Because the FVRA does not allow acting appointments to the IAF Board, any so-called acting officer on that Board is powerless to execute the responsibilities of that role.

Alternatively, Defendants contend that if Congress has not given the President a procedure for appointing acting officers to Board-like entities, then the Take Care Clause must provide one instead.  *See* ECF No. 40, at 6-7, 12-14.  They claim that this power stems from the President's

duty to "faithfully execute[]" the laws and the concomitant authority to "select those who [a]re to act for him under his direction." *Myers v. United States*, 272 U.S. 52, 117 (1926). No one disputes that the President shoulders the burden of enforcing the country's laws. But Defendants would have the court interpret the Take Care Clause in a manner that flouts the FVRA, ignores some of the Framers' chief concerns about concentrated power, and jeopardizes other provisions of the Constitution—the very document that gives life to the Take Care Clause.

The notion that the President always possesses "inherent" Article II power to appoint acting officials is both novel and wrong. Even Judge Rao, who largely sided with Defendants on their request for an emergency stay, "agree[d] with [her] colleagues that this argument is unlikely to succeed because the text and structure of the Constitution strongly suggest the President has no inherent authority to appoint officers of the United States, like IAF Board members, outside the strictures of the Appointments Clause." *Aviel*, 2025 WL 1600446, at *4 n.1 (Rao, J., dissenting). Neither the Constitution nor the courts have ever recognized such a power. It is well-settled law that "[t]he Appointments Clause prohibits the appointment of principal officers without the advice and consent of the Senate." *Id.* at *2 (Katsas, J., concurring). "Such consent 'is a critical structural safeguard' against presidential overreach" and is "a feature of our constitutional system, not a bug." *Id.* (quoting *SW Gen., Inc.*, 580 U.S. at 293). "Given these specific checks and balances regarding appointments, it is unlikely that the Take Care Clause gives the President unfettered discretion to designate acting principal officers with[out] . . . Senate confirmation." *Id.*

Defendants' contrary position creates numerous, significant problems. To begin, if the President has the power to appoint acting officials to any principal office by default, then the FVRA would be utterly meaningless. There would be no utility in passing a statute to govern temporary appointments when the President already inherently possesses that power. Defendants

insist that their reading does not render the FVRA superfluous because the President's "inherent authority to designate acting board members" only exists "'in [the] absence of either a congressional grant or denial of authority.'"  ECF No. 40, at 10 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).[9]  But that makes no sense. Under Defendants' view, the FVRA does nothing more than give the President permission to do what he already has permission to do.  If "inherent authority" acts as a universal backstop for appointing acting officers, it would presumably enable the President to fill any vacancy he wants *regardless* of what Congress has said.  Defendants' position also betrays an internal inconsistency. They may not tout the authoritative effect of the Take Care Clause but simultaneously concede that it retreats when convenient for their argument.  Either the Take Care Clause controls, or it does not—Defendants cannot have it both ways.

On a far more concerning level, Defendants' argument practically obliterates the Appointments Clause and its requirement that all principal officers receive the Senate's advice and consent.  U.S. Const., art. II, § 2, cl. 3.  Assuming Defendants' assertions about the breadth of executive-appointment power are correct, it is unclear what purpose the Appointments Clause serves.  If the President can appoint an "acting" principal officer to a vacant position without *any* time limitations on that appointment, then there would be no reason to require the Senate's approval in the first place.  Theoretically, a President could appoint an acting officer indefinitely— without Senate confirmation—and then never nominate a permanent appointee for that position.

---

[9] Defendants quote *Youngstown* as the only source that supports this proposition, *see* ECF No. 40, at 10, but the relevant quote comes from one of the five separate *Youngstown* concurrences, not the majority opinion.

The "acting" officer would functionally operate as a permanent one for however long the President chooses.

Defendants try to assuage this concern by asserting that "[Mr.] Marocco's designation [is] not intended to be permanent," ECF No. 40, at 12, but that is cold comfort when the logical extension of their position has no limiting principle, *see Aviel*, 2025 WL 1009035, at *9 ("When the court pressed Defendants' counsel for a limiting principle at oral argument, Defendants had no response—convincing or otherwise.  The best they could offer was that the government had no intention of installing an acting principal indefinitely.  But Defendants could not deny that such an outcome *would be permissible* under their reading of the Constitution." (emphasis added)).  Indeed, Defendants claim that the President "must be able to 'select those who [are] to act for him' . . . *until* the Senate confirms a permanent replacement."  ECF No. 40, at 12 (alteration in original) (emphasis added) (quoting *Myers*, 272 U.S. at 117).  If the President fears that his permanent nominee will not survive Senate confirmation, he could simply forgo the nomination altogether and leave his "temporary" officer of choice in place for weeks, months, or even years.  Surely, the Framers did not intend to allow such a glaring workaround to explode their carefully crafted safeguard against unfettered appointment power.

Finding themselves in a constitutional hole, Defendants continue digging.  Perfectly content to cast aside the Appointments Clause, their argument runs headlong into yet another provision: the *Recess* Appointments Clause.  This clause permits the President "to fill up all Vacancies that may happen during the Recess of the Senate" until the end of the next Senate session.  U.S. Const., art. II, § 2, cl. 3.  But if the President *always* has the power to make temporary (or potentially indefinite) appointments without Senate approval, why did the Framers carve out a narrow exception for appointing temporary officers *during* a Senate recess?  The obvious answer,

which Defendants prefer to ignore, is that the President lacks inherent authority to appoint acting officers whenever he chooses. Instead, the Framers gave the President limited, emergency-appointment powers during a Senate recess because he *lacks* such powers when the Senate is in session. The opposite conclusion would render the Recess Appointments Clause mere surplusage. *See Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect[.]").

Defendants' reasoning essentially puts the Constitution at war with itself. To adopt their expansive (and groundbreaking) interpretation of one constitutional clause, the court would have to trample on two others. Their gripe is therefore not with this court, or even with Congress; it is with the Constitution. To rule in Defendants' favor and allow the Take Care Clause to override the Appointments Clause (and reduce the Recess Appointments Clause to worthless text) is both impossible and dangerous. "The Framers 'had lived under a form of government that permitted arbitrary governmental acts to go unchecked,' and they knew that liberty could be preserved only by ensuring that the powers of Government would never be consolidated in one body." *SW Gen., Inc.*, 580 U.S. at 317 (Thomas, J., concurring) (citation omitted) (quoting *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 959 (1983)). For that reason, the Framers enshrined in the Appointments Clause "'an excellent check upon a spirit of favoritism in the President' and a guard against 'the appointment of unfit characters.'" *Id.* at 293 (majority op.) (quoting The Federalist No. 76, at 457 (C. Rossiter ed. 1961) (A. Hamilton)). Contrary to Defendants' assertions, granting the President unfettered discretion to appoint who he pleases at the expense of fundamental checks and balances would not be faithful to the Constitution—it would enable the very "eighteenth[-]century despotism" the Framers worked so desperately to prevent. *Freytag*, 501 U.S. at 883.

As the Supreme Court has recognized, the Appointments Clause naturally counterbalances the potential abuse of the Take Care Clause. *See Freytag*, 501 U.S. at 880 ("Because it articulates a limiting principle, the Appointments Clause does not always serve the Executive's interests."). That is not a flaw; it is by design. "The structural interests protected by the Appointments Clause are not those of any one branch of Government[,] but of the *entire Republic*." *Id.* (emphasis added). Defendants view the strictures of the Appointments Clause as an inconvenience to be cast aside, rather than the "significant structural safeguard[]" that it is. *Edmond*, 520 U.S. at 659.[10] That is a frightening proposition this court will not entertain. Mr. Marocco's "acting" appointment to the IAF Board contravenes, rather than honors, Article II. His appointment and subsequent attempt to fire Ms. Aviel were therefore null and void.

### 2.    Whether President Trump had the power to terminate Ms. Aviel

"Absent relevant legislation" to the contrary, "the power to remove [an officer] is held by the appointing authority, and only by the appointing authority." *Nat'l Treasury Emps. Union v. Reagan*, 663 F.2d 239, 247 (D.C. Cir. 1981). As explained above, IAF Board members are principal officers within the meaning of the Appointments Clause. *See supra* Part IV.A.1. Because that is so, the President possesses the power to remove them from office. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020) (explaining that "'the power of appointing, overseeing, and controlling those who execute the laws' . . . generally includes the ability to remove [them]" (quoting 1 Annals of Cong. 463 (1789))); Tr. of Status Conf., at 18:3-6 (D.D.C. Mar. 19, 2025) (Counsel for Ms. Aviel: "We are not arguing that the [P]resident lacks

---

[10] Tellingly, Defendants do not even reference the Appointments Clause once in their cross-motion for summary judgment or in their reply. *See generally* ECF Nos. 40, 45.

authority to remove members of the [B]oard.  We grant that the case law allows that and that the [B]oard members can be removed."); ECF No. 19, at 6.

But while the President retains the power to appoint (and terminate) principal officers, Congress controls the methods for appointing *inferior* officers.  *Arthrex, Inc.*, 594 U.S. at 12-13. It "may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'"  *Id.* (quoting U.S. Const., art. II, § 2, cl. 2).  In the case of the IAF, Congress specified that "[t]he chief executive officer of the Foundation shall be a [p]resident who shall be appointed by the Board of Directors on such terms as the Board may determine."  22 U.S.C. § 290f(*l*)(1).  The parties agree that the IAF's president is an inferior officer within the meaning of the Appointments Clause because she is "subject to [the] supervision and oversight" of the Board—the IAF's principal officers.  *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021); *see* ECF No. 40, at 14 ("To be sure, as president of the Foundation, [Ms.] Aviel is an inferior officer[.]").

The IAF's organic statute makes clear that Congress intentionally gave the Board, not the President of the United States, the power to hire and fire the Foundation's president.  *See Free Enter. Fund*, 561 U.S. at 493 ("If Congress [vests appointment power in a department head], it is ordinarily the department head, rather than the President, who enjoys the power of removal."). Indeed, pursuant to the IAF's bylaws, the Board controls virtually every aspect of the president's responsibilities.  *See* ECF No. 5-5, at 4 ("The [p]resident shall be . . . responsible to and under the general direction of the Board[,] . . . shall have general supervision, direction[,] and control of the . . . Foundation in accordance with policies established by the Board, and shall exercise all powers and authorities of the Foundation except as the Board may otherwise provide.").

At the preliminary-injunction stage, Defendants offered little in response to counter the notion that only the IAF Board could terminate Ms. Aviel. *See* ECF No. 22, at 13.[11] That made good sense in light of the Appointments Clause, the IAF statute, and settled Supreme Court precedent. But at summary judgment, Defendants change tack. They now claim that "if the President does not have the authority to designate acting Board members, then the President must have the authority to remove [Ms.] Aviel himself" pursuant to his inherent Article II powers. ECF No. 40, at 12. In other words, President Trump's inability to appoint Mr. Marocco enables him to skip past the IAF's principal officers to terminate its inferior officer. The court disagrees for two reasons.

First, Defendants' reformulated argument is revisionist history. President Trump purported to fire Ms. Aviel on February 26, *before* Mr. Marocco tried to do the same on February 28. *See* ECF No. 35-6 (February 26, 2025 email from Mr. Morse to Ms. Aviel stating: "At the direction of President Donald J. Trump, I am writing to inform you that your position on the Inter-American Foundation is terminated, effective immediately"); ECF No. 35-1 ¶ 26; ECF No. 40-2 ¶ 26. Her earnings statement and notice of personnel action both confirmed that her final day of employment was February 26. *See* ECF Nos. 35-7, 35-8. The President's attempted termination was therefore not a backstop; it was the original plan. This chronology is critical because Defendants advance their restructured argument as a conditional: *if* the President cannot appoint a principal officer to do his bidding, *then* he must be able to take matters into his own hands because he cannot carry

---

[11] The government also did not dispute this same argument in a separate removal case, *Brehm v. Marocco*, No. 25-CV-660, 2025 WL 1640193 (D.D.C. June 10, 2025). *See* Tr. of TRO Hr'g, at 9:5-9, *Brehm*, No. 25-CV-660 (D.D.C. Mar. 11, 2025) ("[It]'s clear in our papers, and I think not even disputed in the Defendants' papers, that the law is that an inferior officer is removable by the authority that appointed him, but nobody else—unless Congress alters that default rule.").

out his policy goals. *See* ECF No. 40, at 13; ECF No. 45, at 6 ("The President has the authority to remove [Ms.] Aviel from her position as president of the Foundation *if and only if* (1) the Foundation lacked a Board, and (2) the President lacked the authority to temporarily designate [an acting Board member]." (emphasis added)).

Second, even if the timeline of events were reversed, Defendants' argument would still fail. They rely on a short passage in *Seila Law* for the proposition that the President is only barred from removing "inferior officers with limited duties and no policymaking or administrative authority." ECF No. 40, at 14 (quoting *Seila L.*, 591 U.S. at 218). Because Ms. Aviel wields some executive power as the Foundation's president, Defendants assert that she must be removable by the President. *Id.* But Defendants cite *Seila Law* out of context and in a manner that conflicts with other Supreme Court precedent. The cited portion of *Seila Law* addressed the constitutionality of *tenure protections* for certain executive officers. *See Seila L.*, 591 U.S. at 217 ("We have recognized a second exception for inferior officers in two cases[:] . . . [i]n *Perkins*, we upheld tenure protections for a naval cadet-engineer[,] [a]nd, in *Morrison*, we upheld a provision granting good-cause tenure protection to an independent counsel[.]" (citation and emphasis omitted)). It did not purport to alter the rule from *Free Enterprise Fund*: "[i]f Congress [vests appointment power in a department head], it is ordinarily the department head, rather than the President, who enjoys the power of removal." 561 U.S. at 493. Whether Congress may codify removal protections for inferior officers—the issue referred to in the *Seila Law* passage—differs from the question of who possesses default removal authority under the Appointments Clause. As the Supreme Court has maintained for centuries, "the Constitution authorizes Congress to vest [appointment and removal power] in the head of [a] department." *In re Hennen*, 38 U.S. at 260. In those

circumstances, "the President has certainly no power to remove" an individual lawfully appointed pursuant to that authority. *Id.*

Defendants next argue that if Ms. Aviel is the highest-ranking executive left at the Foundation, then she must be answerable to the President. ECF No. 40, at 14. But the same could be said of any inferior officer serving at the pleasure of a principal officer once the principal officer is terminated. Defendants' position has worrisome implications: the President could easily circumvent the general restriction on firing inferior officers by simply firing the principal officers first. That makes no sense. The Appointments Clause, *Free Enterprise Fund*, and established law would mean little if they were susceptible to such a basic loophole. The President may not fire an otherwise-unfireable officer by first terminating her superiors. If the Supreme Court's statements in *Free Enterprise Fund* mean what they say, the power to appoint confers the power to remove. Here, the Board is undisputably "the appointing authority." *Nat'l Treasury Emps. Union*, 663 F.2d at 247. Accordingly, "the power to remove is held by the [Board], and only by the [Board]." *Id.* Because Defendants' argument defies this bedrock principle, the court concludes that President Trump lacked the authority to unilaterally terminate Ms. Aviel.[12]

---

[12] In her dissent from the denial of an emergency stay, Judge Rao concluded that "the President's removal of [Ms.] Aviel was lawful," but did not condition that conclusion on Mr. Marocco's inability to fire Ms. Aviel (in the way that Defendants do here). *Aviel*, 2025 WL 1600446, at *3 (Rao, J., dissenting). Instead, Judge Rao determined that the IAF president is "removable at will by *either* the Board *or* the President." *Id.* at *4 (emphases added). In her view, "[n]othing in the IAF statute, our caselaw, or the Constitution . . . renders the Board's removal authority exclusive or forecloses the President's ability to remove [Ms. Aviel]." *Id.* That conclusion, however, runs counter to Supreme Court precedent instructing that the power of removal is, by default, reserved for the appointing authority. *See In re Hennen*, 38 U.S. at 260 ("[T]he Constitution has authorized Congress, in certain cases, to vest [the] power [of removal] in the President alone, in the Courts of law, or in the heads of departments; and all inferior officers appointed under each, by authority of law, *must hold their office at the discretion of the appointing power*." (emphasis added)); *id.* (explaining that when inferior officers are subject to appointment and removal by a department

*(continued on next page)*

*    *    *

Defendants' position is riddled with constitutional contradictions. The court was unpersuaded by Defendants' novel and expansive Article-II argument at the preliminary-injunction stage, and it remains unpersuaded now. Several weeks' worth of time has not altered the court's understanding of the FVRA or the President's obligations under the Appointments Clause. Nor have intervening developments assuaged the court's concerns over the dangers of unfettered appointment and removal power. Because siding with Defendants would contravene the FVRA, the Appointments Clause, and Supreme Court precedent, the court concludes that Ms. Aviel's alleged termination was unlawful.

### B.    Remedies

Having settled the illegality of Ms. Aviel's purported termination, the court turns to remedies. Defendants claim that, even assuming the wrongfulness of their actions, the court is powerless to do anything about it. ECF No. 40, at 14-24. The court disagrees.

Ms. Aviel requests three types of relief, either concurrent with or in the alternative to each other. She seeks a declaration clarifying that she remains the lawful president of the IAF, ECF No. 35, at 24-27, an injunction reinstating her to that position, *id.* at 27-32, and—in the absence of

---

head and not the President, "the President certainly has no power to remove."). That precedent is rooted in the Appointments Clause, which provides the default rule that the destiny of inferior officers is controlled by *Congress*, not the President. When Congress chooses to put the fate of an inferior officer in the hands of "the President alone, in the Courts of Law, or in the Heads of Departments," U.S. Const., art. II, § 2, cl. 2, "it is ordinarily the [appointing authority] . . . who enjoys the power of removal," *Free Enter. Fund*, 561 U.S. at 493. Even if the Supreme Court has retreated from this principle in recent years, *see Seila L.*, 591 U.S. at 228, this court must give that Court "the prerogative of overruling its own decisions," "even if [this] lower court thinks [a] precedent is in tension with 'some other line of decisions,'" *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

declaratory or injunctive relief—mandamus relief affording the same remedy, *id.* at 32.  The court addresses each in turn.

### 1.    Declaratory relief

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, any court presiding over an "actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  *Id.* § 2201(a).  Whether to grant such a remedy "always rests within the sound discretion of the court," *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980), and doing so is appropriate if (1) "the judgment will serve a useful purpose in clarifying the legal relations at issue," or (2) "the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding," *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)).

Declaratory and injunctive relief are both forms of equitable remedies.  *See Samuels v. Mackell*, 401 U.S. 66, 70 (1971).  For that reason, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment."  *Id.* at 73.  Even so, the Supreme Court has disclaimed the "suggest[ion] that a declaratory judgment should never be issued . . . if it has been concluded that injunctive relief would be improper."  *Id.*  Indeed, "declaratory relief may be granted 'whether or not further relief is or could be sought.'"  *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1366 (D.C. Cir. 2023) (quoting 28 U.S.C. § 2201).

For the most part, this distinction makes little difference because—as explained below— Ms. Aviel *is* entitled to injunctive relief.  *See infra* Part IV.B.2.  The only wrinkle is that President Trump, one of the named Defendants, is likely beyond the reach of the court's injunctive powers.

*See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) ("[W]e are fully satisfied that this court has no jurisdiction of a [suit] to enjoin the President in the performance of his official duties[.]").  This case therefore presents the rare, "unusual circumstance[]" where the plaintiff has a "strong claim for relief" but an injunction would be "particularly intrusive or offensive."  *Samuels*, 401 U.S. at 73.  Therefore, while the court declines to issue injunctive relief against the President, it concludes that the legal violation here is so obvious as to warrant a declaratory judgment.  By confirming the illegality of Ms. Aviel's purported termination, such relief "clarif[ies] the legal relations at issue" and "afford[s] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York*, 636 F. Supp. 3d at 31 (quoting *Glenn*, 222 F. Supp. 3d at 36).  Accordingly, the court will issue a declaratory judgment as to all Defendants that: (1) Ms. Aviel's alleged firing violated the Appointments Clause and the FVRA; (2) Ms. Aviel's alleged termination was without legal effect and she remains the lawful president of the IAF, and (3) Mr. Marocco was not properly appointed as an acting IAF Board member and lacked any authority to take actions in that role.

## 2.    Injunctive relief

As a threshold matter, Defendants argue that this court lacks the equitable power to reinstate Ms. Aviel to her position as president of the IAF.  ECF No. 40, at 15-16.  The court disagrees for several reasons.  First, Ms. Aviel technically does not need to be "reinstated" because she was never terminated in the first place.  As explained thoroughly above, both attempts to fire Ms. Aviel (first by President Trump and then by Mr. Marocco) had no legal effect.  *See supra* Part IV.A.  Second, even assuming that reinstatement is necessary, numerous other courts have concluded that this precise remedy is available for wrongfully terminated public officials.  *See, e.g.*, *Grundmann v. Trump*, 770 F. Supp. 3d 166, 187 (D.D.C. 2025); *Spicer v. Biden*, 575 F. Supp.

3d 93, 97 (D.D.C. 2021); *Davis v. Billington*, 51 F. Supp. 3d 97, 114 (D.D.C. 2014).  This court would hardly be breaking new ground in affording the same relief to Ms. Aviel.  Third, the *en banc* D.C. Circuit rejected this precise argument in a similar case, holding that the government was unlikely to succeed in showing "that there is no available [reinstatement] remedy for [allegedly unlawfully terminated principal officers]."  *Harris*, 2025 WL 1021435, at *2.  As Judge Katsas explained in concurring in the denial of an emergency stay in *this* case, "our *en banc* order [in *Harris*] is the last word on [whether reinstatement is an appropriate remedy if the removals at issue are unlawful] until either the Supreme Court or a merits panel of [the D.C. Circuit] more definitively resolves the remedies issues."  *Aviel*, 2025 WL 1600446, at *2 n.2 (Katsas, J., concurring).  Finally, multiple D.C. Circuit merits panels have concluded that a court may "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal . . . reappointment."  *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)).

Having settled that the court *may* grant Ms. Aviel the injunctive relief she seeks, the court next addresses whether she has satisfied the necessary factors to receive it.  To earn a permanent injunction, a plaintiff must demonstrate (1) that she has "suffered an irreparable injury"; (2) that the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) that the "balance of hardships between the plaintiff and defendant" warrants a remedy in equity; and (4) that "the public interest would not be disserved by a permanent injunction."  *Anatol Zukerman*, 64 F.4th at 1364 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  The third and fourth factors merge where the government is the opposing party.  *Id.*

*a.    Irreparable harm*

Irreparable harm is "a high standard." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  To satisfy it, a plaintiff must show that the alleged injury is "both certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).  It must also "be beyond remediation," meaning that "[t]he possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (quoting *Wis. Gas Co.*, 758 F.2d at 674).  As was the case at the preliminary-injunction stage, Ms. Aviel has met her burden.

Ms. Aviel claims several significant harms, chief among them the loss of her statutorily guaranteed position and the resulting destruction of the agency she leads.  ECF No. 35, at 27-28.  Defendants, meanwhile, argue that she impermissibly conflates injuries to herself with injuries to the IAF, and that her fears about the IAF's dismantling are unfounded.  ECF No. 40, at 17-18.  The court agrees with Ms. Aviel.

Normally, the loss of employment alone is insufficient to show irreparable harm because the plaintiff can be made whole through backpay and reinstatement.  *See Sampson v. Murray*, 415 U.S. 61, 91-92 (1974) (rejecting a claim of irreparable injury predicated on an employee's "loss of income").  Instead, the plaintiff must demonstrate that her firing presents a "genuinely extraordinary situation" before she may receive an injunction.  *Id.* at 92 n.68.  Here, that condition is met because Ms. Aviel alleges more than the loss of ordinary employment.  Instead, she claims that she has lost the ability to fulfill a high-ranking, public-servant role to which she is entitled.  With it, she has also lost the power to guide a half-century-old independent agency that "serves the United States' strategic interests throughout Latin America"; "engages with community

33

leaders, innovators, and entrepreneurs working to promote prosperity, peace, and democracy in the region"; and has "funded $945 million in small grants to nearly 6,000 local organizations across nearly every Latin American and Caribbean country."  ECF No. 35-1 ¶¶ 1, 3-4; ECF No. 40-2 ¶¶ 1, 3-4.

Contrary to Defendants' assertions, numerous other judges of this court have held that the loss of the statutory right to function in a high-ranking public office *is* an irreparable harm.  *See, e.g.*, *Harris v. Bessent*, 775 F. Supp. 3d 164, 185-86 (D.D.C. 2025); *Wilcox v. Trump*, 775 F. Supp. 3d 215, 235-36 (D.D.C. 2025); *Grundmann*, 770 F. Supp. 3d at 187-88.[13]  Losing the chief executive role at an independent agency like the IAF does not compare to losing one's job at the Library of Congress, *see Davis v. Billington*, 76 F. Supp. 3d 59, 64-66 (D.D.C. 2014), in the Foreign Service, *see Farris v. Rice*, 453 F. Supp. 2d 76, 79-81 (D.D.C. 2006), or as part of the General Services Administration, *see Sampson*, 415 U.S. at 90-92.

But in addition to losing her right to function, Ms. Aviel points to an additional, uniquely irremediable harm because her fate is intertwined with the IAF's very survival.  ECF No. 35, at 28-29.  Preventing Ms. Aviel from acting in her lawful role would enable Defendants to reduce the organization to ash.  Prior to the court's granting of a preliminary injunction, Defendants were hours away from firing every single IAF employee (except one).  ECF No. 35-1 ¶ 32; ECF No. 40-2 ¶ 32.  By that time, they had already canceled all of the Foundation's grants (except one) and had every intention of razing the agency to the ground.  ECF No. 35-1 ¶¶ 33-34; ECF No. 40-2 ¶¶ 33-34; *see* ECF No. 35-2 ¶ 26.  If the IAF practically ceases to exist, then Ms. Aviel's unique,

---

[13] While the Supreme Court recently issued a stay in a pair of those cases (*Harris* and *Wilcox*), the stay was premised on the Court's judgment that the removals of the two plaintiffs were likely lawful.  *See Wilcox*, 145 S. Ct. at 1415.  Here, there is no doubt under the Constitution and prevailing Supreme Court precedent that the removal was unlawful.

statutorily protected role will vanish with it.  If that were to happen, "any harm suffered by the [official is] plainly irreparable" because reinstatement is no longer possible.  *English v. Trump*, 279 F. Supp. 3d 307, 335 (D.D.C. 2018); *cf. Davis*, 76 F. Supp. 3d at 65 ("The plaintiff fails to [show irreparable harm because] he has no concrete proof that the vacancy . . . or some other comparable position will not be available when this matter is ultimately resolved.").

*Berry v. Reagan* is the most instructive comparison.[14]  There, President Jimmy Carter had appointed the plaintiffs as commissioners to the Commission on Civil Rights, "a temporary, bipartisan agency established by Congress."  No. 83-CV-3182, 1983 WL 538, at *1 (D.D.C. Nov. 14, 1983).  The Commission was tasked with "investigat[ing], study[ing], and collect[ing] information regarding deprivations of both civil rights and equal administration of justice."  *Id.*  The Commission was statutorily set to expire in November 1983.  *Id.* at *1 n.1.  One month before the Commission's expiration, President Reagan terminated the plaintiffs.  *Id.* at *1.  The plaintiffs sued, arguing that the President lacked authority to remove them from their roles.  *Id.* at *2.  The district court agreed and enjoined their removal.  *Id.* at *6.  On irreparable harm, the court held that the plaintiffs had shown an injury "sufficient in kind and degree to override the[] factors cutting against the general availability of preliminary injunctions [such as disruption of the administrative process] in Government personnel cases."  *Id.* at *5 (second alteration in original) (quoting *Sampson*, 415 U.S. at 84).  It explained that "[t]he irreparable nature of this injury is

---

[14] Defendants grumble that *Berry* is "unpublished" and "more than forty years" old.  ECF No. 40, at 19.  But it has been cited repeatedly by other judges of this court in similar cases.  *See, e.g.*, *English*, 279 F. Supp. 3d at 334; *Dellinger v. Bessent*, 766 F. Supp. 3d 57, 70 (D.D.C. 2025); *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-CV-542, 2025 WL 1454010, at *30 (D.D.C. May 21, 2025); *U.S. Inst. of Peace v. Jackson*, No. 25-CV-804, 2025 WL 1428641, at *41 (D.D.C. May 19, 2025).  Like the authors of those other opinions, this court finds *Berry* and its reasoning much more persuasive than Defendants' attempts to distinguish it.

evident by the obviously disruptive effect the denial of preliminary relief will likely have on the Commission's final activities." *Id.* (emphasis omitted). Because the Commission would cease to exist before litigation could run its course, the court confidently determined that the plaintiffs' harm was irremediable. *Id.*

So too, here. Defendants' attempt to distinguish *Berry* is unconvincing. They assert that, here, unlike in *Berry*, "[t]he Foundation will continue to operate." ECF No. 40, at 19-20. The court finds this remarkably hard to believe. There are no illusions as to Defendants' ultimate goal. Before Ms. Aviel sought preliminary-injunctive relief, they had already stripped the Foundation to its studs and were days from extinguishing it altogether. To claim that the IAF will continue "operating" with a single grant (which is set to expire) and a single employee (the Foundation's information-security chief) is like saying that a sailboat with no sails, oars, or wheel is still functional because it will not sink. The court will not blind itself to the glaringly obvious: the danger to the IAF's existence is all too real.[15]

Even putting aside the harm that derives directly from losing the statutory right to function, the compounded injury of permanently losing the organization Ms. Aviel has dedicated her career to—an organization she is legally entitled to run—transforms the stakes. Because her inability to stay in her post would almost certainly condemn the IAF to destruction, her injury in the absence of injunctive relief would be irreversible.

---

[15] At the preliminary-injunction stage, this court directly compared Ms. Aviel's case to *Brehm*. In that case, the court held that a similarly situated agency president could *not* show irreparable injury because "the [c]ourt could remedy any harm by reinstating him to his position and ordering backpay." Order at 5, *Brehm*, No. 25-CV-660 (D.D.C. Mar. 11, 2025). The *Brehm* court even contrasted this case, writing: "the mere possibility that defendants will follow the *same path as they did with the IAF* falls short of the 'imminent threat of injury required to grant a TRO.'" *Id.* at 7 (emphasis added) (quoting *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009)). The reason why there was no irreparable injury in *Brehm* is exactly why there *is* irreparable injury here.

### b. Available remedies at law

In the wrongful-termination context, irreparable injury and the availability of remedies at law tend to collapse into one another. *See Grundmann*, 770 F. Supp. 3d at 187 (quoting *Wilcox*, 775 F. Supp. 3d at 235 n.20). The same reasons why Ms. Aviel's unique injuries are irremediable explain why other remedies, like monetary damages, cannot cure the unlawful conduct. A paycheck does not restore her ability to lead an important, strategic, independent agency. Nor does it guarantee the continued existence of her role or the agency in a spectral state. As a result, remedies at law are plainly insufficient.

### c. Balance of the equities and the public interest

Finally, the balance of the equities and the public interest heavily favor granting a preliminary injunction. As always, there is a paramount public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Here, neither President Trump nor Mr. Marocco had the authority to remove Ms. Aviel. It would be a grave disservice to the public and to the rule of law to allow that illegal act to go unanswered. *See id.* at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

Defendants repeatedly argue that the public's interest in allowing the President to carry out his "electoral mandate" overrides any countervailing considerations. ECF No. 40, at 20. In their view, that means he must be able to do what he wishes with the agency and its leadership. But the IAF is a congressionally created organization. And Congress directed that the Foundation may not use appropriated funds to "eliminate . . . or downsize" the agency without "prior consultation . . . with the appropriate congressional committees" and "a detailed justification for

any proposed action." Further Consolidated Appropriations Act, Div. F, 138 Stat. at 843-44. It is unclear how firing nearly every employee and terminating nearly every grant of an agency dedicated to strengthening U.S.-Latin American relations serves the public interest. At its core, the IAF's mission is dictated by Congress. Perhaps Defendants have forgotten that Congress is a *co-equal* branch of government. When the Constitution requires the President to faithfully execute the laws of the United States, that includes laws passed by Congress. The Take Care Clause is not a license to enforce one administration's policy objectives by ignoring established law. That disrespects the legislature, the independence of federal agencies, and the Constitution itself.

Defendants also try to frame their actions as a service to the American people. They say that President Trump must be able to carry out his policy goals by installing any individual he chooses to various posts within government. But that is an uncomfortably restricted view of the public interest. "The Framers understood . . . that by *limiting* the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884 (emphasis added). And as the Supreme Court has made clear, the significant structural safeguard of the Appointments Clause does not protect the interests "of any one branch of Government[,] but of the *entire Republic*." *Id.* at 880 (emphasis added). Defendants would do well to remember that.

*    *    *

For virtually all the same reasons why Ms. Aviel was entitled to a preliminary injunction before, she is entitled to a permanent injunction now. In an abundance of caution, however, the court modifies the scope of its prior injunction in accordance with D.C. Circuit guidance and Supreme Court precedent to exclude the President of the United States.

### 3.    Mandamus relief

In the alternative, Ms. Aviel seeks a writ of mandamus effectively reinstating her to her position.  ECF No. 35, at 32.  A judicial writ is one of "the most potent weapons in the judicial arsenal."  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Will v. United States*, 389 U.S. 90, 107 (1967)).  It is only appropriate if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."  *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021) (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62 (D.C. Cir. 2010)), *cert denied sub nom.*, *Muthana v. Blinken*, 142 S. Ct. 757 (2022).

Because mandamus is only proper where there is no other adequate remedy available, and because the court concludes that an injunction is clearly warranted, the court need not issue mandamus relief.  That said, for the same reasons discussed at length in this opinion, mandamus relief *would* be proper if injunctive relief were to become unavailable.  The remaining two requirements of mandamus relief are satisfied here: (1) Ms. Aviel has a "clear right to relief" under the FVRA, Supreme Court precedent, and the Appointments Clause, and (2) Defendants have a "clear duty" to uphold their commitment to the law.  *See id.*  As other judges of this court have meticulously explained, requests for "reinstatement" have historically been "styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity."  *Wilcox*, 775 F. Supp. 3d at 237 n.22.  And "[t]o the extent that English equity courts declined to issue injunctions reinstating officials to their positions, they likely did so because the King's Bench, a court of law, would readily issue mandamus instead."  *Harris*, 775 F. Supp. 3d at 182.  Even the predecessor court to the D.C. Circuit observed: "[W]hen a person in office *de jure* [and] *de facto* is interfered with . . . it is not only proper, but best, to settle the question by

39

mandamus." *Kalbfus v. Siddons*, 42 App. D.C. 310, 320 (D.C. Cir. 1914) (quoting *Lawrence v. Hanley*, 47 N.W. 753, 754 (Mich. 1891)).  The upshot of this history is that, when the right to relief is glaringly apparent in a removal case, the plaintiff is entitled to *some* form of remedy that prevents her removal.  Whether that relief takes the form of an injunction or a writ of mandamus is less important than whether it issues at all.

## V.    CONCLUSION

For the foregoing reasons, the court will grant Ms. Aviel's motion for summary judgment, ECF No. 35, and deny Defendants' cross-motion for summary judgment, ECF No. 40.  A contemporaneous order will issue.

_____

LOREN L. ALIKHAN
United States District Judge

Date:   August 14, 2025